SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  PART 54

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
PALESTINE MONETARY AUTHORITY,

                          Plaintiffs,                                    DECISION & ORDER
                                                                         INDEX No.: 107777/05
               - against -

DAVID STRACHMAN, as administrator of the Estate
of YARON UNGAR, PROFESSOR MEYER UNGAR,
JUDITH UNGAR, RABBI URI DASBERG, JUDITH
DASBERG, individually and in their capacity as legal
guardians of YISHAI UNGAR & DVIR UNGAR,
AMICHAI UNGAR, DAFNA UNGAR & MICHAEL
COHEN, & THE BANK OF NEW YORK,[1]

                          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
THE ESTATE OF YARON UNGAR, by and through the
administrator of his Estate, DAVID STRACHMAN,
PROFESSOR MEYER UNGAR, JUDITH UNGAR,
RABBI URI DASBERG, JUDITH DASBERG, indivi-
dually and in their capacity as legal guardians of YISHAI
UNGAR & DVIR UNGAR, AMICHAI UNGAR, DAFNA
UNGAR & MICHAEL COHEN,

               - against -                                    INDEX No.: 105521/05

THE PALESTINIAN AUTHORITY, a/k/a, THE PALESTIN-
IAN INTERIM SELF-GOVERNMENT AUTHORITY, THE
PALESTINE LIBERATION ORGANIZATION, YASSER
ARAFAT, JIBRIL RAJOUB, MUHAMMED DAHLAN,
AMIN AL-HINDI, TAWFIK TIRAWI, RAZI JABALI,
HAMAS-ISLAMIC RESISTANCE MOVEMENT, a/k/a,
HARAKAT AL-MUQAWAMA AL-ISLAMIYYA, AB-
DEL RAHMAN ISMAIL ABDEL RAHMAN GHANIMAT,
JAMAL ABDEL FATAH TZABICH AL HOR, RAED
FAKHRI ABU HAMDIYA, IBRAHIM GHANIMAT, &

---

[1] The Order to Show Cause, originally, named David Strachman, as Administrator of the Estates of Yaron Ungar and Erfat [sic] Ungar, and the Bank of New York.  Upon motion of defendants the remaining interested and necessary parties were added to the action.  Also, the estate of Efrat Ungar was removed from the caption since it no longer was a party to the action.

IMAN MAHMUD HASSAN FUAD KAFISHE,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

KORNREICH, J.:

## FACTS

### A. Underlying Judgment

The instant matter involves a judgment for $116,000,000 rendered by the United States

District Court, District of Rhode Island, in the matter of *Estates of Yaron Ungar et al. v. The*

*Palestinian Authority et al.,* C.A. NO. 00105L (Hon. Ronald R. Lagueux). The Palestinian

Monetary Authority ("PMA") was not a named party in the action, and no judgment was

rendered against it.

The Federal judgment was domesticated in New York County under Index Number

105521/05. The Restraining Notice annexed to an information subpoena served upon the Bank

of New York, named the PMA, among others entities.

Additionally, an injunction was issued in Federal Court by Judge Lagueux providing:

> The Palestinian Authority and The Palestine Liberation Organization and
> their officers, agents, servants, employees, attorneys, partners, fiduciaries,
> and any natural or legal person in privity with them and/or acting in active
> concert and participation with them, are hereby prohibited, restrained and
> enjoined from withdrawing, selling, transferring, alienating, pledging,
> impairing, hypothecating, encumbering, concealing, secreting, trading,
> removing or in any way disposing of or effecting a disposition in, directly
> or indirectly, any and all assets of The Palestinian Authority and/or The
> Palestine Liberation Organization however titled (including without limitation
> all accounts, deposits, cash, shares, stock, credits, partnership rights or
> interests, equitable rights or interests, contractual rights, holdings, financial
> interests or real estate) located within the jurisdiction of the United States or
> of any State therein.

Counsel for the Strachman parties annexed a Notice of Injunction to the Federal restraining

order. It stated that the injunction applied to the "PA, PLO, PNA, Palestine Investment Fund ("PIF"), Palestine Pension Fund, Palestine Commercial Services Company, Palestine Pension Fund Insurance and Pension General Corporation, Palestine National Fund ("PNF"), Palestine Monetary Fund ("PMF"), SAMED PECDAR, *and PMA*." [emphasis added]. As a result of the Federal Notice of Injunction and the New York State Restraining Notice (Index No. 105521/05), both prepared by counsel for the Strachman parties, approximately $30,000,000 of wire transfers relating to PMA were placed in a "suspense account" by The Bank of New York ("BNY").

### *B. Instant Proceedings*

In response, PMA instituted an action (Index No. 107777/05) and brought an Order to Show Cause before Justice Fried on June 9, to determine, *inter alia*, if PMA was correctly named in the Notice of Injunction.[2] Justice Fried stated that he was being asked to construe the Federal Injunction, noted that the Federal court which issued the order was in a better position to do so, and determined that it, thus, was premature for a New York court to decide the merits of the restraint. He, nonetheless, adjourned the matter for briefing, discovery and oral argument, suggesting that the parties return to Federal court for clarification of its order.

PMA, then, brought an emergency order before Judge LaGueux on June 16, arguing that the Strachman parties had "sui sponte prepare[d] a notice of injunction that alter[ed], expand[ed], and radically change[d]" the court's injunction. Judge Lagueux found that BNY, which was not a party to the matter before him, was a necessary party and noted that the case was pending in New York and properly should be determined there. He, however, did state that he believed his

---

[2] At that proceeding, PMA stated that the Clerk of the court would not permit it to bring an emergency order under the index number assigned to the domesticated judgment. Consequently, they commenced a new action.

3

injunction was "absolutely clear" and that the questions to be decided, under the Federal order, were: 1) whether PMA was an agent of the PA; and 2) whether it held any funds belonging to the PA or PLO. Judge Lagueux, also, stated that these were factual issues best determined in New York.[3]

The matter came before this Court on June 30, 2005. PMA brought an Order to Show Cause seeking a "preliminary injunction directing The Bank of New York Company, Inc. [sic] to immediately release the block on all funds, resulting from transfer orders by the Palestine International Bank ("PIB") on behalf of the PMA and to honor all pending and future incoming and outgoing transactions by PMA through the PIB or any other agent designated by PMA."  In support of the application, George T. Abed, the Governor of PMA, submitted an affidavit.  He averred that PMA is the regulatory authority for all banks in the Palestinian territories and acts as the clearing house for all commercial banks in those territories. Mr. Abed further averred that PMA, through the Palestine International Bank ("PIB"), cleared all U.S. Dollar transactions with its correspondent bank in New York, BNY.  According to Mr. Abed, those transactions consisted of check clearances and inter-bank and personal money transfers and provided needed liquidity among private banks and individuals in the Palestinian Territories. Mr. Abed denied that PMA holds or manages any assets of the Palestinian Authority ("PA" or "PNA") or the Palestinian Liberation Organization ("PLO") and insisted that the funds in its possession consisted only of

---

[3] PMA argued BNY was restraining the monies pursuant to the Federal injunction.  The Strachman parties, on the other hand, contended that the money was restrained pursuant to the New York restraining notice, not the Federal injunction, specifically arguing, "in the state domestication case, these funds are being held.  Not because of this restraining order, but because of the restraining notice that was issued in New York." June 16 U.S.D.C., R.I., transcript, p. 27. Judge Lagueux repeatedly stated he did not know why BNY had frozen PMA transactions.

4

funds held on behalf of banks, and its own capital, bank reserves and employee pension funds. Moreover, Mr. Abed stated that the restraint on the funds is hindering commerce in the Palestinian Territories and could cause a banking crisis.

BNY did not oppose the application and stated it appeared only as a stakeholder.

The Strachman parties opposed the application and cross-moved for turnover "of all funds belonging to, received from, or held for the benefit of" PMA.[4]  They, also, moved to dismiss PMA's underlying complaint pursuant to CPLR 3211.  However, they failed to append the complaint to their motion, annexing only their answer, counterclaims and cross-claims; the Court, therefore, will not consider that portion of the motion seeking dismissal and denies that application without prejudice.  But, PMA has discontinued its action against BNY and, as a result, that portion of the case is dismissed.

The Strachman parties, in opposition to the Order to Show Cause and in support of their application for turnover, argue that PMA is an alter ego of the PA and PLO.  Moreover, they contend that, even were this not so, PMA is an agent of the PA pursuant to the Federal order.  In support of this argument, The Strachman parties have submitted, *inter alia*, a copy of the Oslo Accords, the treaty between Israel and the Palestinians permitting the establishment of PMA, and the Monetary Authority Law, the enabling statute creating the PMA.

The Court joined the action brought by PMA under Index Number 107777/05 with the action domesticating the Federal judgment, Index Number 105521/05.  The actions were then

---

[4] Additionally, they moved for turnover of PA and PLO funds.  PMA, however, has repeatedly stated that it is not one and the same as the PA or PLO and is not appearing for either party.  Thus, there is no opposition to the request for the turnover of PA and PLO funds.  However, since the motion was not served on the PA and PLO, the Court denied this application with leave to renew upon proper service on the interested parties.

adjourned to a short date for an emergency hearing to determine: the relationship of PMA to the PA and the ownership interests of the funds restrained by BNY. Due to the short date and the emergency nature of the hearing, the Strachman parties' request for extensive discovery, was denied, although they did receive discovery from BNY, which included all of the banking records regarding the money restrained. Both sides subsequently adjourned the hearing in order for needed witnesses to appear.

### C. Hearing

The hearing was held before the Court on August 3, 4, 5 and 6, 2005, at which the following witnesses testified: Mohammed Abu-Habsa, the Executive Director of the Banking Supervision Department of PMA;[5] Jessica Goodwin, Vice President and Group Manager of the Funds Transfer Division of BNY; Usama Mohamed Khader, General Manager of PIB; Dr. George T. Abed, Governor of PMA;[6] Leonard Fernelius, called by PMA as an expert in the establishment of central banks and in clearing house banking activity;[7] and Samuel Newman,

---

[5] Mr. Abu-Habsa testified that he received an MBA in 1981and was a fellow of the Life Management Institute. He had previously been a vice president of Merrill Lynch International Bank in London, chief vice president of Prudential Bache American Investments in London, and managing director of Macro Consultancy and Management Services in London.

[6] Dr. Abed testified that he had received his Ph.D. in economics from the University of California in Berkeley in 1971 and had worked at the International Monetary Fund ("IMF") for twenty-two years. He had been in charge of IMF economic, monetary and financial relations with thirty-two countries in North Africa, the Middle East and Central Asia. When he left the IMF in 2004, he was special advisor to the Managing Director.

[7] Mr. Fernelius testified that he had worked for the Federal Reserve Bank for forty-one years and, then, was a contract employee with the IMF where he worked with underdeveloped countries in creating central banks and setting up and maintaining clearing house operations

called by the Strachman parties as an expert in funds transfers.[8]  Based upon that testimony and

the exhibits introduced at the hearing, I make the following findings of fact.

The Oslo Accords authorized the establishment of a monetary authority for the PA, and

the legislature of the PA passed the Palestine Monetary Authority Law, creating PMA in 1997.

The objectives of PMA and the PA, as stated in the Monetary Law, are to secure the soundness of

the banking system, maintain monetary stability and encourage economic growth in the

Territories.[9]

---

[8] Mr. Newman testified that he had a degree in Business Administration and had attended
an advanced management program at Harvard University.  He worked in banking since 1964 and
specialized in funds transfers.  He was part of the formats working group that created the Society
for Worldwide Interbank Financial Telecommunication ("SWIFT"), the communications system
for funds transfers, and remained on the SWIFT board representing United States banks, for
fourteen years.

[9] Article IV of the Oslo Accords provided that the PA would establish a Monetary
Authority which would have the power and responsibility of regulating and implementing its
monetary policy.  The Article further provided that the Monetary Authority would act as the PA's
official economic and financial advisor and sole financial agent locally and internationally.
   The Monetary Authority Law was subsequently enacted, although portions of it have not
been implemented since, among other things, the PA is not a sovereign government.  Article 2 of
the Law created  PMA with "an autonomous corporate character and full legal capacity to
exercise all the works and actions which guarantee realization of the objectives for which it has
been instituted, including possession of the real estates and movables, required for the progress
of its works and exercise of its activities, and disposal thereof, in accordance with the provisions
of the law."  Articles 3, 4 and 5 exempted PMA from taxes and government duties, placed its
permanent office in Jerusalem and set forth its aims as the maintenance of monetary stability,
encouragement of economic growth in line with the policy of the PA and the issuance of national
currency and coins.  Further, Article 5 gave PMA supervision and control of banks, the task of
insuring cash flow for the banks, the implementation of monetary and credit policies and policies
dealing with foreign currencies, the keeping and management of the National Authority's reserve
of gold and foreign currency, the rendering of economic and financial advice to the National
Authority and the job of serving as financial agent for the National Authority and public
institutions.
   Article 6, *inter alia,* provided that PMA was to issue currency.  Article 8 authorized $15
million of capital for PMA to be provided by the National Authority;  Article 9 provided that if
the budget of  PMA was insufficient, the National Authority was to pay the difference or issue

PMA regulates the twenty-one commercial banks and one development bank operating in the Territories.   Although PMA operates similarly to other central banks, since the Territories are not an independent state, it issues no currency, manages no State reserves or gold and sets no monetary policy in the sense of controlling interest and exchange rates and setting a balance of payment policy.   Nor does it advise the PA or act as its fiscal agent; the Ministry of Finance serves that function.

Each bank operating in the Territories, is required to deposit a reserve fund with PMA. The "Required Reserve Account" consists of 9% of the bank's accounts in U.S. Dollars, Jordanian Dinar and Euros and 8% of accounts in Israeli Shekel – the four currencies used in the Palestinian Territories.   The reserves are recalculated monthly and the banks earn no interest on these reserve accounts.   Instead, these reserves are invested in short-term deposit accounts with well-established, international banks in the name of PMA.   This money is held for the

---

negotiable indebtedness on behalf of PMA; and Article 11 prohibited the use of general reserves except to reduce losses sustained by PMA.   Article 11 also stated that after payment of its commitments, expenses and transfer to its reserve account, the net profits of PMA were to be paid to the treasury of the National Authority.   Additionally, at the request of the Ministry of Finance, PMA was to provide the Treasury with an interest-free advance to cover any deficit for 3 months, the loan not to be in excess of 10% of PMA reserves. Article 36.

The Governor, Deputy Governor and Board of PMA were to be appointed by the Chairman of the National Authority. Articles 15, 17.   All would tender their resignations to the Chairman, and the Chairman was to decide their salaries.   Articles 19, 30.   And, PMA was to report to the National Authority every three months on the activities and monetary status of Palestine and to the Chairman annually.   Articles 39, 67, 68.

Finally, Article 18 sets forth the responsibilities of the Board which were to include:  the licensing of banks; the imposition of penalties on banks; the approval of bank mergers and new branches; the licensing and opening of foreign bank branches, lending institutions and finance companies; the determination of the percentage of  reserves banks must deposit with PMA; the approval of Monetary Authority regulations, rules, internal policies, operation and structure; and the creation of PMA branches and offices, general and regional managers, advisors, budgets and independent auditors.   The regulations of PMA, although written by it, were to be issued by the National Authority. Articles 40-60, 73.

commercial banks, but the interest earned thereon is kept by PMA. In addition, each bank must maintain a "Current Account" for daily check clearing purposes, and a "Call Account" to supplement the current account should the current account fall into a debit balance. The Call Accounts earn interest for the banks.

"Dotation Accounts" are also maintained by PMA for foreign banks operating in the Territories, in which those banks deposit capital. Also, banks which do not invest sufficient money in the community in which they operate, must maintain a "Required Reserve With Interest Account." In a like manner, a reserve has to be maintained by banks who invest in high risk transactions with their customers; this is known as the "Islamic Investment Account." Finally, the commercial banks may deposit funds in a "Time-Deposit Account," where the money is put into International, short-term investments by PMA and the banks receive interest.

According to an April 30, 2005 summary of PMA assets, banks operating in the territories had deposited $518,450,120.00 with PMA, PMA's reserves and capital were $39,253,112.00 and PMA held $2,822,292.00 in its pension fund for its employees. PMA's capital reserve is $18,000,000 of the approximately $39,000,000. Each bank issues monthly reports ("Call Reports"), and PMA conducts on-site inspections of the banks, comparing and reconciling the banks' reports with its findings. The April summary was based upon the Call Reports and the banks' books.

At the end of every banking day, the commercial banks gather in the "clearing room" of PMA in Ramallah, Nablus and Gaza, its three offices, and settle their accounts. PMA uses PIB for the clearing house transactions and maintains an account with it. All dollar transactions are remitted by the commercial banks to PMA's account with PIB on a daily basis to cover the

9

banks' debit balances due to the clearing of checks. Likewise, dollar credit balances are paid to banks through PMA's account with PIB. PIB maintains an account at BNY where all U.S. Dollar transactions, ultimately, are conducted. In a like manner, Dinar transactions are conducted through a PIB account with a bank in the Territories, Euro transactions are conducted through a PIB account with Commerz Bank in Frankfurt and Shekel transactions are conducted through a PIB account with the Israeli Discount Bank of Tel-Aviv. A payment order is written for each transfer of money, and monthly statements are sent to PMA from PIB showing each transaction.

A credit balance must always be maintained by the banks in their current accounts with PMA. Should the account exceed the minimum balance required, money is transferred to the call account or to the commercial bank itself. Then too, PMA transfers money to banks from their Time Deposit accounts. This is accomplished through PMA clearing house accounts at PIB. Forty per cent of check clearing transactions occur in U.S. Dollars. Seventy-five to eighty per cent of other payments and transfers going into the Territories or leaving the Territories, is accomplished in U.S. Dollars.

The Governor of PMA is appointed by the Chairman of the PA and confirmed by the Legislature. The Board of Directors is appointed by the Chairman, upon the recommendation of the Minister of Finance, the Cabinet and Governor. The Board establishes PMA monetary policy and, at times, differs from the PA in its goals. PMA issues regulations governing the banks in the Territories, owns property in its own name, pays its own expenses, maintains a pension fund for its 290 employees, maintains bank accounts in its own name and sues and is sued in court as a separate legal entity. Its employees are not treated as government employees, and their salaries are paid for by PMA. PMA has ultimate authority in all matters related to PMA functions.

The PA refused to fund PMA's required $15,000,000 capital reserve. PMA, therefore, created its capital reserve through profits made from interest earned on the reserve accounts of the commercial banks operating in the Territories and through fees charged to those banks. PMA holds no funds belonging to the PA although it has both borrowed money from and loaned money to the PA. Indeed, the PA presently owes PMA $9,000,000. After paying all of its expenses and ascertaining that its reserve fund is sufficient, a portion of PMA profits is paid to the PA.

As explained by Dr. Abed:

> The PMA as a central bank is charged with being essentially the regulator and guardian of the soundness of the banking system.
> It...licenses banks, regulates banks, insures that banks are run properly... through its inspection of these banks.
> ... PMA also provides needed liquidity when a bank falls short in liquidity in any of the four currencies and it guides banks when they run into difficulties on nonperforming loans, for example. It is the regulator and the guardian of the banking system.

Hearing Transcript, pp. 255-6. He further explained that the commercial banks' reserve funds ensure these functions and secure the accounts of the three-quarters of a million bank depositors. These reserve funds do not belong to PMA.

Dr. Abed spoke to the consequences of the actions taken by BNY in response to the restraining order and injunction.

> ... It is costing us and the banks money, but also it is depriving these banks from access to those funds.
> More importantly, I think, that's where the grave harm comes in, the – as I explained, the PMA is the guardian of the banking system in the Palestinian territory. It is an emerging system. It is a fragile system and the PMA in the past few years has established itself as a credible authority to regulate the banking system.
> The fact that the process by which we exercise one of our central functions,

11

to smooth the liquidity transfers within the system, that this function is stymied, has broken down, is a source of great uncertainty and great harm both to the credibility and the authority of the PMA, and to the confidence of the banks in the PMA as their regulator.

...The banks, as they lose confidence in the PMA, since the PMA is the Party in question in this freeze, they are likely to seek other ways of dealing with the needed transactions, possibly outside the PMA.

It undermines the authority of the PMA, and once the authority is undermined, it is very difficult to resuscitate or to revive, and at the same time, the banks themselves, when they feel unprotected by the guardian or by the regulatory authorities, then the depositors don't feel protected.

If the depositors don't feel protected, they could begin to withdraw their funds from the banking system and go elsewhere. They can easily open accounts with Israeli banks next door, with the Jordanian banks and Egyptian banks, because we have an open banking system.

...When a run on the banks begin, it's impossible to stop. And if the banks run out of deposits, they cannot carry out the functions of lending for business transactions, funding the requirement of their clients and their depositors.

In addition, this freeze has also blocked us from establishing banking relations with international institutions...

....

[Since the middle part of May when the freeze occurred], we have allowed debit and credit to accumulate...In some cases where banks may be needing the liquidity and they need to effect a transfer to them, we allow banks to do it bilaterally...This takes us back to the pre-regulation period before the PMA's creation...

What it does is, it creates another informal market for transactions and payments among banks that could be subject to abuse, since we are not fully in charge of that. We're very careful in the PMA to monitor and to examine transfers and payments to insure the banking system is not abused in any way by anyone, including potentially for money laundering criminal activity.

Hearing Transcript, pp.260-264.

Mr. Fernelius, an expert in the working of the Federal Reserve Bank in the United States and the establishment of central banking systems in developing countries, testified that the Federal Reserve Bank was set up by Congress and the Chairman of the Federal Reserve is appointed by the President of the United States and confirmed by the Senate. The Federal Reserve acts as a clearinghouse, and excess income of the Federal Reserve is remitted to the U.S.

12

Treasury at the end of the year.

Mr. Fernelius opined that PMA looks and acts like other central banks and clearinghouses. Hearing Transcript, p. 377. He further opined that the money restrained appeared to belong to the commercial banks operating in the Territories. *Id.* at 378.

A chart created by the Funds Transfer Department of BNY was introduced into evidence. The chart summarized the transactions which were frozen as a result of the Federal injunction and New York restraining order. The chart, in so far as it related to PMA transactions, was backed up with paperwork -- the SWIFT messages sent by financial institutions regarding the transfers and PIB's monthly account statements, issued by BNY, reflecting the transfers. No transactions involved PMA as the originator and the Palestinian Embassy as the beneficiary, and all of the transfers were bank to bank transactions.

Nineteen transactions are affected by the restraint of PMA funds. Seventeen of those transactions were frozen and the money was put into a "suspense account" – an account holding the money until the court determines what should be done with the funds. The remaining two transactions were not frozen due to insufficient funds in the PIB account. These transfers were suspended and will be carried out or the funds suspended, once funds are available.

Ms. Goodwin, the vice president for funds transfer for BNY, and Mr. Newman, defendant's expert on funds transfers, explained the chart and documentation provided by BNY. In regard to the two suspended transactions, they interpreted the SWIFT documents and account statements as follows:

1) On May 16, 2005, PMA, the source of the funds (the originating bank), issued a payment order to PIB to transfer $2,399,990. PIB sent a written instruction (SWIFT message) to

BNY to transfer the funds to the Bank of Palestine in Gaza, the beneficiary bank.

2) On May 17, 2005, PMA (the originating bank) issued a payment order to PIB to transfer $10,000,000. PIB sent a written instruction to BNY to transfer the funds to JP Morgan/Chase in favor of the Bank of Jordan in Ramallah, the beneficiary bank, to be credited to the books of the Bank of Jordan in Amman.

The remaining seventeen transactions involved the following:

1) On May 16, 2005, PMA (the originating bank) issued a payment order to PIB to transfer $140,000. PIB instructed BNY to transfer the funds to the Palestine Islamic Bank in Gaza, the beneficiary.

2) On May 16, 2005, PMA (the originating bank) issued a payment order to PIB to transfer $649,990. PIB instructed BNY to transfer the funds to the Palestine Investment Bank in Ramallah, the beneficiary.

3) On May 16, 2005, PMA (the originating bank) issued a payment order to PIB to transfer $779,990. PIB instructed BNY to transfer the funds to the Al Quods Bank for Development and Investment in Ramallah, the beneficiary.

4) On May 16, 2005, PMA (the originating bank) issued a payment order to PIB to transfer $310,000. PIB instructed BNY to transfer the funds to the Bank of Jordan in Ramallah as the beneficiary, to the credit of the Bank of Jordan in its account at the Israel Discount Bank.

5) On May 16, 2005, PMA (the originating bank) issued a payment order to PIB to transfer $455,000. PIB instructed BNY to transfer the funds to CitiBank to the credit of the Housing Bank for Trade and Finance of Ramallah, the beneficiary.

6) On May 16, 2005, PMA (the originating bank) issued a payment order to PIB to

transfer $350,000. PIB instructed BNY to transfer the funds to the Jordan National Bank in Ramallah, the beneficiary, to the credit of the Jordan National Bank in Amman.

7) On May 16, 2005, PMA (the originating bank) issued a payment order to PIB to transfer $25,990. PIB instructed BNY to transfer the funds to the Egyptian Arab Land Bank in Jerusalem, the beneficiary.

8) On May 17, 2005, PMA (the originating bank) issued a payment order to PIB to transfer $300,000. PIB instructed BNY to transfer the funds to the Jordan National Bank in Ramallah, the beneficiary.

9) On May 17, 2005, PMA (the originating bank) issued a payment order to PIB to transfer $184,990. PIB instructed BNY to transfer the funds to the Egyptian Arab Land Bank in Jerusalem, the beneficiary.

10) On May 31, 2005, PMA (the originating bank) issued a payment order to Commerz Bank to transfer 39,994.26 Euro. Commerz Bank instructed BNY to transfer the funds to the Union Bank for Savings and Investment in Ramallah, the beneficiary.

11) On June 7, 2005, PMA (the originating bank) issued a payment order to Commerz Bank to transfer 39,994.26 Euro. Commerz Bank instructed BNY to transfer the funds to the Union Bank for Savings and Investment in Ramallah, the beneficiary.

12) On June 8, 2005, PMA (the originating bank) issued a payment order to Commerz Bank to transfer 15,000.01 Euro. Commerz Bank instructed BNY to credit the European Arab Islamic Bank in Ramallah, the beneficiary.[10]

---

[10] Mr. Newman and Ms. Goodwin differed as to who was the originator and who the beneficiary on this transaction.

15

13) On May 16, 2005, the Arab Bank PLC in Ramallah (the originating bank) issued a payment order to the Israeli Discount Bank to transfer $2,920,000. The Israeli Discount Bank instructed BNY to credit PIB with the funds to the credit of PMA as the beneficiary.

14) On May 17, 2005, the Fortis Bank in Belgium (the originating bank) issued a payment order to the Deutsche Bank in New York to transfer $10,005,833.33. The Deutsche Bank instructed BNY to credit the account of the Cairo Amman Bank in Ramallah which was to transfer funds to PMA, the beneficiary. The money in this transaction involved foreign exchange, money market or time deposit funds.

15) On May 16, 2005, the Arab Islamic Bank in Ramallah, (the originating bank) issued a payment order to BNY to transfer $533,000. BNY was instructed to transfer the funds to PIB which was to transfer the funds to PMA in favor of the Arab Islamic Bank in El Birah, the beneficiary.

16) On May 16, 2005, the Union Bank for Savings and Investment in Amman (the originating bank) issued a payment order to BNY to transfer $450,000. BNY was instructed to transfer the funds to PIB who was to transfer the funds to PMA in favor of Union Bank for Savings and Investment in Ramallah, the beneficiary.

17) On May 16, 2005, the Union Bank for Savings and Investment in Amman (the originating bank) issued a payment order to BNY to transfer $500,000. BNY was instructed to transfer the funds to the PIB, who was then to transfer the funds to PMA in favor of the Union Bank for Savings and Investment in Ramallah, the beneficiary.

**Conclusions of Law**

*A. State Restraining Order CPLR Article 52*

16

_____Article 52 of the CPLR is the procedural law by which money judgments are enforced in New York. CPLR §5222 governs the issuance of a restraining notice, specifically providing in subsection b that

> ...A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest...All property in which the judgment debtor or obligor is known or believed to have an interest in and thereafter coming into the possession or custody of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice.

Consequently, a judgment creditor cannot utilize a restraining notice to reach assets in which the judgment debtor has no interest. *Bass v. Bass*, 140 A.D.2d 251, 253 (1st Dept. 1988). Nor is any contingent debt, that is a debt which is not a fixed obligation, reachable under this statute. *Supreme Mdse. Co., Inc. v. Chemical Bk.*, 70 N.Y.2d 344, 349-50 (1987)(executory letter of credit not attachable).

Furthermore, CPLR §5240 permits the court "at any time, on its own initiative or the motion of any interested person, and upon such notice as it may require, make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure." As noted by the court in *Yeshiva Tifferes Torah v. Kesher International Trading Corp.*, 246 A.D.2d 538, 539 (2d Dept. 1998), CPLR §5240 imparts broad discretion upon the courts "to prevent 'unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts.' " For these reasons that follow, the Court finds that BNY holds no property of PMA, which may be restrained pursuant to Article 52 and, therefore, the State Restraining Notice should be modified pursuant to CPLR §5240.

All funds frozen by BNY are transfers. As adopted by New York and many other jurisdictions, UCC Article 4A covers funds transfers, specifically credit transfers, between financial institutions.[11] *See Prefatory Note of Natl. Conf. of Comms. on Uniform State Law and the Amer. Law Inst., McKinneys Cons Laws of NY, Book 62½, Art. 4A, pp. 590-1, [2001].* The scope of Article 4A is delineated by the definitions contained in UCC §§4-A-103, 104. *Official Comment, McKinneys Cons Laws of NY, Book 62½, UCC §4-A-102.*

Among those definitions is that of a "payment order" which is:

> an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary if:
>
>> (I) the instruction does not state a condition to payment to the beneficiary other than time of payment,
>> (ii) the receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender, and
>> (iii) the instruction is transmitted by the sender directly to the receiving bank or its agent, funds transfer system, or communication system for transmittal to the receiving bank.

UCC §4-A-103(1)(a). A "beneficiary" is the person to be paid [§4-A-103(1)(b)]; a "beneficiary bank" is the bank named in the payment order in which the beneficiary's account is to be credited [§4-A-103(1)©]; the "receiving bank" is the bank to which the sender's instruction is addressed [§4-A-103(1)(d)]; and the "sender" is the person giving the instruction to the receiving bank §4-A-103(1)(e). The payment order is deemed issued when sent to the receiving bank. §4-A-103(2).

The sender also is known as the "originator," and the bank which receives the sender's

---

[11] These transfers are further governed by rules promulgated by the New York Clearing Interbank Payments Systems ("CHIPS") and various rules of associations of banks. *Id.*

payment order is called the "originator" or the "originator's bank." §§4-A-104(3), (4). A

receiving bank, other than an originator's or beneficiary's bank is the "intermediary bank."

Consequently,

> "[f]unds transfer" means the series of transactions, beginning with the originator's
> payment order, made for the purpose of making payment to the beneficiary of
> the order. The term includes any payment order issued by the originator's bank
> or an intermediary bank intended to carry out the originator's payment order. A
> funds transfer is completed by acceptance by the beneficiary's bank of a payment
> order for the benefit of the beneficiary of the originator's payment order.

UCC §4-A-104(1).

Additionally, integral to an understanding of UCC §4A are the following terms: "clearing

house," an association of banks regularly clearing items [UCC §4-104(d)]; "funds transfer

system," a communication system through which a bank's payment order is transmitted [UCC

§4-A-105(1)(e)]; and "execute a payment order," the issuance by a receiving bank, other than a

beneficiary bank, of a payment order [UCC §4-A-301(1)]. Title to the wired funds passes to a

receiving bank upon "acceptance" of a payment order. *U.S. v. BCCI Holdings, S.A.,* 980 F.Supp.

515, 521 (1997). "Acceptance" of a payment order by a receiving bank occurs when the

receiving bank executes the order. UCC §4-A-209(1). "Acceptance" of a payment order by a

beneficiary bank occurs, *inter alia,* when the bank pays the beneficiary, notifies the beneficiary of

receipt of the order, credits the beneficiary's account or receives full payment of the amount of

the order. UCC §4-A-209(2).

Article 4A specifically provides that a court may restrain a sender from issuing a payment

order, an originator's bank from executing on the originator's order or a beneficiary's bank from

releasing funds from a payment order. UCC §4-A-503; UCC §§4-A-502. A court, however, is

19

prohibited from restraining a funds transfer at any other point. *Id.* at UCC §4-A-503. As

explained in the *Official Comment*, §4-A-502(4), a creditor is limited in the funds he can reach.

Thus, "[a] creditor of the beneficiary cannot levy on property of the originator and until the funds

transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit

of the beneficiary, the beneficiary has no property interest in the funds transfer which the

beneficiary's creditor can reach." *Id.* at para. 4. Similarly, UCC §4-A-503 prohibits levy on

funds in an intermediary bank

> to prevent interruption of a funds transfer after it has been set in motion. The
> initiation of a funds transfer can be prevented by enjoining the originator or the
> originator's bank from issuing a payment order. After the funds transfer is
> completed by acceptance of a payment order by the beneficiary's bank, that
> bank can be enjoined from releasing funds to the beneficiary or the beneficiary
> can be enjoined from withdrawing funds. No other injunction is permitted. In
> particular, intermediary banks are protected, and injunctions against the originator
> and the originator's bank are limited to issuance of a payment order. Except for
> the beneficiary's bank, nobody can be enjoined from paying a payment order, and
> no receiving bank can be enjoined from receiving payment from the sender of the
> order that it accepted.

*Official Comment*, §4-A-503. *See Eur. Am. Bk. v. Bk. of Nova Scotia*, 12 A.D.3d 189, 189-90

(1st Dept. 2004)(levy cannot be enforced upon receiving bank).

In the instant case, PMA was the originator in the majority of cases, the beneficiary in

others and the intermediary bank in still others. It has no account at BNY. Where PMA was the

originator, the funds were restrained subsequent to the execution of PMA's payment order by the

receiving Bank to BNY, the intermediary bank, by serving a Restraining Notice upon BNY. At

that juncture, title to the funds had passed and the funds were not subject to restraint. *See* UCC

§§4-A-209(1), 4-A-503; *Eur. Amer. Bk. v. The Bk. of Nova Scotia, supra; U.S. v. BCCI Holdings,
S.A., supra.* The fact that a number of the funds transfers were accomplished by transfers on

20

BNY's own books does not change this result. *Eur. Amer. Bk. v. The Bk. of Nova Scotia, supra.* In a like manner, where PMA was the beneficiary or intermediary, the Restraining Notice was served upon BNY, again an intermediary bank, in violation of UCC §4-A-503.[*id*]. Also, where PMA was the beneficiary or intermediary bank, PMA had no property interest in the money at the point it was restrained and the Restraining Notice, therefore, was ineffective. *See Bass v. Bass, supra,* 140 A.D.2d 253; *U.S. v. BCCI Holdings, S.A., supra.*[12] Consequently, the Court modifies the Restraining Notice pursuant to CPLR §5240, deleting PMA from that Notice.

Finally, the doctrine of Federal preemption does not militate otherwise. As noted recently by the Appellate Division, First Department, in *Hyundai Corp. v. Republic of Iraq,* 20 A.D.3d 56, 59-60 (1st Dept. 2005), a finding of preemption is not favored. "Federal preemption can only occur where Congress preempts state law, where preemption is implied because Congress has occupied the entire field, and where preemption is implied because there is an actual conflict between federal and state law." *Id.* None of these situations apply here.

Congress has neither explicitly nor implicitly preempted state law as it regards enforcement of money judgments. Nor is there a conflict between state and federal law. In fact, Federal Rule of Civil Procedure 69(a) requires the Federal courts to apply state procedures in determining what assets are subject to enforcement. *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 313 F.3d 70, 83 (2d Cir. 2002). *Accord Mones v.*

---

[12] The Court rejects the Strachman parties' argument that should the restrained moneys belong to entities other than PMA or even to PMA, the PA would probably reimburse PMA and, therefore, the monies may be levied against. The hearing evidence, in fact, indicates otherwise – all of PMA's expenses are paid for by PMA, not the PA, and the PA refused to even fund PMA's reserve fund and, in all likelihood, would not cover such losses. Moreover, such an argument runs counter to New York law which prohibits levying upon a contingent debt. *See Supreme Mdse. Co., Inc. v. Chemical Bk., supra,* 70 N.Y.2d at 349-50.

21

*Commer. Bk. of Kuwait*, 2005 U.S. Dist. LEXIS 14108, pp. 25-6 (S.D.N.Y. 2005). Here, where the Strachman parties are seeking enforcement of a judgment, New York law applies. Indeed, Judge LeGeuex recognized this when he opined that New York was the appropriate forum for this matter.[13]

### B.  *Federal Injunction– Motion for a Preliminary Injunction*

The disputed funds, nonetheless, remain restrained pursuant to the Federal Injunction. The Court, therefore, now turns to PMA's preliminary injunction application.

The Strachman parties argue that the Federal Injunction trumps the State order.  To begin, they contend that a decision by this Court granting the preliminary injunction would "vitiate the injunction" by releasing the funds without "any chance of restoring the status quo."  The Court disagrees.  The Strachman parties' argument ignores Judge LeGeuex's own words in which he opined that the case should be determined by the New York courts, the locus of the funds. Moreover, in issuing such interim relief, the Court may set a bond which would protect the Strachman parties.  Furthermore, it became clear during the hearing of this matter that PMA must, of necessity, clear U.S. Dollars through a bank in the United States in order to operate. The type of transactions suspended here, thus, will always be available for restraint under the Federal Injunction should the final decision be rendered against PMA.

The Court, however, does agree with the Strachman parties that PMA bears the burden of

---

[13] The Strachman parties argue that UCC Article 4A is preempted here, relying on *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002), *cert. denied* 539 U.S. 927. *Winter*, however, is distinguishable.  In *Winter*, unlike the present case, a conflict existed between specific Federal Law (9 U.S.C. §8 and Admiralty Rule B(1)) and UCC Article 4A. The Court in *Winter*, thus, recognized exclusive Federal jurisdiction in admiralty cases and found UCC 4A was preempted.  The instant case conflicts with no specific Federal law and does not involve admiralty jurisdiction.

proof on its application for a preliminary injunction. That is, PMA must establish: 1) the likelihood of success on the merits; 2) irreparable injury absent the granting of the preliminary injunction; and 3) a balancing of the equities in its favor. *See W.T. Grant Co.* v. *Srogi,* 52 N.Y.2d 496, 517 (1981). The Court finds that PMA has met this burden. In doing so, the Court rejects the Strachman parties' argument that PMA bears the burden of demonstrating that it is not the alter ego of the PA. *See First Nat'l. City Bk.* v. *Banco Para El Comercio Exterior De Cuba* ("*Bancec*"), 462 U.S. 611, 628 (1983)(there exists presumption of independent status of governmental instrumentality established as separate juridical entity, which must be overcome). *Accord Alejandre v. Telefonica Larga Distancia De Puerto Rico, Inc.,*183 F.3d 1277, 1283–4 (11th Cir.) *rehearing en banc, denied 205 F.3d 1357* (1999); *Hester Int'l. Corp. v. The Fed. Repub. of Nigeria,* 879 F.2d 170, 176 (5th Cir. 1989); *Letelier v. Repub. of Chile,* 748 F.2d 790, 795 (2d Cir. 1984); *LNC Investments, Inc. v. Repub. of Nicaragua,* 115 F. Supp.2d 358, 363 (S.D.N.Y.), *aff'd.* 228 F.3d 423 (2d Cir. 2000).

### *1. Likelihood of Success*

The seminal decision of the Supreme Court in *Bancec, supra,* governs this case. In *Bancec,* the Supreme Court was called upon to determine whether a credit institution for foreign trade, created by the Cuban government, was an alter ego of that government and liable for its acts. The Court began by observing that separate juridical entities are created by governments as flexible and independent vehicles capable of obtaining the financial resources necessary to further development in economically backward countries. Relying upon international and common law, it defined these entities:

.... The organization and control of these entities vary considerably, but many

23

possess a number of common features. A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

*Bancec, supra* at 624-5.

The Court found such an entity and its assets to be distinct from that of the government which created it, compared such an entity to a private corporation with limited liability and noted that:

> [f]reely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee.

*Bancec, supra* at 625-6. In sum, the Supreme Court stated, as a general rule, a separate juridical entity created by a sovereign would be looked upon as independent from the sovereign who created it except when necessary to prevent fraud or achieve equity. *Id.* at 630. *Accord Alejandre v. Telefonica Larga Distancia De Puerto Rico, Inc., supra*, 183 F.3d 1277; *Hester Int'l. Corp. v. The Fed. Repub. of Nigeria, supra*, 879 F.2d 170; *Letelier v. Repub. of Chile, supra*, 748 F.2d 790; *LNC Investments, Inc. v. Repub. of Nicaragua, supra*, 115 F. Supp.2d 358.[14]

---

[14] Similarly, New York courts will pierce the corporate veil of an entity when the principal of the corporation exercises complete dominion and control over it and uses it to commit a fraud or wrong against a plaintiff which resulted in injury to the plaintiff. *JSC Foreign Eco. Ass'n. Technostroyexport v. Int'l. Dev. & Trade Servs., Inc.*, 295 F. Supp.2d 366, 377-8 (S.D.N.Y. 2003). The factors to be considered in determining whether there is an abuse of corporate form are: the absence of the formalities of corporate existence, inadequate

Turning to the features outlined in *Bancec* to describe a typical independent government instrumentality, this Court finds that PMA meets all of them. It was created by an enabling statute which specifically described its powers and duties and, in fact, is operated as specified, by a governor and board selected by the government. It is a separate juridical entity with the power to hold and sell property and sue and be sued. It is run as a distinct economic enterprise, is responsible for its own finances, has an autonomous budget, workforce and operation and maintains its offices in an independent location. Moreover, corporate formalities are maintained, it is adequately capitalized, the PA is not free to simply draw on PMA's funds, it deals at arms length with the PA and is treated as a separate profit center. PMA, in fact, has been shown to have the characteristics of a typical central bank and has not been demonstrated to be the agent or alter ego of the PA. *See LNC Investments, Inc. v. Repub. of Nicaragua, supra* at 365 (governmental instrumentalities, like Nicaragua's Central Bank, are not agents of their respective governments).

### *II & III Irreparable Injury and Balancing of Equities*

Nor have the Strachman parties shown that fraud or injustice will result from insulating the PMA from the judgment owed by the PA. *Id.* Indeed, the opposite has been demonstrated.

The evidence elicited at the hearing indicates that irreparable injury will result should the restraint on the BNY funds continue and that the balancing of equities favors PMA. The hearing

---

capitalization, withdrawal of corporate funds for the use of the principal, overlap in ownership, officers, directors and personnel, common office space, discretion exercised by the corporate officers, whether the principal and corporate entity deal at arms length, whether the corporation is treated as an independent profit center, whether the corporation's debts are paid or guaranteed by the principal and whether the corporation had property used by the principal for its own purposes. *Id.* at 378.

25

testimony established that the monies restrained belong, for the most part, to innocent third parties – commercial banks operating in the Territories for whom PMA provides banking services and facilitates money transfers. Restraint of these funds impairs the operation of these entities and may result in loss to them. Additionally, the hearing testimony made clear that the restraint of the subject funds at BNY, puts the entire banking system of the territories at risk, undermines the economic development of the Territories and the PMA's status in the international community, and promotes money laundering, criminal activity and a black market in currency. Finally, the process employed here by the Strachman parties in restraining the PMA troubles the Court. *See Alejandre v. Telefonica Larga Distancia De Puerto Rico, Inc., supra*, 183 F.3d 1286. PMA was never a party to the underlying lawsuit and was not mentioned in the Federal injunction. Rather, the Strachman parties added it to the Notice of Injunction. PMA's first intimation of any involvement with the Strachman parties' claim came only after the funds at BNY were restrained. Procedural due process concerns are raised.

Finally, the hearing evidence demonstrates that the funds restrained by BNY do not belong to the PA or PLO, but, instead, are assets of private banks. According to the evidence presented, all but two of the transactions involved funds belonging to private banks. Only in two of the transactions, the May 16 transaction originating at the Arab Bank PLC and the May 17 transaction originating at the Fortis Bank, was PMA the beneficiary. The testimony of Mr. Abu-Habsa and Governor Abed indicated that the Fortes funds were likely assets of the private banks invested abroad. Their hearing testimony further indicated that the funds likely were transferred by the Arab Bank were funds sent to PMA to supplement its Reserve or Call account. In addition, Governor Abed and Mr Abu-Habsa asserted that PMA controls no funds for the PA or

PLO. The Court recognizes that the Strachman Parties' discovery was limited and that after full

discovery, the evidence might prove otherwise. A discovery schedule, therefore, will be ordered.

*See First City v. Rafidian*, 150 F.3d 172, 175 (2d Cir. 1998). *Cf. Alejandre v. Telefonica Larga*

*Distancia De Puerto Rico, Inc.*, *supra* at 1289. Pending such discovery, a bond posted by PMA

will protect the Strachman parties from any prejudice. Accordingly, it is

ORDERED that the New York State restraining notice is modified to delete the Palestine

Monetary Authority from the entities named; and it is further

ORDERED that the Palestine Monetary Authority's application for a preliminary

injunction is granted and The Bank of New York is directed to release the block on all funds

resulting from transfer orders by the Palestine International Bank on behalf of the Palestine

Monetary Authority and to honor all pending and future incoming and outgoing transactions by

the Palestine Monetary Authority through the Palestine International Bank or any other agent

designated by Palestine Monetary Authority, upon the posting of an undertaking by the Palestine

Monetary Authority in the amount of $30,000,000 within fifteen days of the entry of this

decision (CPLR 6312(b)); and it is further

ORDERED that the action against the Bank of New York is dismissed pursuant to the

stipulation of the parties; and it is further

ORDERED that the motion by the Strachman parties to dismiss PMA's underlying action

against them, is denied without prejudice to renew the motion; and it is further

ORDERED that the motion by David Strachman for turnover of the funds of the

Palestinian Authority and the Palestinian Liberation Organization held by the Bank of New York

is denied without prejudice to renewing the application upon notice to the Palestinian Authority

27

and the Palestinian Liberation Organization; and it is further

ORDERED that the parties are to appear in Part 54 of the Supreme Court New York County, 111 Centre St., room 1227, at 12:00 noon on November 3, 2005, for a preliminary conference in order that discovery can go forward.

Dated: October 14, 2005
New York, New York

SHIRLEY WERNER KORNREICH

FILED

OCT 2 1 2005

COUNTY CLERKS OFFICE
NEW YORK

28