SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

PALESTINE MONETARY AUTHORITY,

               Plaintiff-Counterclaim Defendants,

      v.

DAVID STRACHMAN, as administrator of the
ESTATE OF YARON UNGAR, et al.,

           Defendants-Counterclaim Plaintiffs.

-------------------------------------------------------------------X

**Hon. Shirley W. Kornreich**

Index No.: 107777/05

**NOTICE OF MOTION**

**ORAL ARGUMENT
REQUESTED**

      **PLEASE TAKE NOTICE THAT,** upon the annexed Affirmation of Haig V. Kalbian

Esq. and the exhibits thereto, the annexed Affidavit of George T. Abed, the accompanying

memorandum of law, and all prior pleadings and proceedings, Plaintiff the Palestine Monetary

Authority ("PMA"), by its attorneys, KALBIAN HAGERTY L.L.P., will move this Court, at the

Supreme Court of the State of New York, New York County, Room 130, 60 Centre Street, New

York, New York on July 13, 2006, or as soon thereafter as counsel may be heard for an Order,

pursuant to N.Y. C.P.L.R. § 3212, entering summary judgment in the PMA's favor on the

Counterclaims of Defendant DAVID STRACHMAN, as administrator of the ESTATE OF

YARON UNGAR, PROFESSOR MEYER UNGAR, JUDITH UNGAR, RABBI URI

DASBERG AND JUDITH DASBERG (INDIVIDUALLY AND IN THEIR CAPACITY AS

LEGAL GUARDIANS OF PLAINTIFFS DVIR UNGAR AND YISHAI UNGAR), AMICHAI

UNGAR, DAFNA UNGAR, AND MICHAL COHEN (collectively the "Strachman

Defendants") and for an Order pursuant to N.Y. C.P.L.R. § 6312(b) discharging the undertaking

requirement.

The PMA is entitled to the relief requested on the grounds that, *inter alia*: (i) the Executive Branch has determined that the PMA is independent of the PA and the political question doctrine bars this Court's further review of the PMA's legal status; (ii) even if the PMA were holding any PA funds, which it is not, New York law does not permit this Court to order a financial intermediary holding funds of a judgment debtor outside of New York to bring such funds into New York for turnover to the judgment creditor; (iii) the Strachman Defendants are not entitled, as a matter of law, to an order requiring BNY to turnover funds ostensibly belonging to the PMA, because the turnover request violates New York laws on the levy on funds transfers as articulated in N.Y U.C.C. Article 4-A.

Answering papers, if any, shall be served no later than July 5, 2006.

Reply papers, if any, shall be served no later than July 12, 2006.

Dated: June 23, 2006

Respectfully submitted,

KALBIAN HAGERTY L.L.P.

Haig V. Kalbian (admitted *pro hac vice*)
Claire A. DeLelle (N.Y. Bar # 3941937)
The Brawner Building
888 17th Street, N.W.,
Suite 1000
Washington, DC 20006-3967
202-223-5600


Victor C. Bushell
Cem Ozer
BUSHELL & VALLIERE LLP
60 East 42nd Street
Suite 2925
New York, New York 10165
212-949-4700

*Attorneys for the Palestine Monetary Authority*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

PALESTINE MONETARY AUTHORITY,

          Plaintiff-Counterclaim Defendants,

        v.                           Index No.: 107777/05
                                    Judge Shirley W. Kornreich

DAVID STRACHMAN, as administrator of the
ESTATE OF YARON UNGAR, *et al.*,

          Defendants-Counterclaim Plaintiffs.

------------------------------------------------------------X     **AFFIRMATION OF**
                                          **HAIG V. KALBIAN, ESQ.**
DAVID STRACHMAN, as administrator of the
ESTATE OF YARON UNGAR, *et al.*,

          Plaintiffs-Judgment Creditors,

        v.                           Index No.: 105521/05

THE PALESTINIAN AUTHORITY, *et al.*,

          Defendants-Judgment Debtors.

------------------------------------------------------------X

DISTRICT OF COLUMBIA       )
                            )ss.:
WASHINGTON               )

      HAIG V. KALBIAN, an attorney admitted *pro hac vice* to practice in this Court in connection with the above-captioned case, affirms under the penalties of perjury:

      1.     I am a partner in the law firm of Kalbian Hagerty L.L.P. I am licensed to practice before the courts of the Commonwealth of Virginia and the District of Columbia. I am admitted *pro hac vice* to practice before this Court in connection with the above-captioned case. The New York law firm of Bushell & Valliere LLP serves as local counsel for the PMA in this case.

2.    I submit this Affirmation in support of Plaintiff the Palestine Monetary Authority's ("PMA") Motion for Summary Judgment and Discharge of Undertaking Requirement ("Motion").

### Factual and Procedural Background

3.    This case arises from the collection efforts of Defendants David Strachman, as Administrator of the Estates of Yaron Ungar, Professor Meyer Ungar, Judith Ungar, Rabbi Uri Dasberg and Judith Dasberg (Individually and in Their Capacity as Legal Guardians of Plaintiffs Dvir Ungar and Yishai Ungar), Amichai Ungar, Dafna Ungar, and Michal Cohen (collectively the "Strachman Defendants"), in connection with a judgment for over $116,000,000.00 entered by the United States District Court for the District of Rhode Island in the matter of *Estates of Yaron Ungar et al. v. The Palestinian Authority, et al.*, C.A. No. 00105(L) (Hon. Ronald R. Laguex) (the "RI Judgment" or the "RI Action").

4.    The Strachman Defendants domesticated the RI Judgment in New York County under Index Number 105521/05. Defendants then availed themselves of the New York creditor process[1] to restrain certain funds passing through the Bank of New York ("BNY").

### The Restraining Notice

5.    Specifically, Defendants served a restraining notice (drafted by their attorneys) ("Restraining Notice") on BNY which wrongly named the PMA, among others, as an agent of the Palestinian Authority—the judgment-debtors in the RI Action.    In support of their Restraining Notice to BNY, the Strachman Defendants attached a Notice of Injunction—drafted by their counsel on law firm letterhead—that deceptively stated that an injunction granted in the

---

[1] "Creditor process" means levy, attachment, garnishment, notice of lien, sequestration, or similar process issued by or on behalf of a creditor or other claimant with respect to an account. N.Y. U.C.C. § 4-A-502(1).  The term "creditor process" is a generic term that covers a variety of devices creditors may use, including both attachments and injunctions. *See Weston Compagnie De Finance Et D'Investissment, S.A. v. La Republic Del Ecuador,* 1993 WL 267282, at *2, No. 93 Civ. 2698 (LMM) (S.D.N.Y. July 14, 1993).

RI Action applicable to the judgment-debtors and their agents also applied to the PMA ("Notice of Injunction"). *See* First Amended Complaint at ¶¶5-12, a true and complete copy is attached hereto as Pl.'s Exh. 1.

6.    The PMA, however, was never a party to the RI Action nor was it included in the RI Judgment. Pl.'s Exh. 1 at ¶ 7.

7.    On the basis of the Restraining Notice and the federal Notice of Injunction drafted by the Strachman Defendants' counsel, BNY suspended approximately $30,000,000 in wire transfers.[2] *Id.* at ¶ 44. BNY did so because the PMA was one bank in the chain of transfers relating to the suspended funds. Testimony of Jessica Goodwin ("Goodwin Testimony"), dated August 3, 2005 at 141-192, excerpts attached hereto as Pl.'s Exh. 9. The suspended transactions affected commercial and individual check clearing activities in the Palestinian Territories. Pl.'s Exh. 1. at ¶¶ 4; 21; 22.

8.    As the regulator of twenty-one commercial banks and one development bank operating in the Palestininan Territories, the PMA instituted an action in this Court on June 9, 2005. A first amended complaint was filed on July 19, 2005. *See* Pl.'s Exh. 1.

9.    In its complaint, the PMA alleged: (i) one count for declaratory relief requesting that the Court declare that the PMA is not an agent or alter-ego of the PA or PLO; (ii) tortious interference with business relations against BNY and the Strachman Defendants through the improper use of the New York creditor and federal injunction procedures; and (iii) conversion against BNY. Pl.s' Exh. 1.

---

[2] The precise amount of the dollar transactions affected by BNY's and the Strachman Defendants' actions are $39,634,693. As described in paragraphs 13 and 17 below, two transactions were cancelled due to insufficient funds. One further transaction (paragraph 22 below) was cancelled before BNY debited the PIB's account. The dollar value of the funds actually placed in the suspense account is $17,604,703.33. This amount does not include two Euro transactions in the amounts of 39,994.26 Euro and 15,000.01 Euro (¶¶ 30-31 below).

10.     The matter was first assigned to Justice Bernard Fried. Justice Fried suggested that the question of whether the PMA was correctly named in the Notice of Injunction may be better dealt with by the Rhode Island federal court. Accordingly, the PMA sought relief before the Honorable Ronald Lagueux in the United States District Court for the District of Rhode Island. Judge Lagueux took a different view of the matter stating that because the restrained property was located in New York and because BNY was a necessary party to any relief sought, the matter should be dealt with in New York.

11.     The PMA returned to this Court on June 30, 2005, the matter having been assigned to Justice Kornreich. The Court subsequently held a hearing on PMA's Order to Show Cause seeking a preliminary injunction directing BNY, *inter alia*, to immediately release the block on all funds, resulting from transfer orders by the Palestine International Bank ("PIB") on behalf of the PMA.

12.     The Strachman Defendants filed an answer, counterclaim and cross-claims to the complaint on July 18, 2005. A true and complete copy of the answer and counterclaims is attached hereto as Pl.'s Exh. 2. The Strachman Defendants never filed an answer to the PMA's first amended complaint.

13.     On August 3, 4, 5, and 8, 2005, this Court held an evidentiary hearing on the PMA's request for injunctive relief seeking release of the funds improperly frozen by BNY in response to the Strachman Defendants' improper Restraining Notice.

14.     Prior to the hearing, the Strachman Defendants received copies of all the banking records from BNY pertaining to the suspended wire transfer transactions. The Strachman Defendants used those records to compile "Transactions 1-19" under cover of Defendants' Injunction Hearing Exh. F, which were introduced into evidence during the injunction hearing.

4

Each exhibit contained a chart compiled by BNY identifying each particular suspended transaction. Each suspended transaction was supported by the underlying SWIFT[3] messages issued by BNY regarding the transaction and by letters sent by the commercial bank which was the intended beneficiary of the funds of the suspended transaction.

<u>The Suspended Transactions</u>

15.    During the evidentiary hearing the following undisputed facts regarding the nineteen transactions frozen by BNY were offered into evidence:

16.    On May 17, 2005, the PMA issued a payment order to its bank, the Palestine International Bank ("PIB) to transfer $184,990. PIB instructed BNY to transfer the funds to the Egyptian Arab Land Bank in Jerusalem. BNY froze the transaction based on the Restraining Notice before the funds were credited to the Egyptian Arab Land Bank. *See* Pl.'s Exh. 3, attached hereto (Defs.' Transaction No. 1); Testimony of Samuel Newman, August 8, 2005 ("Newman Testimony"), at 528-530 (All excerpts from Mr. Newman's testimony are attached hereto as Pl.'s Exh. 4).

17.    On May 16, 2005, the PMA issued a payment order to PIB to transfer $25,990. PIB instructed BNY to transfer the funds to the Egyptian Arab Land Bank in Jerusalem. BNY interrupted the transaction after debiting the PIB's account. *See* Pl.'s Exh. 5, attached hereto (Defs.' Transaction No. 2); Newman Testimony at 530:12-26 – 531:1-7.

18.    On May 17, 2005, the PMA issued a payment order to PIB to transfer $300,000. PIB instructed BNY to transfer the funds to the Jordan National Bank in Ramallah. BNY froze the funds after debiting the PIB's account. *See* Pl.'s Exh. 6, attached hereto (Defs.' Transaction No. 3); Newman Testimony at 531:16-26 – 532:1-5.

---

[3] SWIFT is the acronym for the communications system between banks in the funds transfer process—Society for Worldwide Interbank Financial Telecommunications. October Order at 7, note 8 (attached hereto as Exhibit 26).

19.    On May 16, 2005, the PMA issued a payment order to PIB to transfer $350,000. PIB instructed BNY to transfer the funds to the Jordan National Bank in Ramallah to the credit of the Jordan National Bank in Amman. BNY interrupted the transaction after debiting the PIB's account. *See* Pl.'s Exh. 7, attached hereto (Defs.' Transaction No. 4); Newman Testimony at 533:8-22.

20.    On May 17, 2005, PMA issued a payment order to PIB to transfer $10,000,000. PIB sent a written instruction to BNY to transfer the funds to JP Morgan/Chase in favor of Bank of Jordan, Ramallah, to be credited to the books of the Bank of Jordan in Amman. *See* Exh. 5 to the Kalbian Aff. The undisputed evidence shows that this transaction was cancelled due to insufficient funds. *See* Pl.'s Exh. 8, attached hereto (Defs.' Transaction No. 5); Newman Testimony at 534-535. However, Ms. Goodwin testified that BNY intended to freeze this transaction as soon as funds became available. Testimony of Jessica Goodwin, dated August 3, 2005 ("Goodwin Testimony") at 155-156, excerpts are attached hereto as Pl.'s Exh. 9.

21.    On May 16, 2005, the PMA issued a payment order to the PIB to transfer $310,000. PIB instructed BNY to transfer funds to the Bank of Jordan in Ramallah to the credit of the Bank of Jordan in its account at the Israel Discount Bank. BNY froze the funds after it debited PIB's account. *See* Pl.'s Exh. 10, attached hereto (Defs.' Transaction No. 6); Newman Testimony at 535:3-20.

22.    On May 16, 2005, the PMA issued a payment order to PIB to transfer $455,000. PIB instructed BNY to transfer the funds to Citibank to the further credit of the Housing Bank for Trade and Finance in Ramallah. BNY froze the funds after it debited PIB's account. *See* Pl.'s Exh. 11 attached hereto (Defs.' Transaction No. 7); Newman Testimony at 535:21-26 – 536:1-6.

6

23.    On May 16, 2005, the PMA issued a payment order to PIB requesting it to pay $779,900 to the Israeli Discount Bank on the books of BNY for further credit to the Al Quods Bank for Development and Investment in Ramallah. BNY froze the funds after it debited PIB's account. *See* Pl.'s Exh. 12 attached hereto (Defs.' Transaction No. 8); Newman Testimony at 536:7-25.

24.    On May 16, 2005, the PMA issued a payment order to PIB to transfer $2,399,990. PIB instructed BNY to transfer the funds to the Bank of Palestine in Gaza. Like Transaction #5 above, this transaction was stopped by BNY because of lack of funds in the PIB's account with BNY. Newman Testimony at 537:12-538:2. Ms. Goodwin testified that once PIB funds become available, BNY will seize the funds and place them into a suspense account Goodwin Testimony at 155:16-156:6; *see* Pl.'s Exh. 13 attached hereto (Defs.' Transaction No. 9).

25.    On May 16, 2005, the PMA issued a payment order to PIB for $649,990 requesting it to pay JP Morgan and Chase for the Arab Jordan Investment Bank in Amman for the subsequent credit to the Palestine Investment Bank in Ramallah. BNY would have paid JP Morgan and Chase through the CHIPS system.[4] JP Morgan and Chase would have then sent a payment order to Arab Jordan Investment Bank for the account of the Palestine Investment Bank. BNY froze the funds after debiting the PIB's account. *See* Pl.'s Exh. 14 attached hereto (Defs.' Transaction No. 10); Newman Testimony at 538:3-14.

26.    On May 16, 2005, the Union Bank for Savings and Investment in Amman issued a payment order to BNY to transfer $500,000. BNY was instructed to transfer the funds to the PIB, which was then to transfer the funds to PMA in favor of the Union Bank for Savings and Investment in Ramallah. BNY froze the funds after it debited the Union Bank Savings and

---

[4] "CHIPS" is the acronym for Clearing House Inter Bank Payment System.

Investment account on BNY's books. *See* Pl.'s Exh. 15 attached hereto (Defs.' Transaction No. 11); Newman Testimony at 538:23-26 – 539:1-11.

26.    On May 16, 2005, the Union Bank for Savings and Investment in Amman issued a payment order to BNY to transfer $450,000. BNY was instructed to transfer the funds to PIB who was to transfer the funds to PMA in favor of Union Bank for Savings and Investment in Ramallah. BNY debited the Union Bank for Savings and Investment's account on its books and froze the funds. *See* Pl.'s Exh. 16 attached hereto (Defs.' Transaction No. 12); Newman Testimony at 540:14-23 – 541:1-8.

27.    On May 17, 2005, the Fortis Bank in Belgium issued a payment order to the Deutsche Bank in New York to transfer $10,005,833.33. The Deutsche Bank sent a CHIPS transfer to BNY who in turn was instructed to credit the account of the Cairo Amman Bank in Ramallah which was to transfer funds to the PMA. BNY interrupted the transaction when it received the incoming funds from Deutsche Bank in New York. *See* Pl.'s Exh. 17 attached hereto (Defs.' Transaction No. 13); Newman Testimony at 541:9-25.

28.    On May 17, 2005, the Cairo Amman Bank sent a payment order to BNY for $9,630,000 to pay the PIB for the further credit of the PMA. This transaction was not frozen. The undisputed evidence demonstrates that the Cairo Amman Bank's account was never debited and the transaction was in fact cancelled. *See* Pl.'s Exh. 18 attached hereto (Defs.' Transaction No. 14); Newman Testimony at 542:1-21.

29.    On May 16, 2005, the Arab Islamic Bank in Ramallah issued a payment order to BNY to transfer $533,000. BNY was instructed to transfer the funds to PIB which was to transfer the funds to PMA in favor of the Arab Islamic Bank in El Birah. BNY debited Arab

Islamic Bank's account and froze the funds. *See* Pl.'s Exh. 19 attached hereto (Defs.' Transaction No. 15); Newman Testimony at 542:22-25 – 543:1-10.

30.     On May 31, 2005, the PMA issued a payment order to Commerz Bank in Frankfurt to transfer 39,994.26 Euro. Commerz Bank instructed BNY to transfer the funds to the Union Bank for Savings and Investment in Ramallah. *See* Pl.'s Exh. 20 attached hereto (Defs.' Transaction No. 16); Newman Testimony at 543:17-25 – 544:1-23.

31.     On June 8, 2005, the PMA issued a payment order to Commerz Bank in Frankfurt to transfer 15,000.01 Euro. Commerz Bank instructed BNY to credit the Arab Islamic Bank in Ramallah. BNY froze the funds after it debited Commerz Bank's account. *See* Pl.'s Exh. 21 attached hereto (Defs.' Transaction No. 17); Newman Testimony at 545:11-19.

32.     On May 16, 2005, the Arab Bank PLC in Ramallah issued a payment order to the Israeli Discount Bank in Tel Aviv to transfer $2,920,000. The Israeli Discount Bank instructed BNY to credit PIB with the funds to the credit of PMA. BNY froze the funds after it debited the Israeli Discount Bank's account. *See* Pl.'s Exh. 22 attached hereto (Defs.' Transaction No. 18); Newman Testimony at 544:11-25 – 545:1-7.

33.     On May 16, 2005, the PMA issued a payment order to PIB in the amount of $140,000 requesting that the PIB pay the Israeli Discount Bank on the books of BNY for the further credit of the Palestine Islamic Bank in Gaza. BNY froze the funds after it debited the PIB's account. *See* Pl.'s Exh. 23 attached hereto (Defs.' Transaction No. 19); Newman Testimony at 545:22-25 – 546:1-8.

34.     All suspended transactions are set forth in a chart created by BNY, a copy of which is attached hereto as Pl.'s Exh. 24 and was admitted into evidence during the Hearing.

**None of the Restrained Funds Belonged to the PMA and Were Restrained
in Violation of New York's Uniform Commercial Code Governing Fund Transfers**

35.    New York Uniform Commercial Code ("N.Y. U.C.C.") Article 4-A governs fund transfers. As set forth more fully in the accompanying memorandum of law, creditor process may only be served at limited stages during the fund transfer process. Pursuant to Sections 4-A-502(4) and 4-A-503 a court may only restrain funds "prior to initiation by the originator, prior to execution by the originator's bank, prior to release of funds by the beneficiary's bank, and prior to withdrawal of funds." *Weston Compagnie De Finance Et D'Investissment, S.A. v. La Republic Del Ecuador,* 1993 WL 267282, No. 93 Civ. 2698 (LMM) (S.D.N.Y. July 14, 1993).

36.    The Official Comment for N.Y. U.C.C. § 4-A-503 provides that Section 4-A-503 is "designed to prevent the interruption of a funds transfer after it has been set in motion." The Official Comment further provides that intermediary banks are specifically protected from injunctions.

37.    The above factual record demonstrates that by acting on the Restraining Notice and Notice of Injunction, BNY interrupted the funds transfer process after it had been initiated but prior to its completion.

38.    In sum, Transaction Nos. 1-10[5] and No. 19 were wrongfully interrupted, because the PIB, as the originator's bank, acted upon the instructions it received from the PMA and sent wire instructions to BNY to debit its account for the benefit of other banks. Newman Testimony at 528-546 (Pl.'s Exh. 4). BNY executed these instructions and debited the PIB's account and then interrupted the transaction by placing the funds in a suspense account.

---

[5] Transaction Nos. 16 and 17 were also wrongfully interrupted for the same reasons as Transaction Nos. 1-10 and 19, except that in those transactions, the PMA used a bank other than the PIB to send payment orders to BNY. Newman Testimony at 543:11-25 and 545:11-18.

39.    .In each of these transactions, once the PMA issued a payment order, only the PIB could have been restrained from executing the order by the Strachman Defendants, assuming of course that the PMA was the alter ego of the PA, which it is not. However, the Restraining Notice was served on BNY—the intermediary bank in Transaction Nos. 3-10, which cannot be restrained under Article 4-A-503, and in the remaining transactions, the wrong bank to be served with creditor process.

40.    At this stage in the transfer, title to the funds had passed and BNY held no funds in its possession titled to the PMA. *See* N.Y. UC.C. §§ 4-A- 209(1); 4-A-503; *European American Bank v. Bank of Nova Scotia,* 12 A.D.3d 189, 189-90, 784 N.Y.S.2d 99 (1st Dep't 2004) (levy cannot be enforced upon a bank receiving a funds transfer where such receiving bank will enact or conduct a further funds transfer); *see also Bank of New York v. Nickel,* 14 A.D.3d 140, 789 N.Y.S.2d 95 (1st Dep't 2004) (granting summary judgment on the issue of improper restraint of funds in transit).

41.    In Transaction Nos. 11-13 and 18, the originators and originators' banks were banks other than the PMA or PIB. None of these banks are judgment debtors of the Strachman Defendants; therefore none of the funds could be attached. In these transactions, after receiving a payment order, BNY was to issue its own payment order to the PIB, which in turn was to issue a payment order to the PMA. BNY never issued a payment order to the PIB in any of these transactions. Under Article 4-A-502(4), only the PIB (as the beneficiary's bank) could have been restrained from releasing payment to the PMA—the alleged judgment debtor—and not BNY.

42.    In view of the foregoing, the Strachman Defendants are not entitled, as a matter of law, to the restrained funds. In each transaction, even assuming, *arguendo,* that the PMA is the

11

alter ego of the PA (which it is not), BNY was the wrong bank to serve with creditor process and the Strachman Defendants' turnover counterclaim fails as a matter of law. Accordingly, the Court should grant the PMA's summary judgment motion and discharge the undertaking requirement.

### The Court's October 14, 2005 Decision and Order

43.    By stipulation dated October 5, 2005, the parties agreed that the PMA's claims against BNY be dismissed with prejudice. A true and complete copy of the Stipulation of Discontinuance is attached hereto as Pl.'s Exh. 25.

44.    On October 14, 2005, the Court issued a Decision and Order granting the PMA's motion for preliminary injunction ("October Order"). A true and complete copy of the Decision and Order is attached hereto as Pl.'s Exh. 26. The Court held, *inter alia*, that the Restraining Notice should be vacated, because BNY did not hold any funds belonging to the PMA and the Restraining Notice was improperly served on BNY.

45.    Accordingly, the Court ordered BNY to:

> [R]elease the block on all funds resulting from transfer orders by the Palestine International Bank on behalf of the Palestine Monetary Authority and to honor all pending and future incoming and outgoing transactions by the Palestine Monetary Authority through the Palestine International Bank or any other agent designated by [*sic*] Palestine Monetary Authority, upon the posting of an undertaking by the Palestine Monetary Authority in the amount of $30,000,000 within fifteen days of the entry of this decision (CPLR 6312(b)).

October Order at 26 (Pl.'s Exh. 26).

46.    The Court further held that:

> [T]he process employed here by the Strachman parties in restraining the PMA troubles the Court. The PMA was never a party to the underlying lawsuit and was not mentioned in the Federal injunction. Rather, the Strachman parties added it to the Notice of Injunction.

12

PMA's first intimation of any involvement with the Strachman parties' claim came only after the funds at BNY were restrained. Procedural due process concerns are raised.

*Id.* (internal citations omitted).

### The Executive Branch of the U.S. Federal Government Has Declared That the PMA is an Independent Agency

47.     On April 12, 2006, the U.S. Department of the Treasury, Office of Foreign Asset Control ("OFAC") issued General License No. 4, stating that the PMA is an independent agency.[6]  A true and complete copy of OFAC General License No. 4, dated April 12, 2006, Exec. Order No. 13,224, 31 C.F.R. Parts 594, 595, 597 (2001), is attached hereto as Exhibit 27.

48.     OFAC administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries, terrorists, international narcotics traffickers, and those engaged in activities related to the proliferation of weapons of mass destruction.[7]

49.     OFAC derives its authority from the President's powers pursuant to, *inter alia*, the U.S. Constitution and the International Emergency Economic Powers Act (the "IEEPA"), 50 U.S.C.S. § 1701, *et seq.*  The IEEPA gives the President authority to prohibit any transfer of any property in which any foreign country or a national thereof has any interest.  50 U.S.C.S. § 1702(a)(1)(B).

50.     Pursuant to his powers under the U.S. Constitution and the laws of the U.S., including the IEEPA, on September 24, 2001, President Bush signed Executive Order No. 13,244. 66 Fed. Reg. 49,079 (2001).  That Order blocks all property and interests in property of designated terrorist organizations, known as specially designated global terrorists, or SDGTs. *Id.*

---

[6] The Department of the Treasury is an executive department of the U.S. federal government. *See* 31 U.S.C. § 301.

[7] *See* http://www.treas.gov/offices/enforcement/ofac/

On October 31, 2001, the President designated the Islamic Resistance Movement (commonly known as "Hamas"), a Palestinian military and political organization, as one of the SDGTs subject to the Order.[8]

51.    Acting pursuant to its delegation of authority from the President, on April 12, 2006, OFAC determined that the newly-elected Hamas government has a property interest in the PA.[9]  As such, OFAC restricted U.S. persons' dealings with the PA.  *See* OFAC Recent Action Notice, dated April 12, 2006, attached hereto as Pl.'s Exh. 28.  Certain dealings with the PA are either prohibited, require a specific license (determined by OFAC on a case-by-case basis) or are subject to a general license.  *Id.*

52.    General License No. 4 provides, in pertinent part:

(a) U.S. persons are authorized to engage in all transactions otherwise prohibited under 31 C.F.R. parts 594, 595, or 597 with the following entities and individuals:

...

(iv) the following independent agencies: the Central Elections Commission; the Independent Citizens Rights Commission; the General Audit Authority/External Audit Agency; and the Palestine Monetary Authority.

OFAC General License No. 4, dated April 12, 2006, Exec. Order No. 13,224, 31 C.F.R. Parts 594, 595, 597 (2001) (emphasis supplied).

53.    In view of the foregoing OFAC general license, the Executive Branch has already determined that the PMA is an independent agency.  Had it found that the PMA was either controlled by or a part of the PA, the Executive Branch would have included the PMA within the prohibitions enacted against the PA.

---

[8] Hamas' property and interests in property are blocked under three distinct OFAC-administered economic sanctions programs: (1) the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594; (2) the Terrorism Sanctions Regulations, 31 C.F.R. Part 595; and (3) the Foreign Terrorist Organizations Sanctions Regulations, 31 C.F.R. Part 597.
[9] *See* http://www.treas.gov/offices/enforcement/ofac/actions/20060412.shtml

14

54.    In view of the foregoing determination by the Executive Branch and as discussed more fully in the accompanying memorandum of law, the Strachman Defendants' request for declaratory relief presents a non-justiciable question pursuant to the political question doctrine.

55.    Finally, the Strachman Defendants' declaratory relief request should also be dismissed pursuant to C.P.L.R. 3001, because there is no New York state interest implicated in the request that would warrant this Court deciding the matter.  Resolution of this question will have no immediate impact on the rights of the parties, because there are no assets in New York to satisfy any ruling against the PMA (notwithstanding the argument that the political question doctrine presents a non-justiciable question) and the request seeks a bare declaration tantamount to an advisory opinion.

### Stipulation of Partial Discontinuance

56.    On May 24, 2006, the PMA's New York counsel forwarded an executed Stipulation of Partial Discontinuance wherein the parties agreed that the PMA's claims for money damages against the Strachman Defendants would be discontinued.  On June 12, 2006, Robert J. Tolchin, Esq., counsel for the Strachman Defendants, represented to the PMA's New York counsel that he executed the stipulation and submitted it to the Court to be so-ordered.  The undersigned has not yet received a copy of the fully executed stipulation, even though a copy has been requested from Mr. Tolchin.

### Conclusion

57.    Based on the undisputed factual record and the legal argument set forth in the accompanying memorandum of law, the Court should grant the PMA's motion for summary judgment on all the Strachman Defendants' counterclaims.

15

Dated: June 23, 2006

_____
Haig V. Kalbian

TO:
      Robert J. Tolchin, Esq.
      Jaroslawicz & Jaros, Esqs.
      150 William Street, 19th Floor
      New York, New York 10038

      *Attorney for David Strachman, et al.*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------X
PALESTINE MONETARY AUTHORITY,                          :
                                                       :
                    Plaintiff-Counterclaim Defendants, :
                                                       :
            v.                                         :        Index No.: 107777/05
                                                       :
DAVID STRACHMAN, as administrator of the               :
ESTATE OF YARON UNGAR, *et al.*,                       :
                                                       :
                    Defendants-Counterclaim Plaintiffs. :
---------------------------------------------------------------X

### MEMORANDUM OF LAW IN SUPPORT OF THE PALESTINIAN MONETARY AUTHORITY'S MOTION FOR SUMMARY JUDGMENT AND DISCHARGE OF UNDERTAKING

KALBIAN HAGERTY LLP
Haig V. Kalbian (admitted *pro hac vice*)
Claire A. DeLelle
The Brawner Building
888 17th Street, N.W.,
Suite 1000
Washington, DC 20006-3967
(202) 223-5600

BUSHELL & VALLIERE LLP
Victor C. Bushell
Cem Ozer
60 East 42nd Street
Suite 2925
New York, New York 10165
(212) 949-4700

*Attorneys for the Palestine Monetary Authority*

RECEIVED

JUN 3 0 2006

NEW YORK
COUNTY CLERK'S OFFICE

NYS SUPREME COURT
RECEIVED

JUN 3 0 2006

MOTION SUPPORT OFFICE

## TABLE OF CONTENTS

PAGE

I.    TABLE OF AUTHORITIES .......................................................... vii

II.   INTRODUCTION .................................................................... 1

III.  FACTUAL AND PROCEDURAL SUMMARY ......................................... 2

IV.   ARGUMENT ........................................................................ 5

    I.    APPLICABLE LEGAL STANDARD ............................................ 5

    II.   THE UNDISPUTED FACTS DEMONSTRATE THAT THE
          STRACHMAN DEFENDANTS ARE NOT ENTITLED TO THE
          FROZEN FUNDS AS A MATTER OF LAW BECAUSE THE
          PREVIOUSLY RESTRAINED FUNDS DO NOT BELONG TO
          THE PMA AND WERE ILLEGALLY RESTRAINED .................... 6

          A.    Under New York Uniform Commercial Code Article
                4-A, BNY Held no PMA Assets ................................. 7

          B.    Creditor Process may only be Served at Limited
                Stages of the Funds Transfer Process ....................... 8

          C.    The Eighteen Previously Restrained Fund
                Transactions ................................................ 11

                1.    The Strachman Defendants Are Not Entitled
                      To The Funds From Transactions #3-10, #13,
                      #18, And #19 As A Matter Of Law Because
                      BNY Was An Intermediary Bank And
                      Illegally Interrupted These Transactions ....... 13

                2.    As A Matter of Law, The Strachman Defendants
                      Are Not Entitled To The Funds From Transactions
                      #1-2, #11-12, And #15 Because BNY Was Not
                      The Proper Bank To Be Served With Creditor
                      Process ....................................... 17

    III.  THE UNDERTAKING REQUIREMENT PURSUANT TO
          C.P.L.R. § 6312(B) SHOULD BE DISCHARGED .................... 21

IV.  THE PMA IS ENTITLED TO SUMMARY JUDGMENT ON THE
     SECOND COUNTERCLAIM BECAUSE THERE ARE NO ASSETS
     WITHIN NEW YORK STATE AND THIS COURT CANNOT
     COMPEL THE PMA TO BRING ASSETS INTO THE
     JURISDICTION .................................................................... 21

V.   THIS COURT LACKS SUBJECT MATTER JURISDICTION
     OVER THE STRACHMAN'S REQUEST FOR
     DECLARATORY JUDGMENT ............................................. 23

     A.   The Political Question Doctrine Bars Declaratory
          Judgment on the Alter-Ego Question ............................. 23

          1.   The Executive Branch Has Determined That The PMA
               Is An Independent Agency ...................................... 24

          2.   The Non-Justiciability Of A Political Question Is Primarily
               A Function of the Separation Of Powers .................... 26

               a.   Textually Demonstrable Constitutional Commitment
                    To The Executive Branch Of Government ............ 27

               b.   Impossibility Of The Court's Undertaking Independent
                    Resolution Without Expressing Lack Of Respect Due
                    Coordinate To The Legislative and Executive
                    Branches ............................................................. 28

               c.   This Case Presents Unique Circumstances Warranting
                    Unquestioning Adherence To OFAC's
                    Determination .................................................... 29

               d.   Deciding The Alter-Ego Question Could Lead To
                    Multifarious Pronouncements By Different
                    Government Branches And Could Also Violate
                    The Supremacy Clause Of The U.S.
                    Constitution ....................................................... 30

     B.   The Strachman Defendants' Declaratory Relief
          Request must be Otherwise Dismissed Because
          Defendants Seek an Advisory Opinion that will
          have no Immediate Impact on the Parties'
          Rights ......................................................................... 31

VI.  CONCLUSION .................................................................... 33

# TABLE OF AUTHORITIES

**STATE CASES**                                                                **Page**

*ABKCO Indus. v. Apple Films, Inc.,*
39 N.Y.2d 670 (1976)..........................................................................    32

*Alvord v. Swift & Muller Constr. Co.,*
46 N.Y.2d 276 (1978)..........................................................................    5

*Bank of New York v. Nickels,*
14 A.D.3d 140 (1st Dep't 2004)..........................................................    8, 10

*Bass v. Bass,*
140 A.D.2d 251(1st Dep't 1988)..........................................................    6

*Carpenter & Hughes v. De Joseph,*
29 Misc. 2d 519 (N.Y. Sup. Ct. 1961).................................................    21

*European American Bank v. Bank of Nova Scotia,*
12 A.D.3d 189 (1st Dep't 2004)..........................................................    10

*Fried v. Bower & Gardner,*
46 N.Y.2d 765 (1978)..........................................................................    5

*Gryphon Domestic VI, LLC v. App Intl. Fin.Co., D.V.,*
2005 N.Y. Slip Op. 50481U (N.Y. Sup. Ct. Feb. 9, 2005).....................    32

*J. A. Preston Corp. v. Fabrication Enterprises, Inc.,*
68 N.Y.2d 397 (1986)..........................................................................    21

*Jones v. Beame,*
45 N.Y.2d 402 (1978)..........................................................................    26, 29

*Mallad Constr. Corp. v. County Fed. Sav. & Loan Assn.,*
32 N.Y.2d 285 (1973)..........................................................................    5

*McCloskey v. Chase Manhattan Bank,*
11 N.Y.2d 936 (1962)..........................................................................    22

*National Union Fire Ins. Co. of Pitts v. Advanced Employment Concepts, Inc.,*
269 A.D.2d 101(1st Dep't 2000)..........................................................    32

*New York Public Interest Research Group, Inc. v. Carey,*
42 N.Y.2d 527 (1977)..........................................................................    30, 32

*Parkoff v. General Tel. & Electronics Corp.,*
53 N.Y.2d 412 (1981)............................................................................ 21

*Platzman v. American Totalisator Co.,*
45 N.Y.2d 910 (1978)............................................................................ 5

*S. J. Capelin Associates, Inc. v. Globe Mfg. Corp.,*
34 N.Y.2d 338 (1974)............................................................................ 21

*Smith v. Western Union Tel. Co.,*
276 A.D. 210 (1st Dep't 1949).............................................................. 30, 32

*Zuckerman v. New York,*
49 N.Y.2d 557 (1980)............................................................................ 5

## FEDERAL CASES

*Baker v. Carr,*
369 U.S. 186 (1962)............................................................................... 26, 28

*Bancoult v. McNamara,*
445 F.3d 427 (D.C. Cir. 2006).............................................................. 26

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000)............................................................................... 28, 30

*Doe v. State of Israel,*
400 F. Supp. 2d 86 (D.D.C. 2005)........................................................ 29

*First National City Bank v. Banco Para El Comercio Exterior De Cuba,*
462 U.S. 611 (1983)............................................................................... 23

*Haig v. Agee,*
453 U.S. 280 (1981)............................................................................... 29

*Japan Whaling Ass'n v. Am. Cetacean Society,*
478 U.S. 221 (1986)............................................................................... 26

*Kharas Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*
313 F.3d 70 (2d Cir. 2002).................................................................... 20

*Koehler v. The Bank of Bermuda Ltd.,*
2005 U.S. Dist. LEXIS 3760 (S.D.N.Y. March 9, 2005)...................... 22

*Mones v. Commercial Bank of Kuwait,*
399 F. Supp. 2d 310 (S.D.N.Y. 2005)................................................... 22

iv

*New York Times Co. v. U.S.*,
403 U.S. 727 (1971) ................................................................ 27

*Oetjen v. Central Leather Co.*,
246 U.S. 297 (1918) ................................................................ 28

*Schneider v. Kissinger*,
412 F.3d 190 (D.C. Cir. 2005) ................................................ 27, 29

*U.S. v. Belmont*,
301 U.S. 324 (1937) ................................................................ 26

*U.S. v. Curtis-Wright Export Co.*,
299 U.S. 304 (1936) ................................................................ 28

*Weston Compagnie De Finance Et D'Investissement, S.A., v.*
*La Republica Del Ecuador, et al.*,
1993 WL 267282, at *2 (S.D.N.Y. July 14, 1993) ..................... 3, *passim*

**STATE STATUTES**

N.Y. C.P.L.R. § 3001 .............................................................. 26

N.Y. C.P.L.R. § 3212 .............................................................. 1

N.Y. C.P.L.R. § 3212(b) .......................................................... 5

N.Y. C.P.L.R. § 5222 .............................................................. 6

N.Y. C.P.L.R. § 5240 .............................................................. 8

N.Y. C.P.L.R. § 6312(b) .......................................................... 21

N.Y. U.C.C. § 4-A ................................................................. 2, *passim*

N.Y. U.C.C. § 4-A-102 ............................................................ 7

N.Y. U.C.C. § 4-A-103(1)(a) .................................................... 7

N.Y. U.C.C. § 4-A-103(1)(b) .................................................... 7

N.Y. U.C.C. § 4-A-103(1)(c) .................................................... 8

N.Y. U.C.C. § 4-A-103(1)(d) .................................................... 7

N.Y. U.C.C. § 4-A-103(1)(e) .................................................... 7

N.Y. U.C.C. § 4-A-104(1) ....................................................... 7, 18

N.Y. U.C.C. § 4-A-104(2) ....................................................... 13, 17

N.Y. U.C.C. § 4-A-104(3) ....................................................... 7

N.Y. U.C.C. § 4-A-105(1)(b) .................................................... 14

N.Y. U.C.C. § 4-A-209 .......................................................... 8

N.Y. U.C.C. § 4-A-209(1) ....................................................... 10

N.Y. U.C.C. § 4-A-404(1) ....................................................... 7, 19

N.Y. U.C.C. § 4-A-406 .......................................................... 8

N.Y. U.C.C. § 4-A-502 .......................................................... 3, *passim*

N.Y. U.C.C. § 4-A-502(1) ....................................................... 3

N.Y. U.C.C. § 4-A-502(4) ....................................................... 8, *passim*

N.Y. U.C.C. § 4-A-503 .......................................................... 8, *passim*

U.L.A. U.C.C. § 4-A ............................................................ 7

## FEDERAL STATUTES AND OTHER FEDERAL AUTHORITY

International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.* .. 26

National Emergencies Act, 50 U.S.C. § 1601, *et seq.* ...................... 26

United Nations Participation Act of 1945, 22 U.S.C. § 287c ................. 26

Executive Order, No. 13,244
66 Fed. Reg. 49,079 (2001) (President George W. Bush) ..................... 24, 25

Global Terrorism Sanctions Regulations,
31 C.F.R. Part 594 ....................................................... 24, 25

Terrorism Sanctions Regulations,
31 C.F.R. Part 595 ....................................................... 24, 25

Foreign Terrorist Organizations Sanctions Regulations,
31 C.F.R. Part 597.................................................................     24, 25

OFAC Recent Action Notice, dated April 12, 2006...............................     25

OFAC General License No. 4, dated April 12, 2006,
promulgated pursuant to Exec. Order No. 13,224,
31 C.F.R. Parts 594, 595, 597 (2001)..........................................     25

Plaintiff Palestine Monetary Authority ("PMA"), pursuant to C.P.L.R. § 3212, through its counsel, Kalbian Hagerty L.L.P., respectfully submits this memorandum of law in support of its motion for summary judgment on all counter and cross-claims alleged by Defendants David Strachman, as Administrator of the Estates of Yaron Ungar, Professor Meyer Ungar, Judith Ungar, Rabbi Uri Dasberg and Judith Dasberg (Individually and in Their Capacity as Legal Guardians of Plaintiffs Dvir Ungar and Yishai Ungar), Amichai Ungar, Dafna Ungar, and Michal Cohen (collectively the "Strachman Defendants") and on other grounds specified herein.

## INTRODUCTION

### The Strachman Defendants' Counterclaims and Cross-claims

The Strachman Defendants' counterclaims and cross-claim ask the Court to do three things, none of which are permitted by law and are, therefore, ripe for summary judgment. First, the Strachman Defendants ask this Court to declare that the PMA is the alter ego of the Palestinian Authority ("PA") and, therefore, liable for the full amount of a judgment obtained by them against the PA and others in the United States District Court for the District of Rhode Island in the matter of *Estates of Yaron Ungar et al. v. The Palestinian Authority, et al.*, C.A. No. 00105(L) (Hon. Ronald R. Laguex (the "RI Judgment" or the "RI Action"). The Executive Branch of the United States Government (through the Department of the Treasury's Office of Foreign Assets Control "OFAC"), pursuant to statute, however, has already determined the PMA is independent of the PA. The Executive and Legislative Branches of the United States Government are constitutionally vested with exclusive powers over foreign affairs.

Accordingly, the issue of the PMA's relationship to the PA is a political question that is not justiciable by this Court. Furthermore, if this Court were to find the PMA is the alter ego of the PA, such a decision would directly conflict with OFAC's finding and, therefore, be nullified

by the preemptive effect of the Supremacy Clause. Finally, regardless of whether such a ruling will conflict with federal law, New York has no interest in ruling on this issue because the assets central to this dispute should not have been restrained under New York's Uniform Commercial Code and cannot under any circumstances be turned over, as a matter of law, to the Strachman Defendants.

Second, the Strachman Defendants ask the Court to rule that the PMA is holding assets that belong to the PA or owed to the PA and, therefore, are subject to turnover to satisfy the RI Judgment. Even if the PMA were holding PA funds, which it is not, New York law does not permit this Court to order a financial intermediary holding funds of a judgment debtor outside of New York to bring such funds into New York for turnover to the judgment creditor.

Third, the Strachman Defendants ask this Court to order BNY to turnover funds ostensibly belonging to the PMA in order to satisfy the RI Judgment. The Strachman Defendants' request must be denied, however, because it violates New York laws on the levy on funds transfers as articulated in N.Y U.C.C. Article 4-A.

## FACTUAL AND PROCEDURAL SUMMARY

This case arises from the collection efforts of the Strachman Defendants in connection with a judgment for $116,000,000.00 entered by the United States District Court for the District of Rhode Island in the matter of *Estates of Yaron Ungar et al. v. The Palestinian Authority, et al.*, C.A. No. 00105(L) (Hon. Ronald R. Laguex). *See* Affirmation of Haig V. Kalbian, Esq., dated June 22, 2006 ("Kalbian Aff.") at ¶ 3. The Strachman Defendants domesticated the RI Judgment in New York County under Index Number 105521/05. Defendants then availed

themselves of the New York creditor process[1] to restrain certain funds passing through the Bank of New York. Kalbian Aff. at ¶ 4.

### The Restraining Notice

Specifically, Defendants served a Restraining Notice on BNY which named the PMA, among others, as an agent of the Palestinian Authority—the judgment-debtors in the RI Action. In support of their Restraining Notice to BNY, the Strachman Defendants attached a federal Notice of Injunction—drafted by their counsel on law firm letterhead—which stated that an injunction granted in the RI Action applicable to the judgment-debtors and their agents also applied to the PMA ("Notice of Injunction"). *Id.* at ¶ 5. The PMA, however, was never a party to the RI Action nor was it included in the RI Judgment. *Id.* at ¶ 6.

On the basis of the Restraining Notice and the federal Notice of Injunction drafted by the Strachman Defendants' counsel, BNY suspended approximately $30,000,000 in wire transfers.[2] Kalbian Aff. at ¶ 7. BNY did so because the PMA was one entity in the chain of transfers relating to the suspended funds. *Id.* The suspended transactions affected commercial and individual check clearing activities in the Palestinian Territories. *Id.*

As the regulator of twenty-one commercial banks and one development bank operating in the Palestinian Territories, the PMA instituted an action in this Court on June 9, 2005. Kalbian Aff. at ¶ 8. The matter was first assigned to Justice Bernard Fried. *Id.* at ¶ 10. Justice Fried suggested that the question of whether the PMA was correctly named in the Notice of

---

[1] "Creditor process" means levy, attachment, garnishment, notice of lien, sequestration, or similar process issued by or on behalf of a creditor or other claimant with respect to an account. N.Y. U.C.C. § 4-A-502(1). The term "creditor process" is a generic term that covers a variety of devices creditors may use, including both attachments and injunctions. *See Weston Compagnie De Finance Et D'Investissement, S.A.,* 1993 WL 267282, at *2; Official Comment to N.Y. U.C.C. § 4-A-502 at paragraph 5.

[2] The precise amount of the dollar transactions affected by BNY's and the Strachman Defendants' actions are $39,634,693. As described in paragraphs 13 and 17 below, two transactions were cancelled due to insufficient funds. One further transaction (paragraph 22 below) was cancelled before BNY debited the PIB's account. The dollar value of the funds actually placed in the suspense account is $17,604,703.33.

Injunction may be better dealt with by the Rhode Island federal court. *Id.* Accordingly, the PMA sought relief before the Honorable Ronald Lagueux in the United States District Court for the District of Rhode Island. *Id.* Judge Lagueux took a different view of the matter stating that because the restrained property was located in New York and because BNY was a necessary party to any relief sought, the matter should be dealt with in New York. Kalbian Aff. at ¶ 10.

The PMA returned to this Court on June 30, 2005, the matter having been assigned to Justice Kornreich. *Id.* at ¶ 11. The Court subsequently held a hearing on PMA's Order to Show Cause seeking a preliminary injunction directing BNY, *inter alia*, to immediately release the block on all funds, resulting from transfer orders by the Palestine International Bank ("PIB") on behalf of the PMA. *Id.*

### The Injunction Hearing

On August 3, 4, 5, and 8, 2005, this Court held an evidentiary hearing on the PMA's request for injunctive relief. Kalbian Aff. at ¶ 13. Prior to the hearing, the Strachman Defendants received copies of all the banking records from BNY pertaining to the suspended wire transfer transactions. *Id.* at ¶ 14. There is no factual dispute as to the fact that the PMA has no ownership interest in any of the suspended funds. Critical for the purposes of this Motion, testimony was given by Jessica Goodwin, Vice President and Group Manager of the Funds Transfer Division of BNY and Samuel Newman, who was called to testify by the Strachman Defendants as an expert in fund transfers. Both witnesses provided unrefuted testimony regarding the BNY suspended wire transfers and the role that each bank implicated in the transactions played in the transfer process. Pl.'s Exh. 26 at 13. The undisputed evidence demonstrates that none of the affected funds belonged to the PMA and the funds were thus improperly restrained.

# ARGUMENT

## I.    APPLICABLE LEGAL STANDARDS

C.P.L.R. § 3212 (b) authorizes an award of summary judgment when "upon all the papers and proof submitted, the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in directing judgment" in the movant's favor. C.P.L.R. § 3212(b). The movant must support his motion by tender of evidentiary proof in admissible form. *Zuckerman v. New York*, 49 N.Y.2d 557, 562 (1980). To defeat a motion for summary judgment the opposing party must "show facts sufficient to require a trial of any issue of fact." *Id.*, citing C.P.L.R. § 3212(b). If the opponent is to succeed in defeating a summary judgment motion he, too, must make his showing by producing evidentiary proof in admissible form. *Id.*

The New York Court of Appeals has repeatedly held that one opposing a motion for summary judgment must produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact on which he rests his claim or must demonstrate acceptable excuse for his failure to meet the requirement of tender in admissible form; mere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient. *Zuckerman*, 49 N.Y.2d at 562-63, citing *Alvord v. Swift & Muller Constr. Co.*, 46 N.Y.2d 276, 281-282 (1978); *Fried v. Bower & Gardner*, 46 N.Y.2d 765, 767 (1978); *Platzman v. American Totalisator Co.*, 45 N.Y.2d 910, 912 (1978); *Mallad Constr. Corp. v. County Fed. Sav. & Loan Assn.*, 32 N.Y.2d 285, 290 (1973).

The Strachman Defendants are unable to raise a genuine, triable issue of material fact as to any of their counterclaims and crossclaims.

II.    **THE UNDISPUTED FACTS DEMONSTRATE THAT THE STRACHMAN DEFENDANTS ARE NOT ENTITLED TO THE FROZEN FUNDS AS A MATTER OF LAW, BECAUSE THE PREVIOUSLY RESTRAINED FUNDS DO NOT BELONG TO THE PMA AND WERE ILLEGALLY RESTRAINED.**

On October 14, 2005, this Court made the preliminary finding that the Strachman Defendants were not legally entitled to the restrained funds, because "BNY holds no property of PMA, which may be restrained pursuant to Article 52." *See* Order of the Honorable Shirley Werner Kornreich, dated October 14, 2005 ("October Order"), at 17 and 20-21, attached to the Kalbian Aff. as Pl.'s Exh. 26. That is, regardless of whether the PMA is an agent or alter-ego of the PA or the PLO —which it is not—the Strachman Defendants could never be legally entitled to turn over the BNY restrained funds, as requested in their Third Counterclaim. This issue is ripe for summary disposition because there are no material facts that could alter the Court's preliminary findings in this regard in any manner.

Specifically, the Court held (and it is undisputed) that the restrained funds do not belong to the PMA under the New York Uniform Commercial Code. Pl.'s Exh. 26 at 17; 20-21. As such, the restraining notice was invalid because:

> [a] restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest.

*Id.* at 17, quoting C.P.L.R. § 5222; *Bass v. Bass*, 140 A.D.2d 251, 253 (1st Dep't 1988).

Given that the funds do not belong to the PMA for the purposes of assessing the validity of a restraining order it follows then that the Strachman Defendants' turnover request also fails. If the funds do not belong to the PMA then the Court need never reach the question of whether the PMA was the alter-ego of the PA.

As the Court held in the October Order, N.Y. U.C.C. Article 4-A-503 delineates specific stages in the wire transfer process when funds may be permissibly restrained by the court in aid of a judgment creditor.  Pl.'s Exh. 26 at 19-20.  As demonstrated below, the Strachman Defendants improperly served process on BNY, which was the wrong bank in the funds transfer process to be served if the Strachman Defendants intended to capture funds that they claim belong to the PMA as the alleged agent or alter-ego of the PA.

A.     **Under New York Uniform Commercial Code Article 4-A, BNY Held No PMA Assets**

As to the PMA, the Restraining Notice was unlawful under New York law.  Article 4-A of the New York Uniform Commercial Code governs funds transfers.  N.Y. U.C.C. § 4-A-102. "'Funds transfer' means the series of transactions, beginning with the originator's[3] payment order[4], made for the purpose of making payment to the beneficiary[5] of the order." N.Y. U.C.C. § 4-A-104(1).  "The term ['funds transfer'] includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order." *Id.* Notwithstanding the fact that Article 4-A uses the term "funds transfer" to identify the payment from the originator to the beneficiary, "no money or property right of [the originator] is actually transferred to the beneficiary." U.L.A. U.C.C. Article 4-A References & Annotations at 5. Instead, the originator pays the beneficiary by causing the beneficiary's bank to become indebted to the beneficiary in the amount of the payment. *Id.* "A funds transfer is completed by the

---

[3] An "originator" is the sender of the first payment order in a funds transfer. N.Y. U.C.C. § 4-A-104(3). A "sender" is the person giving the instruction to the receiving bank. N.Y. U.C.C. § 4-A-103(1)(e). A "receiving bank" is the bank to which the sender's instruction is addressed. N.Y. U.C.C. § 4-A-103(1)(d).

[4] A "payment order" is an instruction of a sender to a receiving bank to pay, or cause another bank to pay, a fixed or determinable amount of money to a beneficiary if: (i) the instruction does not state a condition to payment to the beneficiary other than time of payment, (ii) the receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender, and (iii) the instruction is transmitted by the sender directly to the receiving bank or to an agent, funds transfer system, or communication system for transmittal to the receiving bank. N.Y. U.C.C. § 4-A-103(1)(a).

[5] A "beneficiary" is the person who to be paid by the beneficiary's bank. N.Y. U.C.C. § 4-A-103(1)(b).

acceptance[6] by the beneficiary's bank[7] of a payment order for the benefit of the beneficiary of the originator's payment order." *Id.* Therefore, payment by the originator to the beneficiary occurs when the beneficiary's bank accepts a payment order for the benefit of the beneficiary of the originator's payment. N.Y. U.C.C. § 4-A-406. Thus, where there is no acceptance on the beneficiary's behalf by the beneficiary's bank, no assets are actually conveyed.

In short, the funds transfer process works by the issuance of a series of instructions, not the actual transmission of the originator's funds from the originator to the beneficiary.[8] The Restraining Notice (vacated by the October Order pursuant to C.P.L.R. § 5240) and the Notice of Injunction only, however, enjoined BNY from disposing of assets in its possession belonging to PA and/or PLO titled in the PMA. Neither the Restraining Notice nor the lawyer-drafted Notice of Injunction instructed BNY to interrupt payment orders in which the PMA was only one entity in the wire transfer chain and could not do so because no assets of the PMA ever came into BNY's possession.

**B.    Creditor Process May Only Be Served At Limited Stages Of The Funds Transfer Process.**

N.Y. U.C.C. §§ 4-A-502(4) and 4-A-503 provide that creditor process may only be served at certain limited stages in the funds transfer process. Section 4-A-502(4) provides that:

---

[6] "Acceptance" by the beneficiary's bank occurs (i) when the beneficiary's bank pays the beneficiary or notifies the beneficiary of receipt of the payment order, or (ii) when the beneficiary's bank receives payment from the bank that issued the payment order to the beneficiary's bank. N.Y. U.C.C. § 4-A-209.
[7] A "beneficiary's bank" is the bank identified in a payment order in which an account of the beneficiary is to be credited pursuant to the order or which otherwise is to make payment to the beneficiary if the order does not provide for payment to an account. N.Y. U.C.C. § 4-A-103(1)(c).
[8] Upon execution of the originator's payment order by the originator's bank, title to the funds transfers from the originator to the originator's bank. *Bank of New York v. Nickels,* 14 A.D.3d 140, 789 N.Y.S.2d 95, 99 (1st Dep't 2004).

> Creditor process with respect to a payment by the originator to the beneficiary pursuant to a funds transfer may be served only on the beneficiary's bank with respect to the debt owed by that bank to the beneficiary. Any other bank served with the creditor process is not obliged to act with respect to the process.

Similarly, the related Section 4-A-503 provides:

> For proper cause and in compliance with applicable law, a court may restrain
>
> > (i)    a person from issuing a payment order to initiate a funds transfer,
> >
> > (ii)   an originator's bank from executing the payment order of the originator, or
> >
> > (iii)  the beneficiary's bank from releasing funds to the beneficiary or the beneficiary from withdrawing the funds.

> A court may not otherwise restrain a person from issuing a payment order, paying or receiving payment of a payment order, or otherwise acting with respect to a funds transfer.

Accordingly, "[a] court may only restrain a funds transfer at certain stages of the operation – prior to initiation by the originator, prior to execution by the originator's bank, prior to release of funds by the beneficiary's bank, and prior to withdrawal of funds." *Weston Compagnie De Finance Et D'Investissment, S.A. v. La Republic Del Ecuador*, 1993 WL 267282, No. 93 Civ. 2698 (LMM) (S.D.N.Y. July 14, 1993) (a copy of which is attached hereto at Appendix A). The Official Comment for N.Y. U.C.C. § 4-A-503 states this section was "designed to prevent interruption of a funds transfer after it has been set in motion." The Official Comment further provides that other than enjoining the originator, the originator's bank, the beneficiary's bank or the beneficiary, no other injunction is permitted; intermediary banks are

specifically protected from injunctions. *See also* Official Comment to Section 4-A-502(4) at paragraph 4.

In each of the transactions at issue (and as the Court held in its October Order), BNY was either an intermediary bank or the bank of a beneficiary or sender other than the judgment-debtor of the Strachman Defendants. Pl.'s Exh. 26 at 20. Therefore, creditor process was improperly served on BNY. As such, the Court correctly reached the conclusion that BNY wrongfully restrained funds in transit. *Id*. There are no other material facts uncovered by discovery or otherwise that could ever alter this decision. Accordingly, an award of summary judgment as to the third counterclaim is warranted.

In the majority of the eighteen transactions, the PMA was the originator and yet the funds were intercepted in transit, which is not permitted under Article 4-A. Pl.'s Exh. 26 at 20. As stated above, the creditor of the originator can only levy on the account of the originator at the originator's bank before the funds transfer is initiated and cannot reach any other funds because no property of the originator is being transferred during the funds transfer process. Official Comment to N.Y. U.C.C. § 4-A-502(4) (emphasis supplied).

As the Court correctly acknowledged, "[w]here the PMA was the originator, the funds were restrained subsequent to the execution of PMA's payment order by the receiving Bank to BNY, the intermediary bank, by serving a Restraining Notice upon BNY." Pl.'s Exh. 26 at 20. The Court further correctly determined that at that juncture, "title to the funds had passed and the funds were not subject to restraint." *Id.*; *see also* §§ 4-A- 209(1); 4-A-503 *European American Bank v. Bank of Nova Scotia*, 12 A.D.3d 189, 189-90, 784 N.Y.S.2d 99 (1st Dep't 2004) (levy cannot be enforced upon a bank receiving a funds transfer where such receiving bank will enact or conduct a further funds transfer); *see also Bank of New York v. Nickel*, 14 A.D.3d 140, 789

N.Y.S.2d 95 (1st Dep't 2004) (granting summary judgment on the issue of improper restraint of funds in transit). The Court also correctly determined as a matter of law that where the PMA was the beneficiary or intermediary bank, service on BNY was still improper because the PMA had no property interest in the funds at the point it was restrained. Pl.'s Exh. 26 at 20.

As shown in further detail below, the undisputed material facts (particularly as articulated in the sworn testimony of the Strachman Defendants' own N.Y. U.C.C. expert) as to each previously frozen transaction demonstrate that there are no assets at issue in this case for which the Defendants can request a turnover order from this Court.

### C. The Eighteen Previously Restrained Fund Transactions.[9]

After being served with the now vacated Restraining Notice and the Notice of Injunction, BNY froze eighteen transactions. *See* BNY chart of suspended transactions, attached to the Kalbian Aff. as Pl.'s Exh. 24; Testimony of Jessica Goodwin ("Goodwin Testimony"), dated August 3, 2005 at 141-192 (Excerpts of Ms. Goodwin's testimony are attached as Pl.'s Exh. 9 to the Kalbian Aff.). BNY's actions exceeded the requirements of the Restraining Notice and the Notice of Injunction because BNY froze assets of banks other than the PMA (which were outside the scope of the Restraining Notice and Notice of Injunction), and in doing so violated N.Y. U.C.C. Article 4-A. An analysis of the undisputed factual circumstances of each transaction demonstrates that the Strachman Defendants are not legally entitled to any of the frozen funds (which funds will be released when the PMA posts a $30 million undertaking) regardless of whether the PMA was the alleged alter-ego or agent of the PA or PLO.

---

[9] It is undisputed that the transaction identified by the Strachman Defendants as Transaction #14 was cancelled. *See, e.g.,* Testimony of Samuel Newman, Transcript of Hearing, dated August 8, 2005, at 542:1-21. Accordingly, Transaction #14 is irrelevant for purposes of this Motion.

Mr. Samuel Newman, the Strachman Defendants' own expert witness, testified that each of the eighteen transactions at issue consisted of a series of payment orders issued by various banks, which BNY interrupted or refused to effectuate. Testimony of Samuel Newman, dated August 8, 2005 ("Newman Testimony") (Excerpts attached hereto as Pl.'s Exh. 4), at 528-530 (Transaction No. 1; Pl.'s Exh. 3); 530:12-26 – 531:1-7 (Transaction No. 2; Pl.'s Exh. 5); 531:16-26 – 532:1-5 (Transaction No. 3, Pl.'s Exh. 6); 533:8-22 (Transaction No. 4; Pl.'s Exh. 7); 534-535 (Transaction No. 5; Pl.'s Exh. 8; *see also* Testimony of Jessica Goodwin, dated August 3, 2005 ("Goodwin Testimony") at 155-156, excerpts are attached to the Kalbian Aff. as Pl.'s Exh. 9); 535:3-20 (Transaction No. 6; Pl.'s Exh. 10); 535:21-26 – 536:1-6 (Transaction No. 7; Pl.'s Exh. 11); 536:7-25 (Transaction No. 8; Pl.'s Exh. 12); 537:12-538:2 (Transaction No. 9; Pl.'s Exh. 13; see also Goodwin Testimony at 155:16-156:6); 538:3-14 (Transaction No. 10; Pl.'s Exh. 14); 538:23-26 – 539:1-11 (Transaction No. 11; Pl.'s Exh. 15); 540:14-23 – 541:1-8 (Transaction No. 12 Pl.'s Exh. 16) 541:9-25 (Transaction No. 13; Pl.'s Exh. 17); 542:1-21 (Transaction No. 14; Pl.'s Exh. 18); 542:22-25 – 543:1-10 (Transaction No. 15; Pl.'s Exh. 19); 543:17-25 – 544:1-23 (Transaction No. 16; Pl.'s Exh. 20); 545:11-19 (Transaction No. 17; Pl.'s Exh. 21); 544:11-25 – 545:1-7 (Transaction No. 18; Pl.'s Exh. 22); 545:22-25 – 546:1-8; (Transaction No. 19; Pl.'s Exh. 23).[10]

The undisputed evidence is crystal clear that none of the payment orders BNY received came directly from or were to go directly to the PMA. *See id.* In short, BNY refused to

---

[10] In sixteen of the transactions, upon receipt of the payment order, BNY stopped the payment order and debited the sender's account at BNY. *Id.* The amounts debited from the senders were placed in a separate suspense account and not the account of bank identified in the payment order. Testimony of Jessica Goodwin, Tr. at 145:20-146:10. In the other two transactions, BNY interrupted the payment order for lack of funds on the part of the Palestine International Bank (the "PIB"), and according to Ms. Goodwin's testimony, did not cancel them, but kept them pending against the account of the PIB until sufficient funds arrived, in which case, these funds too would be debited into the suspense account. *Id.* at 155:19-156:3 (Pl.'s Exh. 9).

complete the payment orders and placed the associated funds (none of which belonged to the PMA) in a BNY suspense account. Because BNY did not act as the PMA's sending or receiving bank in the funds transfer process, BNY never had possession of PMA assets. As the Court held in its October Order, the PMA does not maintain an account at BNY. Pl.'s Exh. 26 at 20; Goodwin Testimony at 151:21-24 (Pl.'s Exh. 9).

1.      **The Strachman Defendants Are Not Entitled To The Funds From Transactions #3-10, #13, #18, and #19 As A Matter of Law Because BNY Was An Intermediary Bank And Illegally Interrupted These Transactions.**

In transactions #3-10, #13, #18, and #19, BNY was an intermediary bank. (Pl.'s Exhs. 6-14, 17, 22, 23 respectively). An "intermediary bank" is a receiving bank other than the originator's bank or the beneficiary's bank. N.Y. U.C.C. § 4-A-104(2). As an intermediary bank, BNY may not be enjoined or restrained from carrying out a funds transfer under N.Y. U.C.C. § 4-A-503 (even if the Restraining Notice or Notice of Injunction had expressly intended to do so, which they do not as discussed above). *Weston Compagnie De Finance Et D'Investissment, S.A.,* 1993 WL 267282, at *2-3; *see also European Am. Bank v. The Bank of Nova Scotia,* 12 A.D.3d 189, 784 N.Y.S.2d 99, 101 (1st Dep't 2004) (Supreme Court properly held that where a further transfer to a receiving bank from the bank served with a levy was contemplated in the funds transfer process, such levy could not be enforced); Official Comment to N.Y. U.C.C. § 4-A-503 (intermediary banks in particular are protected from injunctions). Accordingly, the Strachman Defendants could never be legally entitled to request turnover of these funds even if the PMA were the agent or alter-ego of the PA as the judgment debtor which it is not.

In Transactions #3 ($300,000) and #4 ($350,000), the PMA, as originator, issued payment orders to the PIB, as the originator's bank, to send to BNY, which was in turn to issue

payment orders to the Jordan National Bank PLC in Amman for further payment to the Jordan National Bank PLC in Ramallah. Newman Testimony at 531:12-532:5 and 533: 4-22 (Pl.'s Exh. 4). BNY interrupted the payment orders at the PIB's account at BNY and froze funds relevant to the payment orders in Transactions #3 and #4. *Id.* at 532:20-533:2 and 534:11-13. The intended ultimate recipient of the funds was not BNY's customer, the Jordan National Bank PLC in Amman, but the Jordan National Bank PLC in Ramallah. Newman Testimony at 531:21-532:2 and 533: 13-19 (Pl.'s Exh. 4). "A branch or separate office of a bank is a separate bank for purposes of [Article 4-A]." N.Y. U.C.C. § 4-A-105(1)(b). Accordingly, BNY was a receiving bank other than the originator's bank (which was the PIB) or the beneficiary's bank (which was the Jordan National Bank PLC at Amman). BNY was an intermediary bank that could not be enjoined or restrained pursuant to N.Y. U.C.C. § 4-A-503. Again, the Strachman Defendants are not entitled to a turnover order, as a matter of law, for the funds of these frozen transactions.

Although **Transaction #5 ($10,000,000)** was not effectuated because of lack of funds in the PIB's account with BNY, Newman Testimony at 534:23-535:14, BNY plans to freeze the transaction when funds became available. Goodwin Testimony at 155:16-156:6 (Pl.'s Exh. 9). The PMA initiated the funds transfer by sending a payment order to the PIB, which in turn, sent a payment order to BNY. BNY was to send a payment order to the Bank of Jordan Ltd. in Amman, which in turn was to pay the Bank of Jordan in Ramallah. As discussed above, BNY would be a receiving bank other than the originator's (the PMA) bank (the PIB) or the beneficiary's bank (Bank of Jordan Ltd. in Amman) and therefore would be an intermediary bank thereby precluding restraint.

With regard to **Transactions #6 ($310,000), #7 ($455,000), and #8 ($779,000),** Mr. Newman testified that in each transaction, the PMA issued a payment order to the PIB, which in

turn, issued a payment order to BNY.   Newman Testimony at 535:3-20 (Mr. Newman's testimony with respect to Transaction #6); 535:21-536:6 (Mr. Newman's testimony with respect to Transaction #7); 536:7-22 (Mr. Newman's testimony with respect to Transaction #8).  BNY then was to have issued, had it not interrupted the funds transfer process at the PIB level, payment orders to the Israel Discount Bank Ltd. in both Transactions #6 and #8, and a payment order to CitiBank N.A. in Transaction #7.  *Id.* at 535:10-20 (Mr. Newman's testimony with respect to Transaction #6); 536:14-25 (Mr. Newman's testimony with respect to Transaction #8); 535:22-536:6 (Mr. Newman's testimony with respect to Transaction #7).  In none of these cases, however, was BNY the bank of the beneficiaries because in Transactions #6 and #8, the Israel Discount Bank Ltd. was to use the payment order it should have received from BNY to transfer funds to the Bank of Jordan in Ramallah and the Al-Quods Bank for Development and Investment respectively.  *Id.*  In Transaction #7, Citibank N.A. was to use the payment order it should have received from BNY to transfer funds to the Housing Bank for Trade and Commerce. *Id.*  Accordingly, BNY, being neither the bank for the originator, the PMA, nor either of the beneficiaries' (Bank of Jordan, Al-Quods Bank for Development and Investment, and the Housing Bank for Trade and Commerce) banks (Israel Discount Bank Ltd. and Citibank N.A.), was therefore an intermediary bank.

**Transaction #9** ($2,399,990) like Transaction #5 was stopped by BNY because of lack of funds in the PIB's account with BNY (Newman Testimony at 537:12-538:2) and once PIB funds become available, BNY will seize the funds and place them into a suspense account (Goodwin Testimony at 155:16-156:6).  However, such action would violate N.Y. U.C.C. § 4-A-503 for the same reasons applicable to Transaction #5.  The PMA gave a payment order to the PIB, which in turn, gave a payment order to BNY.  Newman Testimony at 536:26-537:19.  BNY

was to then issue a payment order to JP Morgan Chase, which in turn, was to pay the Bank of Palestine. *Id.* Again, BNY was nothing more than an intermediary bank.

With regard to **Transaction #10 ($649,990)**, Mr. Newman testified that the PMA sent a payment order to the PIB, which in turn, sent a payment order to BNY. Newman Testimony at 538:4-21. BNY, had it not frozen the PIB's payment order, was to have issued a payment order to JP Morgan Chase to pay the Arab Jordan Investment Bank, which in turn was to pay the ultimate recipient of the funds, the Palestine Investment Bank.[11] *Id.* The Palestine Investment Bank was therefore to have been the beneficiary of the funds transfer had BNY not interrupted it. BNY's role in the transaction was as an intermediary bank.

With regard to **Transaction #13 ($10,005,833.33)**, Mr. Newman's undisputed testimony was that Fortis Bank gave a payment order to Deutsche Bank, which in turn, issued a payment order to BNY. Newman Testimony at 541:12-22. Had it not interrupted the payment order from Deutsche Bank, BNY was to have sent a payment order to the Cairo Amman Bank, which in turn was to have paid the PMA. *Id.* Accordingly, BNY was an intermediary bank in that it was neither originator's (the Fortis Bank) bank (the Deutsche Bank) nor the beneficiary's bank (Cairo Amman Bank).

With regard to **Transaction #18 ($2,920,000)**, Mr. Newman testified that the Arab Bank in Ramallah issued a payment order to the Israel Discount Bank, which in turn, issued a payment order to BNY. *Id.* at 544:11-545:5. If BNY had not interrupted the transaction, BNY was to have sent a payment order to the PIB, which in turn was to have paid the PMA. *Id.*

---

[11] Although Mr. Newman referred to both the Palestine Investment Bank and the Palestine International Bank as the ultimate recipient of the funds, BNY documents upon which he based his testimony clearly show that the ultimate recipient or beneficiary of the funds was the Palestine Investment Bank. Either way, BNY was still an intermediary bank.

Accordingly, BNY was an intermediary bank in that it was neither the originator's (Arab Bank in Ramallah) bank (the Israel Discount Bank) nor the beneficiary's bank (the PIB).

With regard to **Transaction #19 ($140,000)**, the PMA sent a payment order to the PIB, which in turn, sent a payment order to BNY. *Id.* at 545:19-546:8. Had it not frozen the PIB's payment order, BNY was to have issued a payment order to the Israel Discount Bank, which in turn, was to pay the ultimate recipient of the funds, the Palestine Islamic Bank. *Id.* Accordingly, BNY was neither the bank of the originator, the PMA, nor the beneficiaries' (the Palestine Investment Bank and the Palestine Islamic Bank) banks (the Arab Jordan Investment Bank and the Israel Discount Bank) and thus was an intermediary bank.

For each of the foregoing transactions, BNY acted as an intermediary bank (*see* N.Y. U.C.C. § 4-A-104(2)) that should not have interrupted the funds transfer process because BNY could not be enjoined or restrained pursuant to N.Y. U.C.C. § 4-A-503. As a result, the Strachman Defendants are not legally entitled to a turnover order for the funds of Transaction Nos. 3-10, 13, 18, and 19.

> 2. **As a Matter of Law, the Strachman Defendants Are Not Entitled To The Funds From Transactions #1-2, #11-12, and #15[12] Because BNY Was Not The Proper Bank To Be Served With Creditor Process.**

For Transactions #1-2, #11-12, and #15, BNY did not act as the intermediary bank for the transaction, but was either the originator's bank (Transactions #11-12 and #15) or the intended beneficiary's bank (Transactions #1-2). (Pl.'s Exhs. 3, 4, 15, 16, and 19 respectively). In each transaction, however, the originator or beneficiary was not a judgment debtor of the Strachman Defendants and the Restraining Notice or Notice of Injunction did not apply to them.

---

[12] All of the testimony and documentary evidence with regard to Transaction #14 indicates that this transaction was cancelled. *See* Newman Testimony at 542:1-21.

With regard to **Transactions #1 ($184,990)** (Exh. 3) and **#2 ($25,990)** (Exh. 4)[13], Mr. Newman testified the PMA was the originator in both transactions. Tr. at 528:20-529:22; 530:12-531:7. The PMA issued payment orders to the PIB, which in turn issued payment orders to BNY to pay Egyptian Arab Land Bank $184,990 in Transaction #1 and $25,990 in Transaction #2. *Id.* In both instances, BNY suspended the payment order by debiting the PIB's account with respect to these payment orders before it credited the Egyptian Arab Land's account at BNY. *Id.* at 529:20-22; 530:3-6; 531:3-7.

In other words, BNY interrupted the payment order at the PIB level, before BNY accepted the credits on behalf of the Egyptian Arab Land Bank. Until the beneficiary's bank accepts the payment order for the benefit of the beneficiary, a funds transfer is not complete. N.Y. U.C.C. § 4-A-104(1). BNY's interruption of the payment orders at the PIB level meant both transactions remained in transit and an injunction could not be issued with respect to these transactions. *See* Official Comment to N.Y. U.C.C. § 4-A-503 ("*After the funds transfer is completed by acceptance of a payment order by the beneficiary's bank*, that bank can be enjoined from releasing funds to the beneficiary or the beneficiary can be enjoined from withdrawing the funds (emphasis added). No other injunction is permitted.").

Even if BNY had accepted the payments order, the Restraining Notice and the Notice of Injunction would still not apply. *See* N.Y. U.C.C. § 4-A-502(4) and Official Comment to that section at paragraph 4. Here, the Strachman Defendants are the purported creditors of the PMA, the originator of the transactions, based on their meritless and self-serving contention the PMA is an alter-ego or agent of the PA, the actual judgment-debtor. As the purported creditors of the

---

[13] The testimony and analysis regarding Transactions #1 and #2 are likewise applicable to Transactions #16 and #17, which were transactions in Euros (EUR 39,994.26 and EUR 15,000.01 respectively). *See* Newman Testimony at 543:11-544:9 and 545:11-18. Transactions #16 and #17 should not have been interrupted for the same reasons that Transactions #1 and #2 should not have been interrupted.

PMA, the Strachman Defendants are limited to enjoining the PMA's account in the PIB (the originator's bank) before the funds transfer is initiated; they cannot reach any other funds because no property of the PMA is being transferred. *See* Official Comment to N.Y. U.C.C. § 4-A-502 at paragraph 4.

Moreover, upon acceptance of a payment order, the beneficiary's bank (in this instance BNY, had it accepted the payment orders from the PIB on behalf of the Egyptian Arab Land Bank) becomes obligated to pay the beneficiary (in this instance the Egyptian Arab Land Bank). N.Y. U.C.C. § 4-A-404(1). At that juncture, creditors of the beneficiary, but not those of the originator, may serve creditor process to reach the funds to be received by the beneficiary. *See* Official Comment to § 4-A-502 at paragraph 4. Given that the Strachman Defendants are purported creditors of the PMA and not the Egyptian Arab Land Bank, even if BNY had accepted the payment orders which the PMA originated, BNY could not be enjoined by the Restraining Notice or the Notice of Injunction with respect to these transactions. *See* Official Comment to N.Y. U.C.C. § 4-A-502 at paragraph 4 (a creditor of the originator can levy on the account of the originator in the originator's bank before the funds transfer is initiated, but cannot reach any other funds because no property of the originator is being transferred). Upon acceptance by BNY, therefore, the Restraining Notice and the Notice of Injunction would have been inapplicable because the funds at issue would not belong to the PMA.

**Transactions #11 ($500,000) (Exh. 15), #12 ($450,000) (Exh. 16), and #15 ($533,000) (Exh. 19)** all involve funds transfers where some bank other than the PMA attempted to transfer funds through BNY to the PIB on to the PMA and then on to another bank. *See* Newman Testimony at 538:22-539:11 (Mr. Newman's testimony regarding Transaction #11); 540:9-541:8 (Mr. Newman's testimony regarding Transaction #12); 542:22-543:10 (Mr. Newman's testimony

regarding Transaction #15). In all of these transactions, after receiving the payment orders from the originators, BNY debited the originators' accounts and froze the payment orders. *See id.* BNY's actions violated N.Y. U.C.C. § 4-A-502(4) because it was never acting as the bank of the PMA.

As stated above, the Strachman Defendants contend (however erroneously) that they are creditors of the PMA. Accordingly, pursuant to N.Y. U.C.C. § 4-A-502(4), to reach the funds in these transactions (assuming the PMA were the beneficiary in all of these transactions, which it was not), the Strachman Defendants were required to serve creditor process – the Restraining Notice and the Notice of Injunction – on the PMA's bank, not BNY. BNY in each of these transactions was the bank that received the payment order from the originator of the funds transfer (which was not the PMA). Accordingly, BNY was not required to act on the Restraining Notice and Notice of Injunction with regard to these transactions and as a matter of law, the Strachman Defendants can never reach the improperly restrained funds. *See* N.Y. U.C.C. § 4-A-502(4) (any bank other than the beneficiary's bank served with creditor process is not obliged to act with respect to the process).[14]

---

[14] BNY stated that it also restrained the funds pursuant to the federal Notice of Injunction (drafted by the Strachman Defendants). *See* Affidavit of Alexander Shapiro, para. 3, dated June 30, 2005; Goodwin Testimony at 14. Without authority from the RI federal court, the Strachman Defendants improperly included the PMA in the Notice of Injunction, stating that the PMA is an agent of the PA. However, as described in detail above, the Strachman Defendants can never be entitled to turnover of these funds, because BNY was the wrong bank to be served with creditor process under N.Y. U.C.C. Article 4-A if the Strachman Defendants intended to restrain funds purportedly belonging to the PMA as an alleged agent for the PA. Fed. R. Civ. P. 69(a) governing execution of judgments provides, in pertinent part, that, "the procedure on execution, in proceedings supplementary to and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held...". *See Kharas Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 83 (2d Cir. 2002). As detailed above, the Notice of Injunction was improperly applied by the Strachman Defendants in terms of the state law procedures for attachment. Moreover, even if the Notice of Injunction had been properly served in keeping with the N.Y. U.C.C. Article 4-A, the Executive Branch has already determined that the PMA is an independent agency and therefore not an agent of the PA (Section V *infra*).

III.    **THE UNDERTAKING REQUIREMENT PURSUANT TO C.P.L.R. § 6312(b) SHOULD BE DISCHARGED.**

Because the Strachman Defendants are not entitled to a turnover order for the previously restrained funds in BNY's possession, as a matter of law, the PMA is entitled to a discharge of the undertaking requirement under C.P.L.R. § 6312(b). *See J. A. Preston Corp. v. Fabrication Enterprises, Inc.*, 68 N.Y.2d 397, 405 (1986) citing, *Carpenter & Hughes v. De Joseph*, 29 Misc. 2d 519, 520 (N.Y. Sup. Ct. 1961). Summary judgment in PMA's favor serves as a "final determination" on the merits, demonstrating that an injunction was correctly granted in the first instance. *See, e.g., Parkoff v. General Tel. & Electronics Corp.*, 53 N.Y.2d 412, 423 (1981) (summary judgment is a final determination on the merits for *res judicata* purposes); *S. J. Capelin Associates, Inc. v. Globe Mfg. Corp.*, 34 N.Y.2d 338 (1974) (grant of summary judgment motion is the procedural equivalent of a trial). Accordingly, PMA respectfully requests that the requirement for an undertaking be discharged herewith.

IV.    **THE PMA IS ENTITLED TO SUMMARY JUDGMENT ON THE SECOND COUNTERCLAIM BECAUSE THERE ARE NO PMA ASSETS WITHIN NEW YORK STATE AND THIS COURT CANNOT COMPEL THE PMA TO BRING ASSETS INTO THE JURISDICTION.**

The Strachman Defendants' Second Counterclaim for turnover alleges that "even in the event that the Court finds that the PMA is legally distinguishable from the PA, the PMA holds assets and funds belonging and/or owed to the PA totaling some $500 million." Counterclaim, at ¶ 82 (Pl.'s Exh. 2). On this basis, the Strachman Defendants request that the Court order the PMA to turnover these funds to satisfy the RI Judgment. Regardless of the fact that the PMA does not hold $500 million in assets belonging to and/or owed to the PA, the funds (no matter to whom they belong) are not located in the United States. *See* Affidavit of Dr. George T. Abed, Governor of the PMA, dated April 25, 2006 (confirming that the PMA has no assets in the U.S.).

The Court has no jurisdiction over these funds.  *See Mones v. Commercial Bank of Kuwait*, 399 F. Supp. 2d 310, 315-317 (S.D.N.Y. 2005) ("it is a well-established principle that a New York court cannot attach property not within its jurisdiction.") (internal citations omitted); *Koehler v. The Bank of Bermuda Ltd.*, 2005 U.S. Dist. LEXIS 3760, *27-28 (S.D.N.Y. March 9, 2005) (although defendant-garnishee agreed to court's personal jurisdiction, court held that plaintiff could not enforce money judgment against debtor's property because debtor's shares were located in Bermuda) (attached hereto at Appendix B).

In *Mones*, the plaintiff obtained a judgment in the United States District Court for the District of Columbia against limited partners of a partnership. 399 F. Supp. 2d at 312.  Mones determined that the judgment debtors had funds deposited with the Commercial Bank of Kuwait ("CBK").  *Id.*  Like the Strachman Defendants, Mones domesticated his judgment in New York and then used that judgment to serve CBK's New York and Kuwaiti offices with a New York restraining notice.  *Id.*  Mones next filed a turnover petition against CBK to require it to turnover the judgment debtor's assets held in various CBK accounts in Kuwait.  *Id.*  The court denied the turnover petition, holding that no New York statute authorizes the court to order a financial intermediary, such as CBK, to turnover funds of the judgment debtor that are held outside of New York.  *Id.* at 316-17; *see McCloskey v. Chase Manhattan Bank*, 11 N.Y.2d 936 (1962) (affirming lower court's grant of summary judgment in favor of bank on the ground that court lacked jurisdiction over assets in foreign accounts even though the court had jurisdiction over the judgment debtor and the bank).  The same conclusion should be reached in the case at bar.

In view of the foregoing, the PMA is entitled to an award of summary judgment as to the Second Counterclaim.

V.   THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER THE STRACHMAN'S REQUEST FOR DECLARATORY JUDGMENT.

   A.   The Political Question Doctrine Bars Declaratory Judgment on the Alter-Ego Question.

The remainder of the Strachman Defendants' counter and cross-claim allegations is wholly dependent on their request for a declaration that the PMA is the alter-ego of the PA. As demonstrated herein, the Executive Branch of the federal government has already decided this issue. Accordingly, the request for declaratory relief presents a non-justiciable political question and should be dismissed for lack of subject matter jurisdiction.[15]

---

[15] Notwithstanding the political question which has arisen since the Court's October Order, the Court made the preliminary finding, based on *First National City Bank v. Banco Para El Comercio Exterior De Cuba* (hereinafter *"Bancec"*), 462 U.S. 611, 624 (1983) and the hearing evidence, that the PMA is a separate juridicial entity from the PA. Pl.'s Exh. 26 at 25. Specifically, the Court held that the PMA met all the features of a typical independent government instrumentality set forth in *Bancec. Id.* The Court held:

> [The PMA] was created by an enabling statute which specifically described its powers, and duties and, in fact, is operated as specified, by a governor and board selected by the government. It is a separate juridicial entity with the power to hold and sell property and sue and be sued. It is run as a distinct economic enterprise, is responsible for its own finances, has autonomous budget, workforce and operation and maintains its offices in an independent location. Moreover, corporate formalities are maintained, it is adequately capitalized, the PA is not free to simply draw on PMA's funds, it deals at arms length with the PA and it is treated as a separate profit center. PMA, in fact, has been shown to have the characteristics of a typical central bank and has not been demonstrated to be the agent or alter ego of the PA.

*Id.*

For purposes of clarity, Governor Abed testified that the PMA governor and board are appointed by the President of the PA and not by the government. Testimony of Governor George T. Abed, August 4, 2005, at 266; 290. The government (the Prime Minister and his Cabinet) may recommend individuals to be appointed to the PMA board, but the final decision is made by the "Chairman" or President, i.e., President Abbas. *See also* Article 15 of the Monetary Authority Law.

1.    **The Executive Branch Has Determined that the PMA Is an Independent Agency.**

The U.S. Department of the Treasury's[16] Office of Foreign Assets Control ("OFAC"), which administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals, has recently made the determination that the PMA is an agency independent of the PA.[17]

OFAC derives its authority from the President's powers pursuant to, *inter alia*, the U.S. Constitution and the International Emergency Economic Powers Act (the "IEEPA"), 50 U.S.C.S. § 1701, *et seq.* The IEEPA provides the President with the authority, in times of "national emergency" to prohibit any transfer of any property in which any foreign country or a national thereof has any interest. 50 U.S.C.S. § 1702(a)(1)(B).

Pursuant to his powers under the U.S. Constitution and the laws of the U.S., including the IEEPA, on September 24, 2001, President Bush signed Executive Order No. 13,244. 66 Fed. Reg. 49,079 (2001). That Order blocks all property and interests in property of designated terrorist organizations, known as specially designated global terrorists, or SDGTs. *Id.* On October 31, 2001, the President designated the Islamic Resistance Movement (commonly known as "Hamas"), a Palestinian military and political organization, as one of the SDGTs subject to the Order.[18]

---

[16] The Department of the Treasury is an executive department of the U.S. federal government. *See* 31 U.S.C. § 301.

[17] *See* http://www.treas.gov/offices/enforcement/ofac/

[18] Hamas' property and interests in property are blocked under three distinct OFAC-administered economic sanctions programs: (1) the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594; (2) the Terrorism Sanctions Regulations, 31 C.F.R. Part 595; and (3) the Foreign Terrorist Organizations Sanctions Regulations, 31 C.F.R. Part 597.

Acting pursuant to its delegation of authority from the President, on April 12, 2006, OFAC determined that the newly-elected Hamas government has a property interest in the PA.[19] As such, OFAC restricted U.S. persons' dealings with the PA. *See* OFAC Recent Action Notice, dated April 12, 2006, attached to the Kalbian Aff. as Pl.'s Exh. 28.[20] Certain dealings with the PA are either prohibited, require a specific license (determined by OFAC on a case-by-case basis) or are subject to a general license. *Id.*

OFAC made the following notable exception, however, to the foregoing:

> (a)     U.S. persons are authorized to engage in all transactions otherwise prohibited under 31 C.F.R. parts 594, 595, or 597 with the following entities and individuals:
>
> . . .
>
> > (iv) the following <u>independent agencies</u>: the Central Elections Commission; the Independent Citizens Rights Commission; the General Audit Authority/External Audit Agency; and the <u>Palestine Monetary Authority</u>.

OFAC General License No. 4, dated April 12, 2006, Exec. Order No. 13,224, 31 C.F.R. Parts 594, 595, 597 (2001) (the "General License") (emphasis supplied), attached to the Kalbian Aff. as Pl.'s Exh. 26.

As demonstrated by the above General License, the Executive Branch has already determined that the PMA is an independent agency. Had it found the PMA was either controlled by or a part of the PA, the Executive Branch would have included the PMA within the prohibitions enacted against the PA.

---

[19] *See* OFAC Recent Action Notice, dated April 12, 2006, available at, http://www.treas.gov/offices/enforcement/ofac/actions/20060412.shtml.

[20] The OFAC anti-terrorism regulations apply to all U.S. persons, including all U.S. citizens and permanent resident aliens regardless of where they are located, all persons and entities within the United States, all U.S. incorporated entities and their foreign branches. http://www.ustreas.gov/offices/enforcement/ofac/faq/answer.shtml.

2.      The Non-Justiciability of a Political Question is Primarily a Function of the Separation of Powers.

The political question doctrine renders the Strachman Defendants' request for declaratory relief non-justiciable and the Court should thus dismiss their request for lack of subject matter jurisdiction.[21] *See Jones v. Beame*, 45 N.Y.2d 402, 408-09 (1978) (courts should "abstain from venturing into areas if it is ill-equipped to undertake the responsibility and other branches of government are far more suited to the task"), citing *Baker v. Carr*, 369 U.S. 186, 208-237 (1962) ("Not only does resolution of [foreign relations] issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views." (footnotes omitted)).

The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Society*, 478 U.S. 221, 230 (1986); *Bancoult v. McNamara*, 445 F.3d 427 (D.C. Cir. 2006) (affirming complaint dismissal based on lack of subject matter jurisdiction under the political question doctrine, because claims required judicial scrutiny of the exercise of foreign policy and national security powers, which are committed by the U.S. Constitution to the executive and legislative branches of government).

The U.S. Supreme Court in *Baker v. Carr* provided six factors that may render a case non-justiciable:

---

[21] C.P.L.R. § 3001 provides that the Court may only render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed. C.P.L.R. § 3001.

[1] [a] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment of multifarious pronouncements by various departments on one question.

369 U.S. at 217.

The factors should be analyzed in the disjunctive and to find a political question, the court need only conclude that one factor is present. *See Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005). Several factors are present in this case rendering the subject matter of the declaratory relief non-justiciable.

> (a)    **Textually Demonstrable Constitutional Commitment to the Executive Branch of Government**

Whether the PMA is an alter-ego or a part of the PA is an issue that clearly involves "policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Id.* Resolution of this question has far-reaching foreign policy and national security implications. The current Palestinian government is controlled by Hamas—a designated terrorist organization. The Executive Branch has determined that national security and foreign policy issues dictate that U.S. dealings with the PA be carefully regulated. The Executive Branch has further determined that the PMA is independent of the PA and U.S. dealings with the PMA are not prohibited. Pl.'s Exh. 26.

It is well-settled that foreign policy and national security issues are constitutionally committed to the Executive and Legislative Branches of the U.S. government and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision. *See Schneider*, 412 F.3d at 194-95 (setting forth the extensive constitutional support

27

for the commitment of foreign policy and national security decisions to the Executive and Legislative Branches, but not the Judiciary); *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative – 'the political' -- Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision").

By virtue of its constitutional authority (including Articles I and II of the U.S. Constitution), Congress enacted the IEEPA, which vests the President with authority to deal with "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701. To deal with such a threat, the President has the authority to, *inter alia*, regulate, prohibit or license any transactions involving any property in which a foreign national or country has an interest. 50 U.S.C. § 1702(a). By virtue of the foregoing authority and also its authority pursuant to Article II of the Constitution, *see United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (Describing the President as possessing "plenary and exclusive power" in the international arena and "as the sole organ of the federal government in the field of international relations . . . ."), the Executive Branch has made the policy determination that the PMA is legally separate from the PA. *See Schneider*, 412 F.3d at 194 (applying the six *Baker* factors).

> (b)  **Impossibility of the Court's Undertaking Independent Resolution without Expressing Lack of Respect Due Coordinate to the Legislative and Executive Branches**

OFAC obviously has many resources available to it—such as intelligence sources and policy advisors—that can reach far beyond the jurisdiction of this Court and the realms of

permissible discovery under the C.P.L.R.    OFAC is therefore best placed to make the determination as to the PMA's legal standing relative to the PA.  *See generally Jones*, 45 N.Y.2d at 408-09.  As such, it would be impossible for the Court to undertake an independent resolution of the question at hand without expressing a "lack of respect due coordinate branches of government." *Schneider*, 412 F.3d at 197-98.  For the same foregoing reasons and in terms of point three of the *Baker* factors, the Court will be unable to make a determination without passing judgment on the policy decision made by OFAC in issuing General License No. 4.

(c)    **This Case Presents Unique Circumstances Warranting Unquestioning Adherence to OFAC's Determination**

The way in which the U.S. conducts its affairs on issues intertwined or related to the unique aspects of the Israeli-Palestinian situation satisfies the unusual need for this Court to exercise unquestioning adherence to the political decision already made by the Executive Branch regarding the PMA.  *See Doe v. State of Israel*, 400 F. Supp. 2d 86, 111-12 (D.D.C. 2005) ("It is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-Palestinian conflict, which has raged on the world stage with devastation on both sides for decades. The region of the Middle East specifically, and the entire global community generally, is sharply divided concerning these tensions; American foreign policy has come under attack as a result. This Court has previously observed that 'foreign policy is constitutionally committed to the political branches, and disputes over foreign policy are nonjusticiable political questions.'") citing *Haig v. Agee*, 453 U.S. 280, 292 (1981).   U.S. foreign relations in this area are understandably delicate and there is strong need for the U.S. to speak with a single voice on any issues touching this region.

(d)    Deciding the Alter-Ego Question Could Lead to
Multifarious Pronouncements by Different
Government Branches and Could Also Violate
the Supremacy Clause of the U.S. Constitution

There exists the real danger of embarrassment of multifarious pronouncements on the issue of PMA's legal status. As well as potentially causing embarrassment, a different decision by this Court on the alter-ego question would violate the Supremacy Clause of the U.S. Constitution (Art. VI, cl. 2). *See Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000). In *Crosby*, the issue was whether a Massachusetts law restricting state contracts with companies doing business with or in Burma was invalid under the Supremacy Clause owing to its threat of frustrating federal statutory objectives. 530 U.S. at 366-367. In *Crosby*, Congress had provided the President with express statutory authority (pursuant to the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 ("the federal Act")) to "exercise economic leverage against Burma, with an eye towards national security." 530 U.S. at 375-76.

The Supreme Court held that the Massachusetts Burma law, if enforced, would "blunt the consequences of discretionary Presidential action" by imposing a different, state system of economic pressure against the Burmese political regime. 530 U.S. at 376. Specifically, the state law penalized some private action that the federal Act did not and its sanctions were immediate, perpetual and had no termination provision. *Id.* at 376-77. The Court held that Congress "manifestly intended to limit economic pressure against the Burmese Government to a specific range" and the state law frustrated that intent. *Id.*

As such, any subsequent state action on the question of the PMA's relationship with the PA would undermine and likely conflict with Congress' investiture of power in the President in violation of the Supremacy Clause. Finally, even if the Court were to reach the same decision as

30

the Executive Branch, there is no guarantee that the decision will not extend beyond the parameters intended by OFAC.

For the foregoing reasons, the Court should decline to exercise jurisdiction over the Strachman Defendants' First and Second Counterclaims.[22]

### B. The Strachman Defendants' Declaratory Relief Request Must Be Otherwise Dismissed Because Defendants Seek An Advisory Opinion That Will Have No Immediate Impact On The Parties' Rights.

Summary resolution of the Strachman Defendants' claim as to the previously restrained funds strips this Court of any New York State interest in entertaining the remainder of the Strachman Defendants' request for relief. The only New York State interest that mandated New York judicial action was the fact that a New York bank, BNY, had illegally restrained monies in contravention of N.Y. U.C.C. Article 4-A.

This is what apparently motivated Judge Lagueux to send the PMA back to New York. As Judge Lagueux noted:

> It's a New York case at this point. And what funds are frozen are frozen in New York. They're frozen pursuant to New York court authority, and it's a New York judge that will have to make a determination on this matter.

Transcript of Proceedings, dated June 16, 2005, at 29:19-23.

Having demonstrated in detail above (and the Court already having made the preliminary determination) that the Strachman Defendants could never be entitled—under any set of facts—to the proceeds of the restrained transactions (regardless of whether the PMA is an alter-

---

[22] The Court will note that in its request for declaratory relief, the PMA similarly requests a declaration that it is not the alter-ego or agent of the PA. This request obviously preceded OFAC's recent action notice and can be readily dismissed upon resolution of this Motion in the PMA's favor. In addition, the OFAC determination has preempted the Court's preliminary analysis that the federal Notice of Injunction is also restraining the funds. October Order at 22. Because OFAC has decided that the PMA is an independent agency, it is not within the scope of the notice of injunction and there is no basis for the undertaking requirement. *See also* Section III, *supra*.

ego or agent of the PA), there is no other New York State interest at issue. Judge Lagueux's entire rationale for sending this matter back to New York has disappeared.

Declaratory relief under C.P.L.R. § 3001 is wholly discretionary.[23] The Strachman Defendants' first counterclaim (and part of their second counterclaim) simply requests that the Court rule that the PMA is an agent or alter-ego of the PA and requests that on this basis the Court order the PMA to pay the RI Judgment in full. The Strachman Defendants seek an advisory opinion from the Court. *New York Public Interest Research Group, Inc. v. Carey*, 42 N.Y.2d 527 (1977) (taxpayers sought an advisory opinion where no genuine controversy existed). Resolution of this question will have no immediate impact on the rights of the parties. *See, e.g., Smith v. Western Union Tel. Co.*, 276 A.D. 210, 213 (1st Dep't 1949) (declaratory relief denied where minority stockholders were attempting to force a declaratory judgment in the absence of a clear showing of a present need thereof). Specifically, the Strachman Defendants have not identified any attachable property within New York that could be attached if the Court grants them relief. The PMA has no property located within the State of New York or anywhere else in the United States. Abed Aff. at ¶ 3; *see, e.g., Gryphon Domestic VI, LLC v. App Intl. Fin.Co., D.V.*, 2005 N.Y. Slip Op. 50481U, at (N.Y. Sup. Ct. Feb. 9, 2005) (restraining notices do not reach property in other jurisdictions) citing *ABKCO Indus. v. Apple Films, Inc.*, 39 N.Y.2d 670, 674-75 (1976); *National Union Fire Ins. Co. of Pitts v. Advanced Employment Concepts, Inc.*, 269 A.D.2d 101, 101 (1st Dep't 2000). Entertaining the Strachman Defendants' request for declaratory relief would be futile and constitute a waste of the Court's valuable resources in that

---

[23] C.P.L.R. § 3001 provides:

> The supreme court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed. If the court declines to render such a judgment it shall state its grounds.

the Strachman Defendants would have to domesticate any declaratory judgment in a foreign jurisdiction to reach attachable assets, which jurisdiction may or may not recognize a New York court's decision.

## CONCLUSION

For all the foregoing reasons, the Palestine Monetary Authority respectfully requests that the Court grant summary judgment as to the Strachman Defendants' Second Counterclaim and Cross-claim against the PMA and Third Counterclaim and Cross-claim against Bank of New York. In so doing, PMA requests that the undertaking request be discharged. The PMA further requests that the Court decline to exercise jurisdiction over Defendants' First Counterclaim and Cross-claim seeking declaratory relief.

Dated: June 22, 2006                    Respectfully submitted,

                                        KALBIAN HAGERTY L.L.P.

                                        Haig V. Kalbian (admitted *pro hac vice*)
                                        Claire A. DeLelle (N.Y. Bar # 3941937)
                                        The Brawner Building
                                        888 17th Street, N.W., Suite 1000
                                        Washington, DC 20006-3967
                                        202-223-5600

                                        Victor C. Bushell
                                        Cem Ozer
                                        BUSHELL & VALLIERE LLP
                                        60 East 42nd Street, Suite 2925
                                        New York, New York 10165
                                        212-949-4700
                                        *Attorneys for the Palestine Monetary Authority*

TO:     Robert J. Tolchin, Esq.
        Jaroslawicz & Jaros, Esqs.
        150 William Street, 19th Floor
        New York, New York 10038

        *Attorney for David Strachman, et al.*

33

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------X

PALESTINE MONETARY AUTHORITY,                    :

      Plaintiff-Counterclaim Defendants,    :

         v.                                 :       Index No.: 107777/05

DAVID STRACHMAN,                                 :
As Administrator of the
ESTATES of YARON UNGAR, *et al.*,                :

      Defendants-Counterclaim Plaintiffs.  :       **AFFIDAVIT**
                                                 :       **OF SERVICE**


---------------------------------------------------------------X

DAVID STRACHMAN,                                 :
As Administrator of the
ESTATES of YARON UNGAR, *et al.*,                :
                                                 :
      Plaintiffs-Judgment Creditors,       :
                                                 :
         v.                                 :       Index No.: 105521/05
                                                 :
THE PALESTINIAN AUTHORITY, *et al.*,             :
                                                 :
      Defendants-Judgment Debtors.         :
                                                 :
---------------------------------------------------------------X

IN THE DISTRICT    )
                             ): SS
OF COLUMBIA      )

      Marale G. Garabetian, duly sworn, deposes and says:

      1.      I am over 18 years of age and not a party to this action.  I reside at 5800 Quantrell

Avenue, Apt. # 1520, Alexandria, VA 22312.

      2.      On June 23, 2006 I served a true and complete copy of (i) Palestinian Monetary

Authority's Notice of Motion, Affirmation of Haig V. Kalbian, Esq. and supporting exhibits,

and; (ii) Memorandum of Law in Support of the Palestinian Monetary Authority's Motion for Summary Judgment and Discharge of Undertaking and supporting exhibits, by depositing a true and correct copy of the same enclosed in a post-paid envelope, properly addressed and marked for second day delivery, in an official depository under the exclusive care and custody of Federal Express within the District of Columbia upon:

> Robert J. Tolchin, Esq.
> Jaroslawicz & Jaros
> 150 Williams Street, 19th Floor
> New York, New York 10038

Marale G. Garabetian

Sworn to me before this
29th day of June 2006

Notary Public

Columbia : SS
Subscribed and Sworn to before me, in my presence,
this 29 day of June , 2006

Shaquita Wilson, Notary Public, D.C.
My commission expires June 14, 2009

Index No.: 107777/05

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PALESTINE MONETARY AUTHORITY,

Plaintiff-Counterclaim Defendants,

v.

DAVID STRACHMAN, as administrator of the
ESTATE OF YARON UNGAR, *et al.*,

Defendants-Counterclaim Plaintiffs.

MEMORANDUM OF LAW IN SUPPORT OF THE
PALESTINIAN MONETARY AUTHORITY'S MOTION
FOR SUMMARY JUDGMENT AND DISCHARGE OF
UNDERTAKING

KALBIAN HAGERTY LLP
Attorneys for the Palestine Monetary Authority

888 17th Street, N.W., Suite 1000
Washington, DC 20006
(202) 223-5600