UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

LESLYE KNOX, Individually, and as Natural Guardian  :
of Plaintiffs Jordan Terrell Ellis, Reuven Carter,
Shanon Carter, Shayrah Carter, Yoshavyah Carter and  :    Civil Action No. 07-3349
Amitai Carter, JORDAN TERRELL ELLIS, minor,
REUVEN CARTER, minor, SHANON CARTER, minor,  :
SHAYRAH CARTER, minor, YOSHAVYAH CARTER,
minor, AMITAI CARTER, minor, by their Next Friend and  :
Guardian Leslye Knox, and TSAPHRIRAH ELLIS,
                                                            :
                                                            :
                    Plaintiffs-Judgment Creditors,          :
                                                            :
            - against -                                     :
                                                            :
THE BANK OF NEW YORK,                                       :
                                                            :
                    Defendant-Garnishee,                    :
                                                            :
PALESTINE MONETARY AUTHORITY,                               :
                                                            :
                    Applicant for Intervention.             :

------------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF PALESTINE MONETARY
AUTHORITY'S MOTION FOR LEAVE TO INTERVENE AND FOR AN ORDER
VACATING THE WRIT OF EXECUTION AND DISMISSING THE COMPLAINT**

Scott R. Emery
LYNCH DASKAL EMERY LLP
264 West 40th Street
New York, New York  10018
(212) 302-2400

-and-

Haig V. Kalbian
Mary M. Baker
KALBIAN HAGERTY LLP
888 17th Street, NW, Suite 1000
Washington, DC  20006
(202) 223-5600

Attorneys for Palestine Monetary Authority

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT**................................................................1

**STATEMENT OF FACTS**..................................................................2

**ARGUMENT**...................................................................................11

I.     THE PMA IS ENTITLED TO INTERVENE AS OF RIGHT FOR CLARIFICATION FROM THIS COURT REGARDING THE SEIZED FUNDS.............................11

       A.    The Intervention Standard..................................................11

       B.    This Application Is Timely....................................................12

       C.    PMA Has An Interest Relating To The Property That Is the Subject of the Action, And Its Interest Will Be Impaired By The Disposition Of The Action Should Its Motion for Leave to Intervene Be Denied...............................................13

       D.    PMA's Interest Is Not Protected Adequately By The Parties to the Action........13

II.    THE PMA IS ENTITLED TO AN ORDER VACATING THE WRIT OF EXECUTION IMMEDIATELY RELEASING THE SEIZED FUNDS AND DISMISSING THE COMPLAINT..................................................................................13

       A.    The Seized Funds Are Being Held Pursuant To The Enforcement Of A Default Judgment Entered Against The PA And The PLO, Not PMA, Which Was Not Named In The Action, Served With Notice Of The Action, Given An Opportunity To Be Heard, Or Afforded Any Due Process Whatsoever.........................13

       B.    The Seized Funds Have Been Restrained in Violation of U.C.C. Article 4A......15

       C.    The Plaintiffs' Claims Present a Non-Justiciable Political Question...............16

           i.    There Exists A Textually Demonstrable Constitutional Commitment Of The Issue To A Coordinate Political Department............................18

           ii.    Undertaking Independent Resolution Of The Issue Would Express A Lack Of Respect Due To A Coordinate Branch Of Government.................18

           iii.   There Is An Unusual Need For Unquestioning Adherence To A Political Decision Already Made.........................................................19

           iv.   There Exists The Potential For Embarrassment Were The Court To Rule Differently From The Executive Branch On The Issue.....................19

D.    The *Knox* Parties are Bound By The New York Supreme Court's Ruling In The *Ungar* Case Holding That PMA Is Not A Department, Division, Or *Alter Ego* Of The PA But Is An Independent Entity............................................................20

    i.    The *Res Judicata* Implications Of The April 2007 Order...................21

    ii.    The *Ungar* Order Constitutes An Adjudication On The Merits............21

    iii.    The *Knox* Parties Are Bound By The *Ungar* Order Because They Are In Privity With The Ungars.......................................................22

E.    Continued Restraint Of The Seized Funds Is Prohibiting PMA From Performing Even Its Most Basic Function, Damaging Its Relationship With Commercial Banks, Causing It To Suffer Substantial Monetary Damages, And Severely Harming Its Goodwill And Reputation In The Middle East And Around The World.......................................................................................23

F.    Plaintiffs Have Not Served The Judgment Debtor As Required By CPLR 5225 and 5227......................................................................................24

**CONCLUSION**...........................................................................25

::

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Allen v. McCurry*, 449 U.S. 90 (1980)……………………………………………..……….21

*Am. Med. Ass'n v. United Healthcare Corp.*, 2006 WL 3833440 (S.D.N.Y. 2006)…………….22

*Baker v. Carr*, 369 U.S. 186 (1962)…………………………………………………..…17, 18, 20

*Bancoult v. McNamara*, 445 F.3d 427 (D.C. Cir. 2006)…………………..………………..…..17

*Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123 (2d Cir. 2001)…………………………….....11, 12

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)…………………………….....19

*Doe v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005)…………………..……………….....19

*Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394 (1981)…………………………………...21

*Ferris v. Cuevas*, 118 F.3d 122 (2d Cir. 1997)……………………...…………………..…………22

*First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*,
    462 U.S. 611 (1983)……………………………………………………….……..20

*In re Neuman*, 55 B.R. 707 (S.D.N.Y. 1985) ……………………………………………..…12

*Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261 (2d. Cir. 1997)…………………………..21-22

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986)……………….…………….17

*Jones v. Beame*, 45 N.Y.2d 402 (1978)………………………………………………..…….17, 19

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs. Inc.*,
    295 F.Supp.2d 366 (S.D.N.Y. 2003)……………………………………………………14

*LNC Invs., Inc. v. Rep. of Nicaragua*, 115 F.Supp.2d 358 (S.D.N.Y. 2000)…………………..14, 20

*Monahan v. New York City Dep't of Corrections*, 214 F.3d 275 (2d Cir. 2000)……………..21, 22

*Oetjen v. Cent. Leather Co.*, 246 U.S. 297 (1918)…………………………………..……………..18

*Palestine Monetary Auth. v. Strachman*,
    2007 WL 1063867 (N.Y. Sup. Apr. 2, 2007)………………..……………..…...*passim*

**TABLE OF AUTHORITIES**
**(CONTINUED)**

<u>**Cases**</u>                                                                                                      <u>**Page(s)**</u>

*Phoenician Trading Partners LP v. Iseson,*
     2004 WL 3152394 (E.D.N.Y. Dec. 11, 2004)...............................................24, 25

*Schneider v. Kissinger,* 412 F.3d 190 (D.C. Cir. 2005)........................................17, 18, 19

*Tachiona ex rel. Tachiona v. Mugabe,* 186 F.Supp.2d 383 (S.D.N.Y. 2002) .....................11

*Veal v. Gercaci,* 23 F.3d 722 (2d Cir. 1994)...........................................................23

*Weston Compagnie De Finance Et D'Investissment, S.A.*
     *v. La Republic Del Ecuador,* 1993 WL 267282 (S.D.N.Y. July 14, 1993)...............15

*Weston Funding Corp. v. Lafayette Towers, Inc.,* 550 F.2d 710 (2d Cir. 1977)....................21


<u>**Statutes and Rules**</u>                                                                                 <u>**Page(s)**</u>

FED.R.CIV.P. 11.......................................................................................23

FED.R.CIV.P. 12(b)(1) .................................................................................1

FED.R.CIV.P. 12(b)(6) .................................................................................1

FED.R.CIV.P. 24(a)(2)...............................................................................1, 11

N.Y. C.P.L.R. § 5225................................................................................24, 25

N.Y. C.P.L.R. § 5227................................................................................24, 25

N.Y. C.P.L.R. § 5239..................................................................................14

N.Y. C.P.L.R. § 5240..................................................................................14

N.Y. U.C.C. Article 4A..............................................................................*passim*

N.Y. U.C.C. § 4-A-502.............................................................................4, 15

N.Y. U.C.C. § 4-A-503.............................................................................6, 15

TABLE OF AUTHORITIES
(CONTINUED)

**Other Authorities**                                                                                    **Page(s)**

71 Fed. Reg. 27199 (May 10, 2006)…………………...……………………..………….……...16

OFAC Recent Action Notice (April 12, 2006)…………………...……………………..…………17

OFAC General License No. 4 (April 12, 2006)…………………...……………………..………...17

vi

## PRELIMINARY STATEMENT

Palestine Monetary Authority ("PMA") respectfully submits this memorandum of law in support of its Motion for Leave to Intervene, pursuant to Rules 6(d) and 24(a)(2) of the Federal Rules of Civil Procedure, allowing PMA to intervene to obtain confirmation from this Court that the Writ of Execution dated February 14, 2007 has no bearing on any PMA clearance funds suspended by the Bank of New York ("Seized Funds"), which the New York Supreme Court ordered released on April 2, 2007. PMA further moves, pursuant to F.R.C.P. 12(b)(1) and (6), to dismiss the Complaint for the reasons discussed below and for an order immediately vacating the Writ of Execution served on the Bank of New York ("BNY") that, according to plaintiffs' April 25, 2007 complaint commencing turnover proceedings, purports to attach the Seized Funds.

Since May 2005, PMA has been attempting to have the Seized Funds released after they were improperly suspended by BNY in response to a restraining notice issued pursuant to a judgment in a case adjudicated in the District Court of Rhode Island. On April 2, 2007, PMA obtained a final order in New York Supreme Court for release of the funds. BNY, however, persisted in its refusal to release the funds on the ground that plaintiffs <u>might</u> prevail in a turnover proceeding in this case involving the Seized Funds. On April 26, 2007, plaintiffs filed a complaint seeking turnover of the Seized Funds.

PMA's motion to intervene should be granted because:

A.    PMA is not a party in the underlying action;

B.    PMA has an interest relating to the property that is the subject of the action, and its interest will be impaired by the disposition of the action should its motion for leave to intervene be denied; and

C.    PMA's interest is not protected adequately by the parties to the action.

PMA's motion for an order vacating the writ, releasing the Seized Funds, and dismissing the Complaint should be granted on an emergency basis because:

A.   The Seized Funds are being held pursuant to the enforcement of a default judgment entered against the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO"), not PMA, who was not named in the action, served with notice of the action, given an opportunity to be heard, or afforded any due process whatsoever;

B.   The Seized Funds have been restrained in violation of U.C.C. Article 4A because they were funds in transit and not subject to seizure;

C.   The plaintiffs' claims present a non-justiciable political question;

D.   The *Knox* plaintiffs are bound by the April 2, 2007 Decision and Order issued by Justice Shirley W. Kornreich of the Supreme Court of the State of New York, County of New York (holding that PMA is not a department, division, or *alter ego* of the PA but is an independent entity) on *res judicata* grounds because i) their interest is identical to that of the plaintiffs in the case over which Justice Kornreich presided and ii) the exact same attorneys control these plaintiffs; and

E.   Continued restraint of the Seized Funds prevents PMA – as a central banking institution – from performing even its most basic function, damaging its relationship with the commercial banks that it supervises, causing it to suffer substantial monetary damages, and severely harming its goodwill and reputation in the Middle East and around the world.

## STATEMENT OF FACTS

This motion arises from the aggressive collection efforts of two sets of plaintiffs in separate legal proceedings, the *Ungar* and *Knox* actions. The plaintiffs in both lawsuits have acted through the exact same agents and attorneys – David Strachman and Robert J. Tolchin – to obtain judgments against parties other than PMA and thereafter attempt without legal basis to collect against PMA by commencing turnover proceedings.

### The *Ungar* Action

The "*Ungar* Action" was litigated before the New York Supreme Court, New York County, as Index No. 107777/05. *See* First Amended Complaint filed by PMA on July 19, 2005, ("*Ungar* Complaint"), a copy of which is attached as Exhibit A to the Affirmation of Scott R.

Emery in Support of the Palestine Monetary Authority's Motion for Leave to Intervene dated May 7, 2007 ("Emery Aff."). Defendants in that action were, *inter alia*, David Strachman, as Administrator of the Estates of Yaron Ungar, Professor Meyer Ungar, Judith Ungar, Rabbi Uri Dasberg and Judith Dasberg (Individually and in Their Capacity as Legal Guardians of Plaintiffs Dvir Ungar and Yishai Ungar), Amichai Ungar, Dafna Ungar, and Michal Cohen (collectively referred to in the *Ungar* Action as the "Strachman Defendants" or "Strachman Parties").[1]

PMA's dispute with the Strachman Parties arose from the latter's efforts to collect a judgment of over $116,000,000.00 entered by the U.S. District Court for the District of Rhode Island in the matter of *Estates of Yaron Ungar et al. v. The Palestinian Authority, et al.,* C.A. No. 00105(L) (Hon. Ronald R. Laguex) ("RI Judgment"). The RI Judgment was issued against the Palestinian Authority ("PA"), the Palestinian Liberation Organization ("PLO"), and several individuals closely aligned with those organizations. *See* RI Judgment, a copy of which is attached to the Emery Aff. as Exhibit B. PMA, however, was not a party to the *Ungar* Action, was not named in that action as an entity holding assets of the PA or PLO, and is not named in the RI Judgment. *See id.* at ¶ 7.

To collect on the RI Judgment, the Strachman Defendants sought and were granted an Injunction dated May 5, 2005 ("RI Injunction"), which enjoined the PA and PLO – as well as their agents – from withdrawing, transferring, secreting, or removing those entities' assets except in payment of normal operating expenses. (A copy of the RI Injunction is attached to the Emery Aff. as Exhibit C.)

---

[1] The procedural posture was somewhat odd in that the State Court clerk would not permit PMA to bring an emergency order under the assigned index number for the domesticated judgment. Accordingly, PMA proceeded as a plaintiff to dissolve the wrongful Notice of Injunction.

The Strachman Parties domesticated the RI Judgment in New York Supreme Court, New York County, under Index Number 105521/05. *See* Ex. A at ¶¶ 5-12. They then availed themselves of the New York creditor process to restrain certain funds passing through BNY.[2] More specifically, the Strachman Parties served a "Notice of Injunction" dated May 9, 2005 ("Notice of Injunction"), a copy of which is attached to the Emery Aff. as Exhibit D, on BNY. Significantly, David Strachman drafted the Notice of Injunction on his law firm's letterhead; it was not issued or endorsed by any court and, although it attaches the RI Injunction, it wrongly claims that the RI Injunction applies to PMA funds under the claim (wholly unsupported) that funds of the PA and PLO are "held and/or titled" in the name of PMA.[3]

PMA was established in the mid-1990's as a direct result of and pursuant to the issuance of Law No. 2 of 1997 in the Palestinian Territories in accordance with the terms of the Oslo Accords.[4] PMA serves as the regulatory authority for commercial banks and related deposit-taking institutions in the Palestinian Territories. *See* Ex. A at ¶ 13-22. It is not controlled by the PA or PLO and possesses an autonomous corporate character financially and operationally independent from those entities. *See* Decision and Order dated April 2, 2007 ("April 2007 Order") with Notice of Entry, a copy of which is attached to the Emery Aff. as Exhibit E, at 4; *Palestine Monetary Auth. v. Strachman*, 2007 WL 1063867 (*"PMA v. Strachman"*), at *2 (N.Y. Sup. Apr. 2, 2007); *see also* Decision and Order dated October 15, 2005 ("October 2005 Order"),

---

[2] "Creditor process" means levy, attachment, garnishment, notice of lien, sequestration, or similar process issued by or on behalf of a creditor or other claimant with respect to an account. N.Y. U.C.C. § 4-A502(1).

[3] PMA sought to have the RI District Court Judge rule on the matter; however, given that the funds were held by BNY in New York and New York's debtor-creditor laws would apply, the Court sent the parties back to New York State Court.

[4] The Oslo Accords refers to a series of agreements reached between Israel and the Palestine Liberation Organization between 1993 and 1998.

a copy of which is attached to the Emery Aff. as Exhibit F, at 10. It does not hold or manage any funds belonging to either organization or of any other named defendant in the *Ungar* Action. Furthermore, PMA has enjoyed and continues to enjoy good banking relations with banks in Israel, Europe, and throughout the world. PMA is also in good standing with the United States Treasury and the Federal Reserve Bank. *See* Emery Aff. at ¶ 2.

As is the case with central banks generally, PMA's core function is to perform clearance transactions, here, in U.S. dollars on behalf of the banks it regulates. (PMA also performs clearance transactions in Euros, Jordanian dinars, and Israeli shekels.) Prior to the seizure of the funds at issue, PMA conducted these clearance transactions through the Palestine International Bank ("PIB"), which operates as a commercial bank in the Palestinian Territories. PIB, in turn, processed the transactions through its account with BNY. PMA does not maintain an account with BNY (*see* Ex. F at 20) and, in fact, holds no assets in the U.S. *See* Emery Aff. at ¶ 3.

In 2005, on the basis of the RI Injunction, the Notice of Injunction, and the State Restraining Notice, BNY suspended approximately $30,000,000 in wire transfers.[5] *See* Ex. A at ¶ 44. BNY did so because PMA was one party in the chain of transfers relating to the Seized Funds. *See* August 3, 2005 testimony of Jessica Goodwin, excerpts of which are attached to the Emery Aff. as Exhibit G, at 141-92. BNY further advised that it would freeze additional funds if PMA conducted any further clearance transactions through BNY. *See* Ex. A at ¶ 42-43.

PMA instituted the *Ungar* Action on June 3, 2005. With its complaint, PMA moved for a temporary restraining order and preliminary injunction ("TRO Motion"). Thereafter, PMA filed

---

[5] The precise amount of the dollar transactions initially affected by the Strachman Parties' actions is $39,634,693. Two transactions were cancelled due to insufficient funds, however, and one further transaction was cancelled before BNY debited the PIB's account. The dollar value of the funds actually placed in the suspense account is $17,604,703.33. This amount does not include two Euro transactions of 39,994.26 Euro and 15,000.01 Euro.

its First Amended Complaint. *See* Ex. A. The Strachman Parties filed (i) a counterclaim seeking

a declaratory judgment that PMA is an *alter ego* of the PA or, alternatively, that PMA holds PA

assets and (ii) a crossclaim against BNY seeking turnover of all assets in BNY's possession

belonging to PMA and numerous other entities.

### The New York Supreme Court Ruled That The Funds Were Seized Improperly

Justice Shirley W. Kornreich of the New York Supreme Court held an evidentiary

hearing in August 2005 on the TRO Motion where PMA offered evidence that the Seized Funds

should be released because (i) the funds do not belong to PMA but instead to its customers; (ii)

PMA is a separate entity from the PA; and (iii) PMA does not hold any assets of the PA. The

court issued the October 2005 Order, holding that the Seized Funds never should have been

seized in the first place.

In particular, the court held that the seizure contravened N.Y. U.C.C. § 4-A-503, which

sets out specific stages in the wire transfer process when funds may be permissibly restrained by

the court in aid of a judgment creditor. *See* Ex. F at 17, 20-21. The Seized Funds belong to third

party banks; PMA merely served as an intermediary, and attachment at this transfer stage of the

process was not proper under U.C.C. Article 4A. *See id*. PMA then moved for summary

judgment. (A copy of PMA's motion for summary judgment, without exhibits, is attached to the

Emery Aff. as Exhibit H.)

Though the New York Supreme Court had granted the preliminary injunction and ordered

the Seized Funds released in 2005, it conditioned release on PMA's posting an undertaking of

$30 million pending further discovery on the Strachman Parties' claims that PMA was an

somehow an *alter ego* or held funds of the PA. *See* Ex. F at 26-27. PMA was unable to obtain a

bond or letter of credit because of the prohibitive cost and the uncertain political situation in the

region. Accordingly, BNY has continued to hold the Seized Funds even after the October 2005

Order, and PMA has remained unable to conduct clearance transactions in U.S. dollars on behalf

of its regulated banks.

### BNY And The *Knox* Plaintiffs Are Fully Aware Of The Prior Proceedings

BNY was included as a named defendant in the *Ungar* Action. PMA later stipulated to

dismiss with prejudice its claims seeking monetary damages against BNY in the *Ungar* Action.

The Stipulation of Discontinuance, a copy of which is attached to the Emery Aff. as Exhibit I,

further expressly stipulated that BNY would remain a party to the *Ungar* Action as a stakeholder

and be subject to the Court's ruling on PMA's claim for declaratory and injunctive relief.

### The State Supreme Court Rendered A Summary Judgment Order Releasing The Seized Funds

On April 2, 2007 – after 22 months of litigation – Justice Kornreich issued a Decision

and Order granting summary judgment on all of PMA's claims, as well as on all cross-claims as

they relate to PMA. *See* Ex. E at 18-19; *PMA v. Strachman*, at *9. Justice Kornreich

adjudicated and declared that PMA "is a separate juridical entity from the Palestinian Authority"

and ordered that "the money in its name, restrained by [BNY], should be released." Ex. E at 19;

*PMA v. Strachman*, at *9 (emphasis added).[6]

It should be noted that in making her determination, Justice Kornreich relied, *inter alia*,

on the determination by the U.S. Treasury Department that PMA is indeed an independent entity.

In pertinent part, her opinion reads:

> [O]n April 12, 2006, OFAC [the Office of Foreign Assets Control of the U.S.
> Department of the Treasury] authorized transactions with the PMA, as well as
> several other agencies in the Palestinian territories it deemed to be "independent"

---

[6] A copy of the Decision and Order was served on counsel for BNY on April 6, 2007. A copy of
the Order with Notice of Entry was served on counsel for the Strachman Parties and BNY on
April 10, 2007.

from the PA-The Central Elections Commission, The Independent Citizens Rights' Commission and the General Audit Authority/External Audit Agency. The independence or separateness of the PMA from the PA is the issue this court must determine in this case. The court's undertaking an independent resolution of an issue identical to that already decided by OFAC, the court believes, would express a lack of respect due the Executive branch and its orders. (OFAC is not limited by concepts of title under state law in promulgating its regulations and defining interests in property and its definition is subject to deferential judicial review). More important, it would insert the judicial system into foreign policy regarding worldwide terrorism and Middle-East relations. And, if the court were to make a determination different from the policy statement of OFAC and the political decision of the Executive branch that is, were the court to find PMA an alter ego or part of the PA there exists potential for embarrassment. The court, therefore, finds the issue of the separate juridical status of the PMA non-justiciable.

Ex. E at 11-12; *PMA v. Strachman*, at *5 (emphasis added); *see also* Ex. A, at ¶¶ 13-25.

## PMA's Interest In The *Knox* Turnover Action

After learning that the court had granted PMA summary judgment in the *Ungar* Action, Robert J. Tolchin, counsel for the Strachman Parties, informed PMA's counsel that — notwithstanding the express order for immediate release – the Seized Funds at BNY remained restrained owing to a Writ of Execution recently served on BNY in the *Knox* Action, *i.e. Knox v. Palestinian Authority*, 03 Civ. 4466 (VM)(THK) (S.D.N.Y.).[7]   (A copy of the email from Robert J. Tolchin to Haig V. Kalbian dated April 8, 2007 is attached to the Emery Aff. as Exhibit J.)  Mr. Tolchin never mentioned the *Knox* case to PMA prior to the April 2007 Order against his clients in *Ungar* and never served a copy of the restraining notice on PMA's counsel.

Despite the pendency of the *Ungar* case, the *Knox* Plaintiffs and their attorneys, Messrs. Strachman and Tolchin, failed to give any notice whatsoever to PMA.  PMA was not a

---

[7] On July 11, 2006, this Court ordered that the Clerk enter default judgments against the PA and PLO in the amount of $192,740,660.13 and entered a Writ of Execution as to the PA and PLO on February 14, 2007.  (A copy of the Writ of Execution is attached to the Emery Aff. as Exhibit K.)  Apparently, the United States Marshal served the *Knox* Writ of Execution on BNY on February 15, 2007.

defendant in the *Knox* Action, was never served with notice of or appeared in that action, and is not named in the Judgment issued in favor of the *Knox* plaintiffs. Neither the *Knox* plaintiffs nor BNY gave notice to PMA when the Writ of Execution was served on BNY. PMA was unaware that a Writ of Execution had been served until the April 8, 2007 email from Mr. Tolchin.

Nowhere in the *Knox* Writ of Execution is PMA mentioned. The Writ seeks to claim the "goods and chattels of the Palestine Liberation Organization and the Palestinian Authority (a/k/a "The Palestinian Interim Self-Government Authority" and/or "The Palestinian Council" and/or "The Palestinian National Authority"). *See* Ex. K.

In his April 8, 2007 email, Mr. Tolchin informed counsel that he would "conduct some consultations regarding whether the *Knox* plaintiffs intend to stand on their execution/restraining notice, and to proceed against these funds." *See* Ex. J. He further stated, "I expect to be able to inform you of the position of the *Knox* plaintiffs by no later than Monday, April 16, 2007." *See id.* On April 10, 2007, counsel for PMA requested that Mr. Tolchin withdraw the *Knox* Writ of Execution immediately. *See* April 10, 2007 email from Haig V. Kalbian to Robert J. Tolchin, a copy of which is attached to the Emery Aff. as Exhibit L.

**The Seized Funds Remain Improperly Restrained By The Bank Of New York**

On April 11, 2007, PMA counsel telephoned BNY counsel, Kenneth M. Bialo, to discuss BNY's position, particularly given the New York Supreme Court's recognition that, pursuant to N.Y. U.C.C. Article 4A, it is improper to restrain funds in transit. Despite the fact that nowhere in the *Knox* Writ of Execution is PMA mentioned, BNY counsel advised that unless the Writ is withdrawn or BNY is otherwise ordered, BNY would continue to restrain the Seized Funds.[8]

---

[8] On April 12, 2007, PMA counsel faxed to Mr. Bialo a letter stating that, pursuant to Justice Kornreich's Order, BNY is prohibited from restraining the Seized Funds at issue and that the

On April 18, 2007, Mr. Tolchin said to PMA counsel, "I write as a courtesy to inform you that the *Knox* plaintiffs will be seeking turnover of the PA/PMA funds held by BNY. Their turnover action should be filed in the next few days." *See* April 18, 2007 email from Robert J. Tolchin to Haig V. Kalbian, a copy of which is attached to the Emery Aff. as Exhibit N.

On the same day, PMA sought and Justice Kornreich issued an Order requiring the attorneys for the *Ungar* and *Knox* parties to show cause why an order should not be entered, among other things, requiring plaintiffs' counsel to withdraw the *Knox* Writ of Execution served on BNY, prohibiting plaintiffs' counsel from attempting to circumvent the court's April 2007 Order granting PMA summary judgment, and requiring BNY to immediately release the Seized Funds pursuant to N.Y. U.C.C. § 4 and per the Court's April 2007 Order. (A copy of the Order to Show Cause is attached to the Emery Aff. as Exhibit O.)

A hearing on the Order to Show Cause was held on April 19, 2007. (A transcript of that hearing is attached to the Emery Aff. as Exhibit P.) At the hearing, counsel to the *Ungar* and *Knox* plaintiffs contended that because they believe that PMA is associated with the defendants targeted in the *Knox* Writ of Execution, BNY should continue to restrain the very same funds that the New York State Supreme Court has already ordered to be released in the *Ungar* Action.

Justice Kornreich denied PMA's motion on the grounds that her court has no jurisdiction over the *Knox* matter and cannot interpret the *Knox* Writ of Execution. She directed that any claims arising from the *Knox* matter should be brought in this Court. *See* Ex. P at 33-34.

On April 20, 2007, PMA counsel again faxed to counsel for BNY a letter demanding that BNY comply with the April 2, 2007 Order and inform PMA in writing what action BNY

---

Seized Funds must be released. (The April 12, 2007 letter from Scott R. Emery to Kenneth M. Bialo is attached to the Emery Aff. as Exhibit M.)

intended to take with respect to the Seized Funds. (A copy of the April 20, 2007 letter is attached to the Emery Aff. as Exhibit Q.) BNY did not respond to the letter.

On April 26, 2007, plaintiffs filed a complaint in this Court against BNY commencing turnover proceedings. Despite the fact that Messrs. Tolchin and Strachman and the *Knox* plaintiffs have specifically targeted the Seized Funds in this action, they failed to serve PMA's counsel with the complaint. PMA thus now turns to this Court for relief. Multiple grounds exist for this Court to vacate the *Knox* Writ of Execution and to dismiss the complaint in its entirety.

## ARGUMENT

## POINT I

### THE PMA IS ENTITLED TO INTERVENE AS OF RIGHT FOR CLARIFICATION FROM THIS COURT REGARDING THE SEIZED FUNDS

**A.    The Intervention Standard**

Pursuant to Fed.R.Civ.P. 24(a)(2),

> Upon timely application anyone shall be permitted to intervene in an action ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

To intervene as of right, a movant must: "(1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 128-129 (2d Cir. 2001). As this Court has noted, "the test is a flexible and discretionary one, and courts generally look at all four factors as a whole rather than focusing narrowly on any one of the criteria." *Tachiona ex rel. Tachiona v. Mugabe*, 186 F.Supp.2d 383, 394 (S.D.N.Y. 2002). For an interest to be cognizable under Rule 24(a)(2), it

must be "direct, substantial, and legally protectable." *Brennan*, 260 F.3d at 129.  Given that

BNY is wrongfully holding some $18 million in clearance funds for PMA, the damage to PMA's

reputation and ability to function, and that plaintiffs seek turnover of these funds, PMA meets the

standards for intervention as of right.

**B.    This Application Is Timely**

There is a four prong test to evaluate timeliness in the Southern District.  *See In re*

*Neuman*, 55 B.R. 707, 709 (S.D.N.Y. 1985).  Pursuant to this test,

> the following factors are to be evaluated: (1) the length of time the proposed
> intervenor knew or reasonably could have known of his interest in the case before
> petitioning to intervene, (2) the extent of prejudice that the existing parties to the
> litigation will suffer due to the proposed intervenor's failure to petition at the time
> he first knew or should have reasonably known of his interest in the case, (3) the
> extent of prejudice that the proposed intervenor will suffer if his application for
> intervention is denied, and (4) any unusual circumstances militating either for or
> against the application as timely.

*Id.*

As discussed above, PMA was not aware of the *Knox* Writ of Execution and the effect

that it would have on PMA's interests until April 8, 2007, some two months after this Court had

ordered the *Knox* Action closed.   Moreover, plaintiffs cannot claim prejudice as they

orchestrated these events by failing to give any notice – despite almost two years of litigation by

Mr. Tolchin in the *Ungar* case – to PMA that its funds would be restrained as a result of the

*Knox* action.  Plaintiffs' counsel placed PMA in a position where it is forced to apply for

intervention at this time.  PMA should not be denied the opportunity to intervene because of

plaintiffs' counsel's lack of good faith and failure to give timely notice.  As discussed below,

PMA will certainly continue to suffer if its application is denied.

**C.    PMA Has An Interest Relating To The Property That Is The
Subject Of The Action, And Its Interest Will Be Impaired By The
Disposition Of The Action Should Its Motion For Leave To Intervene Be Denied**

PMA's interest in the property that is the subject of the action is clear on the face of the Complaint. As the Complaint states, "BNY currently holds funds nominally titled to the Palestine Monetary Authority ("PMA") in the amount of approximately $20 million. In this proceeding, Plaintiffs/Judgment Creditors seek turnover of those funds." *See* Complaint, attached to the Emery Aff. as Exhibit R, at ¶¶ 24-25.

In applying for intervenor status, PMA seeks a ruling from this Court that the Writ of Execution has no bearing on any PMA clearance funds suspended by the Bank of New York so that it may resume its core business of managing liquidity in the Palestinian economy forthwith.

**D.    PMA's Interest Is Not Protected Adequately By The Parties To The Action**

Both plaintiffs and BNY i) have flouted the April 2007 Order granting PMA summary judgment, ii) violated state law (particularly U.C.C. Article 4A), and iii) run roughshod over the most basic notions of due process (i.e., notice) and fair play. Because BNY has refused to release the Seized Funds despite the PMA's repeated, grounded insistence that BNY is in violation of N.Y. U.C.C. 4A and Justice Kornreich's April 2007 Order, PMA's interests are clearly not adequately protected in this action.

## POINT II

### PMA IS ENTITLED TO AN ORDER VACATING THE WRIT OF EXECUTION IMMEDIATELY RELEASING THE SEIZED FUNDS AND DISMISSING THE COMPLAINT

**A.    The Seized Funds Are Being Held Pursuant To The Enforcement
Of A Default Judgment Entered Against The PA And The PLO, Not PMA,
Which Was Not Named In The Action, Served With Notice Of The Action,
Given An Opportunity To Be Heard, Or Afforded Any Due Process Whatsoever**

BNY's assertion that it will continue to hold the funds originally seized by the 2005 *Ungar* restraining notice based on a claim by the *Knox* plaintiffs' counsel that the same funds remain restrained by the *Knox* Writ of Execution is unjustifiable. *See* Ex. P at 23. Pursuant to 28 U.S.C. 3203(c), "[a] writ of execution shall specify...the name of the judgment debtor, and the judgment debtor's last known address." Here, a cursory glance at the *Knox* Writ of Execution served on BNY demonstrates that it fails to mention PMA and provides no legal support for the continued retention of the Seized Funds. *See* Ex. K. BNY's restraint of the Seized Funds pursuant to the *Knox* Writ of Execution is, on its face, patently improper and unjust.[9]

While a "judgment creditor may restrain the assets of a judgment debtor wherever those assets may be," the assets of third parties may not be restrained in anticipation of a finding that a third party is an alter ego or holds assets of alleged alter egos of the judgment debtor, for such a situation would be violative of N.Y. C.P.L.R. § 5222 and "would also pose significant due process problems." *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs. Inc.*, 295 F. Supp.2d 366, 392-93 (S.D.N.Y. 2003).

As described above, PMA was not named in the action, served with notice of the action, given an opportunity to be heard, or afforded any due process whatsoever. The underlying litigation was commenced in 2003, and an inquest regarding damages was held on November 8, 2005, months after PMA was brought into the *Ungar* action. Given the well-settled law, as well as their own knowledge of Justice Kornreich's Orders, Messrs. Tolchin and Strachman had an affirmative duty to inform known counsel for PMA that its client would be targeted in this

---

[9] Pursuant to CPLR 5240, "a court may, on its own initiative or the motion of any interested person...make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure." *See N.Y. C.P.L.R. 5240; LNC Invs., Inc. v. Rep. of Nicaragua*, 115 F. Supp.2d 358, 361 (S.D.N.Y. 2000); *see also N.Y. C.P.L.R. 5239.*

litigation. Through subversive tactics, the plaintiffs have at once attacked PMA and denied it the opportunity to fairly litigate the underlying issues in this case.

**B.    The Seized Funds Have Been Restrained In Violation Of U.C.C. Article 4A**

By continuing to withhold the Seized Funds, BNY is in violation of New York U.C.C. Article 4A, which authorizes wire transfer funds to be seized only at certain specific stages of the process. See U.C.C. §§4-A-503, 4-A-502; Ex. F at 12; Ex. E at 19-20, *PMA v. Strachman*, at *6. Specifically, § 4-A authorizes a court to restrain an originator from issuing a payment order, an originator's bank from executing on an originator's order or a beneficiary's bank from releasing funds from a payment order. *See id.* Therefore, BNY would have been permitted to freeze the Seized Funds only if it was the bank of the originator or the beneficiary of any given transfer. In the *Ungar* case, documentary evidence conclusively established that the BNY did not serve in this role but was merely an intermediary bank in each of the transfers it froze.[10]   *See* Ex. F at 14-20.  U.C.C. § 4-A-503 expressly prohibits levy on funds in an intermediary bank "to prevent interruption of a funds transfer after it has been set in motion." *See* U.C.C. §§ 4-A-503, 4-A-502; Ex. E at 13.  The Official Comment for N.Y. U.C.C. § 4-A-503 provides that it is "designed to prevent the interruption of a funds transfer after it has been set in motion." The Official Comment further provides that intermediary banks are specifically protected from injunctions. *See also Weston Compagnie De Finance Et D'Investissment, S.A. v. La Republic Del Ecuador,* 1993 WL 267282, at *3 (S.D.N.Y. July 14, 1993) (a court may only restrain a funds transfer "prior to initiation by the originator, prior to execution by the originator's bank, prior to release of funds by the beneficiary's bank, and prior to withdrawal of

---

[10]  Evidence offered at the August 2005 hearing also reflects that these funds do not actually belong to the PMA but to the banks the PMA regulates; the funds merely pass briefly into the custody of the PMA as it conducts clearance transactions on those banks' behalf.  *See* Ex. F at 13, 25-26.

funds"). By acting on the Restraining Notice and Notice of Injunction, BNY interrupted the funds transfer process after it had been initiated but prior to its completion.

As articulated above, in October 2005, Justice Kornreich agreed with PMA's position and specifically redacted PMA from the *Ungar* State Restraining Notice, finding that the Notice of Injunction drafted and served by Mr. Strachman violated Article 4A of the New York Uniform Commercial Code. *See* Ex. F. In her April 2007 Order, Justice Kornreich recognized that by continuing to restrain the Seized Funds, BNY was in violation of N.Y. U.C.C. Article 4A. *See id.*

BNY cannot justify in any way its refusal to release the Seized Funds. First, Justice Kornreich specifically ruled – twice – that the seizure was never proper and violated U.C.C. Article 4A. Second, the language of basic creditor-debtor cases emphasizes that assets of third parties cannot be restrained just because someone anticipates an *alter ego* argument or finding. Third, and worse for BNY, if BNY had any "good faith doubts" as to the above, Justice Kornreich ruled clearly and unequivocally that i) the seizure violated state law and ii) PMA was separate from and held no funds of the PA or PLO. *See id.* at 17-21, 26; Ex. E at 3-4, 19; *PMA v. Strachman*, at *1-2, 9.

## C.    The Plaintiffs' Claims Present A Non-Justiciable Political Question

As discussed in the Statement of Facts section above, the Office of Foreign Assets Control ("OFAC"), an executive department of the federal government, has already ruled that PMA is independent from the PA. *See* Ex. E at 11-12; *PMA v. Strachman*, at *5. OFAC is an Executive Branch agency responsible for enforcing economic and trade sanctions based on U.S. foreign policy and national security goals. The sanction regulations administered by OFAC encompass, in OFAC's words, a "foreign affairs function". *See* 71 Fed. Reg. 27199 (May 10,

2006).  Under various OFAC-administered sanctions programs, Americans are restricted from dealing with designated terrorist groups, including Hamas.  In early 2006, OFAC determined that the newly-elected Hamas government has a property interest in the P.A.[11]  At the same time, however, OFAC set forth an official policy statement proclaiming PMA to be an agency independent of the PA and thereby authorized Americans to engage in transactions with PMA. *See* OFAC General License No. 4 (April 12, 2006), a copy of which is attached to the Emery Aff. as Exhibit T).

The political question doctrine prohibits courts from exceeding their constitutional authority.  *See Baker v. Carr*, 369 U.S. 186, 217 (1962); *Jones v. Beame*, 45 N.Y.2d 402, 408-09 (1978) (the court should "abstain from venturing into areas if it is ill-equipped to undertake the responsibility and other branches of government are far more suited to the task."); *see also PMA v. Strachman*, at *4.  The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *Bancoult v. McNamara*, 445 F.3d 427, 438 (D.C. Cir. 2006) (affirming dismissal for lack of subject matter jurisdiction under political question doctrine).

A six point test, as set forth in *Baker*, is applied when deciding the political question doctrine.  Each prong stands on its own and the court need only conclude that one factor is present to preclude justiciability.  *See Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005).  The elements are whether: 1) there is a commitment of the issue to a coordinate political department; 2) there are judicially discoverable and manageable standards for resolving the

---

[11] *See* OFAC Recent Action Notice, dated April 12, 2006, a copy of which is attached to the Emery Aff. as Exhibit S.

issue; 3) a non-judicial discretionary policy determination must be made in order to resolve the issue; 4) the court's undertaking independent resolution of the issue would express a lack of respect due to a coordinate branch of government; 5) there is an unusual need for unquestioning adherence to a political decision already made; and 6) there exists the potential for embarrassment were the court to rule differently from another political department on the issue. *See Baker,* 369 U.S. at 217.

Based on, among other things, the Executive Branch's determination that PMA is independent of the PA, several of the factors set forth in *Baker* are present rendering the subject matter of this action non-justiciable.

### i.    There Exists A Textually Demonstrable Constitutional Commitment Of The Issue To A Coordinate Political Department

It is well-settled that foreign policy and national security issues are constitutionally committed to the Executive and Legislative Branches of the U.S. government and the propriety of what may be done is not subject to judicial inquiry or decision. *See Schneider,* 412 F.3d at 194-95 (setting forth the extensive constitutional support for the commitment of foreign policy and national security decisions to the Executive and Legislative Branches, but not the Judiciary); *Oetjen v. Cent. Leather Co.,* 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative – 'the political' – Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision").

### ii.    Undertaking Independent Resolution Of The Issue Would Express A Lack Of Respect Due To A Coordinate Branch Of Government

OFAC obviously has many resources available to it that can reach far beyond the jurisdiction of this Court, and is therefore best placed to make the determination as to PMA's

legal standing relative to the PA. *See, generally, Jones,* 45 N.Y.2d at 408-09. As such, it would be impossible for this Court to undertake an independent resolution of the question at hand without expressing a "lack of respect due coordinate branches of government." *Schneider,* 412 F.3d at 197-98.

### iii. There Is An Unusual Need For Unquestioning Adherence To A Political Decision Already Made

Courts have observed that "foreign policy is constitutionally committed to the political branches, and disputes over foreign policy are non-justiciable political questions." *Doe v. State of Israel,* 400 F. Supp. 2d 86, 112 (D.D.C. 2005). The way in which the U.S. conducts its affairs on issues intertwined or related to the unique aspects of the Israeli-Palestinian situation satisfies the unusual need for this Court to exercise unquestioning adherence to the political decision already made by the Executive Branch regarding PMA. *See id.* at 111-12 ("It is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-Palestinian conflict").

### iv. There Exists The Potential For Embarrassment Were The Court To Rule Differently From The Executive Branch On The Issue

As Justice Kornreich acknowledged, there exists the real danger of embarrassment on the issue of PMA's legal status should the court rule differently from the Executive Branch on the issue. *See* Ex. E at 12; *PMA v. Strachman,* at \*5. As well as potentially causing embarrassment, a different decision by this Court on the *alter ego* question would violate the Supremacy Clause of the U.S. Constitution (Art. VI, cl. 2). *See Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 388 (2000). Finally, even if the Court were to reach the same decision as the Executive Branch, there is no guarantee that the decision would not extend beyond the parameters intended

by OFAC.  For the foregoing reasons, the Court should dismiss the instant matter because it begs a non-justiciable political question.[12]

**D.    The *Knox* Parties Are Bound By The New York Supreme Court's Ruling In The *Ungar* Case Holding That PMA Is Not A Department, Division, Or *Alter Ego* Of The PA But Is An Independent Entity**

Government instrumentalities established as juridical entities distinct and independent from the sovereign – as PMA was – should normally be treated as such.  *See First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 626-27 (1983).  However, "[w]here a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," one may be held liable for the actions of the other.  *Id.* at 629. Plaintiffs have the burden of proving the agency relationship or the resulting fraud if PMA is recognized as an independent corporate entity.  *See LNC Invs., Inc. v. Rep. of Nicaragua*, 115 F.Supp.2d 358, 363 (S.D.N.Y. 2000).

In order for a government instrumentality, such as PMA, to lose its separate juridical status and become the *alter ego* or agent of its parent government, the parent government, here, the PA, must exercise "extensive control over the instrumentality's daily operations and abus[e] the corporate form."  *Id.*  As discussed further below, plaintiffs have failed to meet their burden. Indeed, there has been no showing by BNY or the *Knox* plaintiffs that PMA is an *alter ego* or holds funds for the named judgment debtors in the *Knox* action.  Because PMA is not an agent of the PA and has been deemed a separate juridical entity from the PA, the Seized Funds must be released.

---

[12] As discussed above, Justice Kornreich has already ruled that this issue represents a non-justiciable political question after applying the six factors presented in *Baker*.  *See* Ex. E at 10-12; *PMA v. Strachman*, at *5.

i.    The *Res Judicata* Implications Of The April 2007 Order

Under the doctrine of *res judicata*, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981); *Allen v. McCurry*, 449 U.S. 90, 96 (1980) (federal court is obligated to give the same preclusive effect to that judgment as the courts of the rendering state). To establish *res judicata*, "a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 285 (2d Cir. 2000).

The third prong of this test is easily resolved. The core issue of the *Knox* Parties' turnover action is whether the Seized Funds (the exact funds at issue in the *Ungar* case) may be attached in furtherance of executing a judgment against the PA. As discussed below, prongs one and two require a closer look but are just as readily satisfied.

ii.    The *Ungar* Order Constitutes An Adjudication On The Merits

A judgment is considered "on the merits" if it completely disposes of the underlying cause of action, or "determines that the plaintiff has no cause of action." *Weston Funding Corp. v. Lafayette Towers, Inc.*, 550 F.2d 710, 713 (2d Cir. 1977), *citing* Restatement of the Law of Judgments § 49 (1942). Here, the trial court's April 2007 Order grants summary judgment – relying on several independent grounds – on behalf of PMA and against all of the *Ungar* Parties' claims.[13]

---

[13] Note that the preclusive effects and the finality of the April 2007 Order is not diminished in any fashion by the notice of appeal filed by Strachman and Tolchin. *See e.g., Jacobson v.*

### iii.     The *Knox* Parties Are Bound By The *Ungar* Order Because They Are In Privity With The Ungars

The April 2007 Order precludes the *Knox* Parties and their counsel from relitigating the *Ungar* case provided that the previous action involved the plaintiffs or "those in privity with them." *Monahan*, *supra*, 214 F.3d at 285. PMA does not contend that the *Knox* Parties were parties to the *Ungar* case; however, the privity of the parties is clearly established by the fact that they are represented by the same counsel following a concerted strategy against PMA.

This Circuit has clearly held that a party in a subsequent case may be barred by *res judicata* from relitigating issues resolved in a prior case if its interest is identical to that of the prior plaintiffs and it is controlled by the same party, including an attorney. *See Ferris v. Cuevas*, 118 F.3d 122, 128 (2d Cir. 1997). The Second Circuit in *Ferris* held that where the prior and subsequent plaintiffs "shared a law firm which formulated an overarching strategy for the two actions," the plaintiffs are considered in privity with one another. *Id.* This does not apply in cases where two separate plaintiffs just happen to secure the same attorney for similar claims, but is intended to "prevent one controlling person . . . from bringing multiple suits in the names of different plaintiffs, and controlling the litigation from the shadows." *Id.* This is exactly the circumstance of the present litigation.

The *Knox* Parties are represented by a team of attorneys, namely David Strachman and Robert Tolchin,[14] who have followed a concerted plan of obtaining a judgment against the PA, without naming the PMA in the underlying litigation or openly alleging that PMA is an *alter ego*

---

*Fireman's Fund Ins. Co.*, 111 F.3d 261, 268 (2d. Cir. 1997) (citing New York law); *see also Amer. Med. Ass'n v. United Healthcare Corp.*, 2006 WL 3833440, at *17 (S.D.N.Y. 2006).

[14] Mr. Strachman represented the plaintiffs in the underlying *Ungar* Action. He was the named administrator of plaintiffs' estate in the action domesticating the judgment in New York State Supreme Court under Index Number 105521/2005. Mr. Tolchin represented the Strachman Parties in that action.

of the PA. Once the judgment is obtained, the Strachman/Tolchin team then attempts to garnish funds held by a third party, BNY, in the name of PMA.

It was outrageous enough when the Strachman/Tolchin team pursued this nefarious course for the Ungars – conveniently concocting a notice of injunction that suited them and which Judge Kornreich redacted nearly two years ago. In the face, however, of (i) the October 2005 Order holding that the seizure was improper and violated U.C.C. Article 4A; (ii) the April 2007 Order directing the release of the Seized Funds and (iii) plaintiffs' counsel specific knowledge of PMA's litigation efforts to secure the release of the Seized Funds, this newest claim for turnover relating to the exact same funds is beyond the pale and squarely in the realm of Rule 11.[15] The face of the pleadings and filings demonstrates that the *Knox* Parties are in privity with the *Ungar* Parties and the *Knox* Parties' action for turnover of the Seized Funds must be dismissed.

**E.    Continued Restraint Of The Seized Funds Is Prohibiting PMA From Performing Even Its Most Basic Function, Damaging Its Relationship With Commercial Banks, Causing It To Suffer Substantial Monetary Damages, And Severely Harming Its Goodwill And Reputation In The Middle East And Around The World**

The effects of the disingenuous acts of plaintiffs' counsel and BNY's unlawful restraint on PMA's clearance funds are deleterious and far-reaching. As discussed above, for over two years, approximately $18 million of the wire transfers relating to PMA has been frozen as a result of the RI Injunction and the Notice of Injunction. The ramifications of this restraining notice have extended from quantifiable losses to PMA's intangible assets. While the issue of whether PMA was an *alter ego* or held funds of the named defendants was adjudicated by the

---

[15] Black letter law holds that a principal is held to have knowledge if his agent has knowledge, has reason to know, or should know. *See Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994).

New York State Supreme Court, the restraining order frustrated PMA's reputation and its position as the central bank of the Palestinian Territories.

As detailed above, after nearly two years of litigation, the New York State Supreme Court ordered the Seized Funds to be released. Through March 31, 2007, PMA has suffered in excess of $2.2 million in lost interest and/or interest obligations on the Seized Funds. It continues to incur such damages at a rate in excess of $3,200 per day while the Seized Funds continue to be restrained (figure varies according to interest rate changes). While funds are frozen by BNY, PMA cannot fulfill its obligations to the banks it serves and is limited in its ability to generate income. Moreover, PMA has been obliged, as a matter of principle, to pay interest to the banks it serves on funds that have been frozen by BNY. If BNY's improper restraint of the funds continues, PMA's relationship with the commercial banks it serves will continue to be damaged and PMA will continue to suffer substantial monetary damages as well as the loss of its goodwill and reputation as a trusted member of the international banking community. Thus, for PMA, time is demonstrably of the essence as it seeks to resolve the status of the Seized Funds.

## F.    Plaintiffs Have Not Served The Judgment Debtor As Required By CPLR 5225 And 5227

Plaintiffs' claim for turnover must be dismissed because plaintiffs have not shown or alleged that the Complaint in this deferral action was served on the judgment debtors, the PA and the PLO.[16] Section 5227 of the New York Civil Practice Law and Rules requires that "[n]otice of the proceeding shall also be served upon the judgment debtor...." N.Y. C.P.L.R. § 5227; *Phoenician Trading Partners LP v. Iseson*, 2004 WL 3152394, at *4 (E.D.N.Y. Dec. 11, 2004).

---

[16] PMA has never been served with the Complaint. While not the judgment debtor, due process requires service upon it as it is its property plaintiff seeks to obtain.

Here, there is no indication in the docket or papers that plaintiffs have complied with the requirement for service on judgment debtors, the PA and the PLO. Failure to serve the judgment debtors is grounds for dismissal of the turnover claim. *See Phoenician*, 2004 WL 3152394, at *4 ("[t]o be entitled to judgment pursuant to §5225 or §5227, [the judgment creditor] must also have served...the judgment debtor...with notice of the proceeding[,] [and] [f]ailure to serve the judgment debtor renders the proceeding jurisdictionally defective").

## CONCLUSION

For the foregoing reasons and the reasons set forth in the accompanying Affirmation of Scott R. Emery in Support of the Palestine Monetary Authority's Motion for Leave to Intervene and for an Order Vacating the Writ of Execution and Dismissing the Complaint, the Palestine Monetary Authority respectfully requests that this Court enter an order vacating the Writ of Execution, dismissing the complaint, and directing immediate release of the Seized Funds, and for such further relief as the Court deems appropriate.

Dated: New York, New York
      May 7, 2007

Respectfully submitted,

LYNCH DASKAL EMERY LLP

By: _____
    Scott R. Emery (SR-6293)
    264 West 40th Street
    New York, New York  10018

Of Counsel:

    Haig V. Kalbian
    Mary M. Baker
    KALBIAN HAGERTY LLP
    888 17th Street, NW, Suite 1000
    Washington, DC 20006
    (202) 223-5600

Attorneys for Palestine Monetary Authority