UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LESLYE KNOX, et al.,

                 Plaintiffs – Judgment Creditors,

     v.                                       Case No. 07-CV-03349 (VM)

THE BANK OF NEW YORK,

                 Defendant – Garnishee,

     v.

PALESTINE MONETARY AUTHORITY,

                 Applicant for Intervention.

**PLAINTIFFS – JUDGMENT CREDITORS' MEMORANDUM IN OPPOSITION TO THE PALESTINE MONETARY AUTHORITY'S MOTION FOR LEAVE TO INTERVENE AND FOR AN ORDER VACATING THE WRIT OF EXECUTION <u>AND DISMISSING THE COMPLAINT</u>**

JAROSLAWICZ & JAROS, ESQS.
*Attorneys for the plaintiffs*
150 William Street, 19th Floor
New York, New York 10038
(212) 227-2780

Table of Contents

FACTUAL BACKGROUND...........................................................................1

I.

THE PMA'S MOTION TO INTERVENE ..................................................1

II.

THE KNOXES' ACTION IS NOT PRECLUDED BY THE DECISION
IN THE *UNGAR* MATTER ..........................................................................3

III.

THIS TURNOVER ACTION IS NOT PROHIBITED BY THE UCC....................10

IV.

THE STATUS OF THE PMA CANNOT BE DETERMINED ON THE
INSTANT MOTION ....................................................................................13

V.

THE PA HAS BEEN SERVED ......................................................................18

VI.

THERE ARE NO GROUNDS TO QUASH THE EXECUTION ...........................18

CONCLUSION .............................................................................................22

Table of Authorities

# Cases

*Alejandre v. Republic of Cuba*, 42 F.Supp.2d 1317 (S.D.Fla. 1999) ....................................................14

*Anon. v. Anon.*, 181 A.D.2d 629, 630, 581 N.Y.S.2d 776 (1st Dept. 1992) ......................................................................................................................7

*Matter of Blatter*, 16 B.R. 137 (Bkrtcy.N.Y. 1981)....................................................................................21

*Chiarini ex rel. Chiarini v. County of Ulster*, 780 N.Y.S.2d 669 (3d Dep't 2004) ..................................................................................................7

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ...................................................................................14

*Ferris v. Cuevas*, 118 F.3d 122 (2d Cir. 1997) ...........................................................................................3

*Hartford Acc. & Indem. v. Columbia Cas. Co.*, 98 F.Supp.2d 251 (D.Conn. 2000) ...................................................................................................4

*Jackson v. Board of Educ. of City of New York*, 812 N.Y.S.2d 91 (1st Dep't 2006) ....................................................................................................7

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.*, 295 F.Supp.2d 366 (S.D.N.Y. 2003)...........................................................19

*Monahan v. New York City Dept. of Corrections*, 214 F.3d 275 (2d Cir. 2000)..............................................................................................................8

*Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.*, ___ F.Supp.2d ___, 2007 WL 1200067 *10 (S.D.N.Y. April 27, 2007) ......................................................................................................................12

*New York News Inc. v. Newspaper and Mail Deliverers' Union*, 139 F.R.D. 291 (S.D.N.Y. 1991)..................................................................................2

*NLRB v. United Technologies Corp.*, 706 F.2d 1254 (2d Cir. 1983)........................................................8

*Palestine Monetary Auth. v. Strachman*, 2007 WL 1063867 (N.Y.Sup. 2007) ............................................................................................ *passim*

*Pollicino v. Roemer and Featherstonhaugh P.C.*, 716 N.Y.S.2d 416 (3d Dep't 2000) ..................................................................................................7

*Ramey v. Rockefeller*, 348 F. Supp. 780 (E.D.N.Y 1972) ..................................................................4

*Ruiz v. Comm. of Dep't of Transp.*, 858 F.2d 898 (2d Cir. 1988)...........................................................3

*Ryan v. New York Telephone Company*, 62 N.Y.2d 494, 500, 478
    N.Y.S.2d 823 (1984) ..................................................................................................8

*Securities Industry Ass'n v. Bd. of Governors of the Fed. Reserve
    System*, 628 F. Supp. 1438 (D.D.C. 1986) .....................................................................2

*Weiss v. National Westminster Bank, PLC*, __ F.R.D. ___, 2007
    WL 1460933 (E.D.N.Y. May 14, 2007).........................................................................13

*Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57 (2d Cir.
    2005) .........................................................................................................................6

## **Statutes and Regulations**

Antiterrorism Act, 18 U.S.C. § 2331 *et seq.* .......................................................................12

CPLR §§ 5225-5227 .....................................................................................................20

CPLR § 5232...............................................................................................................20

UCC §§ 4-A-502 and 4-A-503 ................................................................................... 10-13

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LESLYE KNOX, et al.,

        Plaintiffs – Judgment Creditors,

    v.                                   Case No. 07-CV-03349 (VM)

THE BANK OF NEW YORK,

        Defendant – Garnishee,

    v.

PALESTINE MONETARY AUTHORITY,

        Applicant for Intervention.

## PLAINTIFFS – JUDGMENT CREDITORS' MEMORANDUM IN OPPOSITION TO THE PALESTINE MONETARY AUTHORITY'S MOTION FOR LEAVE TO INTERVENE AND FOR AN ORDER VACATING THE WRIT OF EXECUTION <u>AND DISMISSING THE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiffs – Judgment Creditors ("Knoxes") respectfully submit their Opposition to the omnibus motion filed by the Palestine Monetary Authority ("PMA").

The PMA's motion should be denied (except as stated in Part I below) and this matter should proceed to discovery and trial.

## <u>FACTUAL BACKGROUND</u>

The factual background and procedural history of this action is presented in the accompanying declaration of Robert J. Tolchin, Esq., and the exhibits annexed thereto. Rather

than burden the Court with a duplicative recitation of those facts here, plaintiffs respectfully refer the court to that declaration.

## **LEGAL ARGUMENT**

### I.    **THE PMA'S MOTION TO INTERVENE**

The PMA seeks to intervene as of right in this action pursuant to FED.R.CIV.P. 24(a)(2). (PMA Memo at Point I.[1])

Though the Knoxes dispute the accuracy of many of the arguments asserted by the PMA in support of its motion to intervene, the Knoxes do not oppose intervention by the PMA *per se*, provided the intervention conforms to the Federal Rules.

Because its motion papers are phrased confusingly, it appears that the PMA <u>may</u> be attempting to intervene only for limited purposes. The PMA states that it seeks "to intervene to obtain confirmation from this Court that the Writ of Execution dated February 14, 2007 has no bearing on any PMA clearance funds" and "further moves, pursuant to F.R.C.P. 12(b)(l) and (6), to dismiss the Complaint for the reasons discussed below and for an order immediately vacating the Writ of Execution." (*See* PMA Memo at Preliminary Statement, paragraph 1). Similar language appears in the Affirmation of Scott R. Emery submitted by the PMA in support of the instant motion. (*See id*. at ¶ 1).

It is unclear what the PMA means by this phraseology. But to the extent, if any, that the PMA is seeking to intervene for limited purposes only, the Knoxes strenuously oppose any such limited intervention.

---

[1] The PMA unfortunately did not see fit to number the pages of its memorandum, and references thereto will be thus made by section numbers.

The Federal Rules of Civil Procedure simply do not allow an intervenor to limit its own status, and to pick and choose the purposes for which it will intervene. *See, e.g., New York News Inc. v. Newspaper and Mail Deliverers' Union*, 139 F.R.D. 291, 293 (S.D.N.Y. 1991) ("it is clear that the Federal Rules do not anticipate limited, 'special status' intervenors"); *Securities Industry Ass'n v. Bd. of Governors of the Fed. Reserve System*, 628 F. Supp. 1438, 1440 (D.D.C. 1986) (intervenor by right cannot limit its intervention).

Thus, the Federal Rules of Civil Procedure do not permit limited intervention, and if that is what the PMA is seek its motion for limited intervention must be denied as a matter of law.

Aside from being prohibited by the federal rules, limited intervention would cause severe prejudice to the Knoxes. The PMA clearly intends to actively litigate and extinguish the Knoxes' turnover proceedings, filing motions and introducing testimony in the manner of a full-fledged party. Thus, limited intervention would give the PMA all the rights and benefits that party status entails but not necessarily the attendant responsibilities and obligations. The PMA should not be allowed (if that is what is seeking) to carve out a "heads-I-win-tails-you-lose" status for itself that – aside from being prohibited under the federal rules of intervention – would be inequitable to the Knoxes.

Therefore, if the PMA is seeking to intervene for limited purposes only its motion should, and respectfully must be, denied. Otherwise, the Knoxes have no objection to the PMA's motion to intervene.

## II.    THE KNOXES' ACTION IS NOT PRECLUDED BY THE DECISION IN THE *UNGAR* MATTER

The PMA argues that the Knoxes are precluded from bringing this action by the decision of the New York Supreme Court in *Palestine Monetary Auth. v. Strachman*, 2007 WL 1063867 (N.Y.Sup. 2007). (PMA Memo at D).[2]

This argument fails for several independent reasons:

### A.    The Knoxes Are Not in Privity with the Ungars

The PMA claims that the Knoxes and the Ungars are in privity for *res judicata* purposes because, allegedly, "that they are represented by the same counsel following a concerted strategy against PMA." (PMA Memo at D(iii)).

This claim is utterly frivolous.

The fact that different parties share the same attorney <u>most certainly does not</u> place them in privity for *res judicata* purposes. *See Ferris v. Cuevas*, 118 F.3d 122, 127-28 (2d Cir. 1997) (Court of Appeals was "careful … to state" that fact that two parties had same attorney was "not conclusive" as to existence of privity) (citing *Ruiz v. Comm. of Dep't of Transp.,* 858 F.2d 898 (2d Cir. 1988)).

Likewise:

> Hartford argues the privity of Columbia and Continental is demonstrated by their discovery coordination for Hartford's claims under the separate certificates in arbitration and in this Court. Hartford contends that the close functional relationship between Columbia and Casualty is reflected by the fact that Hartford's

---

[2] The Knoxes address this argument first solely because it purports to present a threshold defense which, logically, should be disposed of before proceeding to the PMA's other arguments.

> claims and billings for both the Columbia and Continental
> certificates were submitted, handled and investigated by the same
> CNA RE claims analyst, and that identical legal counsel represents
> Columbia in this litigation as represented Continental in the
> Related Arbitration. <u>While courts in this circuit have considered
> such facts in the privity analysis, such facts were not dispositive.</u>

*Hartford Acc. & Indem. v. Columbia Cas. Co.,* 98 F.Supp.2d 251, 257 (D.Conn. 2000) (emphasis added).

Similarly:

> We know of no basis for holding that the mere fact that the same
> attorney represented the parties in another action that has gone to
> judgment makes the latter *res adjudicata* against his client.

*Ramey v. Rockefeller*, 348 F. Supp. 780 785 (E.D.N.Y 1972).

Rather, in order to demonstrate that the Knoxes and the Ungars are in privity, the PMA would have to prove – *inter alia* – that Messrs. Strachman and Tolchin had "formulated an overarching strategy for the two actions" and are "bringing multiple suits in the names of different plaintiffs, and controlling the litigation from the shadows." *Ferris*, 118 F.3d at 128.

Indeed, *Ferris* and *Ruiz* involved attorneys representing groups of identically-situated potential plaintiffs, who strategically brought multiple state and federal actions on behalf of selected subsets of plaintiffs.

The PMA has made <u>no showing whatsoever</u> that Messrs. Strachman and Tolchin have an "overarching strategy" for the two cases, that they – rather than each set of clients – are calling the shots in each of the respective cases, or that there is any strategic cooperation at all between the two groups of judgment creditors.

The PMA's entire claim of "privity" rests on the bald *ipse dixit* assertions of its counsel that Messrs. Strachman and Tolchin have a "concerted strategy" and a "concerted plan." (PMA Memo at D(iii)).

This <u>factual</u> claim is not supported by an iota of evidence. Indeed, the PMA admits as much, arguing lamely that the "privity" between the parties is demonstrated on the "face of the pleadings and filings." *Id*.

Moreover, elsewhere in its papers the PMA contradicts this claim and admits that:

> This motion arises from the aggressive collection efforts of <u>two sets of plaintiffs in separate legal proceedings</u>, the *Ungar* and *Knox* actions. The plaintiffs in both lawsuits have acted through the exact <u>same agents</u> and attorneys — David Strachman and Robert J. Tolchin …

(PMA Memo, Statement of Facts, ¶ 1). (Emphasis added).

Thus, the PMA admits here that the Ungars and the Knoxes are conducting "separate legal proceedings" and that Strachman and Tochin are "agents" taking instructions from their clients in each of these separate proceedings (as attorneys are ethically required to do) and not strategic masterminds manipulating their clients as part of a "concerted plan" aimed at the PMA.

Furthermore, and more fundamentally, the PMA makes no showing of any "concerted" plan or strategy because – as a matter of clear empirical fact – none could <u>possibly</u> exist: **<u>the Ungars' judgment enforcement proceedings were initiated well over a year before the Knoxes even had their judgment</u>**.

It is therefore self-evident that there is not and cannot be "an overarching strategy" (*Ferris*, 118 F.3d at 128) to bring different proceedings against the PMA to enforce these two judgments, which were given – and so first became enforceable – years apart.

The PMA's claim of privity is therefore meritless.

**B.     The Decision of the New York State Court Regarding the Status of the PMA is Not an Adjudication on the Merits**

The New York court did *not* rule on the merits whether the PMA is legally separate from the PA, or whether (if legally separate) the PMA should be found to be an alter ego of the PA.

On the contrary, the court *declined* to rule on the status of the PMA, on the ground that the Executive Branch had determined that the PMA is independent of the PA and that the status of the PMA was therefore a "political question." *Palestine Monetary Auth.*, 2007 WL 1063867 at 4-5.

As the Second Circuit recently reiterated, "a dismissal under the political question doctrine is *not* an adjudication on the merits." *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 74 fn. 18 (2d Cir. 2005). (Emphasis in the original). (Internal quotations omitted).

Accordingly, and contrary to the PMA's assertion, the decision in *Palestine Monetary Auth.* in respect to the status of the PMA did *not* constitute an adjudication on the merits and so has *no* preclusive force.

**C.     The Decision of the New York State Court Regarding the UCC Was Dicta, Not an Adjudication on the Merits**

After finding that it was bound by a determination of the Executive Branch that the PMA was separate from the PA, the New York court then went on to state that "even were it to find the issue justiciable, the funds would still have to be released" under the relevant provisions of New York's UCC. *Palestine Monetary Auth.*, 2007 WL 1063867 at 6.

This part of the state court decision is dicta. Once the state court concluded that the Executive Branch had spoken dispositively regarding a "political question" it was required "to

surrender jurisdiction." *Anon. v. Anon.*, 181 A.D.2d 629, 630, 581 N.Y.S.2d 776 (1st Dept. 1992).

It is elementary that an obiter dictum is not an "adjudication on the merits." *See e.g. Chiarini ex rel. Chiarini v. County of Ulster*, 780 N.Y.S.2d 669 (3d Dep't 2004) (Dicta in court opinion should not be accorded preclusive effect.); *Pollicino v. Roemer and Featherstonhaugh P.C.*, 716 N.Y.S.2d 416 (3d Dep't 2000) (Language in court decision that is not necessary to resolve an issue constitutes dicta and should not be accorded preclusive effect.); *Jackson v. Board of Educ. of City of New York*, 812 N.Y.S.2d 91 (1st Dep't 2006) (same).

Alternatively, even assuming that the statements of the state court regarding the UCC were not merely dicta, they were <u>at most</u> an alternative ground for judgment. This "UCC ground" was completely unnecessary and unessential to the final result, because the state court had <u>already</u> determined (on the basis of its "political question" finding) that the PMA's funds at BNY were not subject to turnover. It is well established in New York law that alternative and/or unessential findings are not preclusive in a subsequent litigation. *See e.g. Ryan v. New York Telephone Company*, 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823 (1984) ("the issue must have been material to the first action or proceeding and essential to the decision rendered therein") (citing cases).

Indeed, the language used by Justice Kornreich strongly indicates that she was not <u>ruling</u> on the UCC issue. Rather than stating that "the court holds" or "the court finds" regarding the UCC issue, Justice Kornreich wrote only that "the court notes" and the "PMA is correct in arguing." *Palestine Monetary Auth.*, 2007 WL 1063867 at 6.

Moreover, at the conclusion of its decision, the state court "Ordered, Adjudged and Declared" that "the Palestinian Monetary Authority is a separate juridical entity from the

Palestinian Authority" (*id.* at 9) but made <u>no such order or declaration</u> in respect to the UCC issue.

Thus, the discussion of the UCC contained in *Palestine Monetary Auth.* is dicta, or at most an alternative holding, and therefore has no preclusive effect.

### D.    The Facts Presented in the Two Cases Are Substantively Different

As noted in the very case cited by the PMA in support of its *res judicata* claim, *Monahan v. New York City Dept. of Corrections,* 214 F.3d 275 (2d Cir. 2000):

> Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction of series of transactions is at issue, whether the same evidence is needed to support both claims, and <u>whether the facts essential to the second were present in the first</u>.

*Id.* at 285 (quoting *NLRB v. United Technologies Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983)) (emphasis added).

The essential facts in this case are different, both in respect to the status of the PMA and the UCC issue, from those which obtained in the Ungar proceeding:

Regarding the question of the status of the PMA, the New York court assumed, on the basis of the OFAC license, that the Executive Branch had taken the position that the PMA was legally separate from the PA.

However, Justice Kornreich did not solicit the position of the Executive Branch, or even seek to confirm that the OFAC license represented the position which she ascribed to it.

In short, the state court decision is based entirely on its own assumption as to the position of the Executive Branch.

In this case, however, the Executive Branch intends to make its actual position known to the Court. Counsel for the Knoxes was recently contacted by an attorney from the office of the United States Attorney for the Southern District of New York, who was seeking a copy of the complaint in this action. The attorney explained that the Court had notified her office of this case, and sought the position of the United States in respect thereto.

Thus, this Court will evidently soon have the benefit of the actual (rather than merely assumed) position of the Executive Branch. Clearly, if it emerges that the Executive Branch does not take the position attributed to it by the state court, the decision in *Palestine Monetary Auth.* can have no preclusive effect whatsoever since "the facts essential" (*Monahan, id.* at 285) to determining whether this case presents a non-justiciable political question will be different than the factual basis assumed by Justice Kornreich.

The facts presented in this case in respect to the UCC issue are also substantively different. The Ungars intercepted "funds transfers" and attempted to enforce their judgment against those "funds transfers" thereby implicating the UCC. *Palestine Monetary Auth.*, 2007 WL 1063867 at 6.

By contrast, and as discussed in detail in Part III below, the Knoxes did not intercept and are not seeking to enforce their judgment against a "fund transfer" within the meaning of the UCC. The funds at issue were intercepted by BNY and the Ungars well over a year before the Knoxes obtained their judgment and have been sitting in an account at BNY ever since, and the UCC therefore does not apply to the Knoxes' action for turnover of those funds. (*See* Part III, *infra*).

Accordingly, the facts of the UCC issue before this Court differ substantively from those considered in *Palestine Monetary Authority* and that decision therefore has no preclusive force here.

## III.      THIS TURNOVER ACTION IS NOT PROHIBITED BY THE UCC

The PMA argues that its assets at BNY[3] are shielded from the Knoxes' turnover proceeding by UCC §§ 4-A-502 and 4-A-503. (PMA Memo at Point II(b)).

This argument is baseless for two fundamental reasons.

First, §§ 502 and 503 apply only to restraint of and issuance of creditor process on a "funds transfer." Unlike the Ungars, however, the Knoxes did not issue creditor process on or seek to restrain funds transfers. The funds transfers were intercepted and extinguished by the Ungars long before the Knoxes served their Writ of Execution on BNY. The funds levied upon by the Knoxes, and of which they seek turnover, are not "funds transfers" but garden-variety deposits being held by BNY.

Thus, §§ 4-A-502 and 4-A-503 simply do not apply to the assets at issue.

Second, even assuming, *arguendo*, that the funds at issue are deemed to be "funds transfers" neither §§ 4-A-502 and 4-A-503 prevent the relief sought by the Knoxes.

---

[3] In its memorandum the PMA asserts that the funds are not "actually" owned by the PMA. (*See* PMA Memo at fn. 10). But PMA's counsel has explictly represented that the funds are "essentially…the PMA's money." (*See* Transcript, June 16, 2005, in *PMA v. Strachman, et al,* (C.A. 05-261L) (D.R.I.), attached to declaration of Robert J. Tolchin). Likewise, the Knoxes' complaint alleges that the assets belong to the PMA. At most therefore, the question of ownership is a disputed issue of fact that cannot be resolved on a motion to dismiss.

Section 4-A-503 deals solely with restraint by injunctions. *See id.* Official Comment. The Knoxes have not caused an injunction to be issued in respect to these funds, and so § 4-A-503 is irrelevant here.

Section 4-A-502 deals with "creditor process" which is defined as including "levy, attachment, garnishment, notice of lien, sequestration, or similar process issued by or on behalf of a creditor or other claimant with respect to an account" (id. at subsection 1) and therefore obviously applies to the Writ of Execution and proceedings brought by the Knoxes.

The sole provision of § 502 relevant here is subsection (4) which provides that:

> Creditor process with respect to a payment by the originator to the beneficiary pursuant to a funds transfer may be served only on the beneficiary's bank with respect to the debt owed by that bank to the beneficiary. Any other bank served with the creditor process <u>is not obliged to act</u> with respect to the process.

Section 4-A-502(4) (emphasis added).

Thus, subsection (4) does <u>not prohibit the bank from honoring the process, but merely exempts the bank from doing so</u>.

Thus, subsection (4) <u>allows the bank to honor the process if it so chooses</u>.

Here, the Bank of New York has done exactly that.

Nor does subsection (4) prohibit the judgment creditor from serving an execution or from seeking turnover of the funds where, as here, the bank has elected to honor the creditor process.

In short, since BNY has decided to honor the Knoxes' creditor process and to restrain the funds, nothing in UCC §§ 4-A-502 and 4-A-503 prohibits or prevents the Knoxes from seeking turnover of those funds.

Again, the language of the provision is explicit and clear: the bank "is not obliged to act." No amount of expansive statutory construction or interpretative pettifoggery by the PMA can possibly convert this express provision into a prohibition.

Finally, it should be noted that the Knoxes' judgment arises under federal law, specifically the Antiterrorism Act, 18 U.S.C. § 2331 *et seq*. ("ATA"). This point is critical, because a growing body of case law in this circuit has refused to apply the provisions of UCC § 4-A-502 where they conflict with federal interests. *See, e.g. Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.*, ___ F.Supp.2d ___, 2007 WL 1200067 *10 (S.D.N.Y. April 27, 2007) ("The case before me presents a clash of policies: state law protections of banking and commercial interests, and federal law which, in this instance, is protective of admiralty interests. In the absence of federal legislation on this subject, the admiralty interests, and the law of *Winter Storm* must prevail, as a matter of federal supremacy. *See* U.S. Const. art. VI, cl. 2.").

Enforcement of judgments entered under the ATA is also intended to advance federal interests at least as important as those in admiralty law:

> The legislative history of the ATA … reveal[s] this country's profound and compelling interest in combating terrorism at every level, including disrupting the financial underpinnings of terrorist networks. …
>
> Therefore, Congress has explicitly granted private parties the right to pursue common tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations. *See, e.g., Minpeco,* 116 F.R.D. at 523 (finding a private right of action in enforcing antitrust and commodities fraud laws to ensure the stability of U.S. financial markets, and noting, "[I]t is difficult to imagine a private commercial lawsuit which could be more infused with the public interest."). Certainly, private tort actions directed at compensating victims of terrorism and

> thwarting the financing of terrorism vindicate the national and
> international public interest.

*Weiss v. National Westminster Bank, PLC*, __ F.R.D. ___, 2007 WL 1460933 (E.D.N.Y. May 14, 2007) (emphasis added).

Therefore, to the extent, if any, that the Court finds that the Knoxes' enforcement proceedings are prohibited by the UCC, it should hold that the vital federal interests implicated and vindicated by the enforcement of the Knoxes' ATA judgment "must prevail, as a matter of federal supremacy" (*Navalmar, id.*) over the provisions of the UCC.

At the very least, those same federal interests mandate that this Court construe § 4-A-502(4) of the UCC according to its plain and explicit terms – which clearly do not prohibit the instant turnover proceedings – and reject the PMA's expansive interpretation.

## IV.     THE STATUS OF THE PMA CANNOT BE DETERMINED ON THE INSTANT MOTION

The PMA urges this Court to dismiss this action on the grounds that the Executive Branch has determined that it is legally separate from the PA, and that that determination binds the Court as a non-justiciable "political question." (PMA Memo at Point II(C)).

But the complaint in this action expressly alleges that the Executive Branch has determined that the PA and PMA are legally indistinguishable. (*See* Complaint ¶¶ 54-60).

Thus, there is a blatant factual dispute between the parties regarding the position of the Executive Branch. Moreover, for the purposes of the instant motion, the Knoxes' allegations must be taken as true.

Accordingly, this prong of the PMA's motion – which is founded on a factual claim disputed in the Knoxes' complaint – must be summarily denied.

In any event, this argument is meritless. Under the PMA's theory, the question of whether or not a foreign agency is legally separate from the central government of which it is a part is reserved exclusively to the Executive Branch, and is therefore non-justiciable.

The crushing and fatal defect in this theory is that the Executive Branch itself has never endorsed or supported it, and neither has any court.

If the PMA's theory were correct, then the Executive Branch could settle any dispute in a U.S. court regarding the separate status of a foreign agency, merely by making the position of the Executive Branch known to the court. According to the PMA, the Executive's position is dispositive, and the court hearing the matter would be bound by that position.

In fact, however, this has never occurred. Rather, whenever the Executive Branch has a position about the status of a foreign agency, it files an amicus brief or a "statement of interest," setting forth its position. That position does not in any way bind the court, and the courts are not only free – but required – to adjudicate the status of the foreign entity. Even the briefest survey of the case law turns up numerous examples of this.

One example (and there are a multitude of others throughout the case law) is *Alejandre v. Republic of Cuba*, 42 F.Supp.2d 1317 (S.D.Fla. 1999) *rev'd* 183 F.3d 1277 (11th Cir. 1999). In that case, the district court ruled, applying the standards set out by the Supreme Court in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), that the separate legal status of a telecommunications company owned and controlled by the Cuban government should not be considered, and that the company should be held liable for judgment entered against Cuba itself.[4]

---

[4] As was determined in the underlying case and as the PMA has expressly conceded, the PA is not a "foreign state." In its decision of October 14, 2005, the state court applied the *Bancec* standard to the question of whether the PMA should be considered as separate from the PA. The

The Court of Appeals reversed, and after a lengthy analysis and discussion held that *Bancec* required the opposite conclusion. *Alejandre*, 183 F.3d 1283-90.

Significantly for our purposes, the United States filed a brief in the Court of Appeals, asserting that the entity at issue was a separate legal entity that should not be held liable for the judgment against Cuba.

And therein lies the rub: under the PMA's theory, the brief filed by the United States asserting the separate status of the entity at issue should have settled the matter, and rendered it non-justiciable. Yet, the United States itself claimed no such privilege or power.

Nor did the Court of Appeals treat the position of the United States as binding. Indeed, the appellate decision does not even bother to note the position of the United States, and instead conducted a nine-page intensive analysis under *Bancec* to determine whether the Cuban entity should be recognized as having separate status.

And that is the second rub: the entire purpose of *Bancec* is to provide clear legal standards to determine whether a foreign agency should be recognized as having separate status. The very existence of the *Bancec* standards – which are to be applied by the Judicial Branch, not the Executive – is proof positive that this question is not only justiciable, but that it is within the exclusive prerogative of the judiciary. Otherwise *Bancec* would be meaningless.

Thus, the position of the Executive Branch in respect to the alleged separate status of an agency of a foreign state – and all the more so an agency of a non-state such as the PA – is neither binding nor entitled to any special weight. If the Executive has an opinion on the subject

---

application of *Bancec* to a non-state to have been in error, since the rationale underlying *Bancec* (the language of the Foreign Sovereign Immunities Act and comity between states) relates only to foreign states. This point is of no moment for the purposes of the instant motion, however, since the PMA's argument is baseless even in respect to agencies and instrumentalities of actual foreign states, all the more so to agencies of non-states.

it can file a brief and the court can consider or completely ignore that position (as did the Court of Appeals in *Alejandre*) as it deems appropriate. But at the end of the day the court is not only free, but duty-bound to apply the law to the facts and rule, as it – not the Executive – sees fit.

Therefore, even if the OFAC license constituted the official position of the Executive Branch regarding the status of the PMA, that position would have no impact on these proceedings.

In any event, the OFAC license does not constitute the official position of the Executive Branch regarding the status of the PMA, for several reasons:

<u>First</u>, OFAC is a division of the Treasury, not of the Department of State. Foreign policy positions are expressed by the Department of State, not the Treasury. OFAC can no more proclaim U.S. foreign policy than can the IRS, which like OFAC is part of the Treasury. OFAC characterized the PMA as an independent agency for the purposes of its own sanctions regime license, not as an expression of U.S. foreign policy.

Say, for example, the IRS – which is as much a part of the Executive Branch as OFAC – decided to classify the PMA as a "separate agency" for its own (tax) purposes. Would that prevent the Knoxes from making their argument before this Court? Hardly.

<u>Second</u>, OFAC did not state that the PMA is a <u>separate</u> legal entity, only that it is an "independent agenc[y]". The statement about "independence" is meaningless in this context, where the question is whether the PMA is a <u>separate</u> legal entity. The FBI is part and parcel of the Executive Branch, part of the legal entity known as the United States of America, yet it is an "independent agency," though it is not legally separate.

<u>Third</u>, an examination of the full text of the license shows that OFAC made no <u>determination</u> whatsoever about the "independent" status of the PMA. Rather, OFAC organized

the license in to groups, using categories familiar to any eleventh grade civics student (after all, the license is not directed at lawyers or judges, but at businessmen interested in doing business with the PA), i.e., executive, judiciary, legislature, and "independent agencies." The purpose and substance of the license is to name those parts of the PA government – including, significantly, the office of the PA president and other core elements of the PA itself – that are not controlled by Hamas personnel. The division into categories is completely incidental to the license, and in no way constitutes a "finding" or "determination."

Fourth, OFAC itself published "Guidelines On Transactions With The Palestinian Authority" stating that:

> OFAC sanctions against the Palestinian Authority affect **only transactions by U.S. persons with the Palestinian Authority**. Therefore, these sanctions generally <u>do not</u> prohibit U.S. persons from providing assistance to, or engaging in business dealings with, private individuals, corporations, or organizations in the West Bank or Gaza.

> General Licenses: On April 12, 2006, OFAC issued 6 general licenses, available on OFAC's website and published in the *Federal Register* (71 *Fed. Reg.* 27199, May 10, 2006), authorizing U.S. persons to engage in certain transactions **with the Palestinian Authority**.

See     www.treas.gov/offices/enforcement/ofac/programs/terror/ns/pal_guide.pdf     (emphasis added).

Thus, the OFAC license at issue here "authorize[es] U.S. persons to engage in certain transactions <u>with the Palestinian Authority</u>" and that license is necessary because "OFAC sanctions against the Palestinian Authority affect only transactions by U.S. persons <u>with the Palestinian Authority</u>."

Furthermore, OFAC has explained that the license is a "'White List' of <u>parts of the Palestinian Authority</u> that U.S. persons can deal with" and that "Dealings with any <u>part of the Palestinian Authority</u> not listed in the General License require a specific license from OFAC." *See OFAC Guide to Dealing with the Palestinian Authority*, published by OFAC at www.treas.gov/offices/enforcement/ofac/programs/terror/pa.shtml (emphasis added).

Thus, the OFAC license was issued because doing business with the PMA is doing business with the Palestinian Authority, and so OFAC's position supports the Knoxes' position that the PMA and PA are the same legal entity.

In summary, this entire argument has no basis in law or in fact.


## V.    THE PA HAS BEEN SERVED

The PMA asserts that this action must be dismissed because judgment debtor PA has not been served with this turnover action. (PMA Memo, Point II(F)).

On the contrary, the Knoxes timely served the PA in accordance with the provisions of the NY CPLR, which govern service herein. (*See* docket item 10).


## VI.    THERE ARE NO GROUNDS TO QUASH THE EXECUTION

The PMA seeks to vacate the Writ of Execution which the Knoxes caused to be levied on BNY. (*See* PMA Memo at II). For the reasons discussed below this branch motion should be denied.[5]

---

[5] As preliminary matter it must be pointed out that even if the PMA were to prevail in this case the Writ of Execution could not be vacated, since it does not mention the PMA. Rather, in that case, the Court's determination that the assets at issue are not subject to execution by the Knoxes would operate to permit and require the BNY to release the funds. The Writ of Execution would remain intact.

The PMA first argues that the Writ fails to comply with the provisions of 28 U.S.C. § 3203(c). PMA Memo at II(A).

As the PMA's counsel knows, or should have known, § 3203 is part of the Federal Debt Collection Procedures Act, which applies to enforcement of judgments by the United States – not by private parties such as the Knoxes. *See* 28 U.S.C. § 3201 *et seq*.

Indeed, the very provision with which the PMA asserts the Knoxes failed to comply – § 3203(c) – specifically refers to the issuance of the writ by "counsel for the United States" and service of the writ by "the United States." *Id*. It stretches credulity far past the breaking point to believe that the PMA's counsel could have simply "overlooked" these provisions.

This argument is therefore not only meritless but knowingly frivolous, and is precisely the type of wasteful and pointless assertion that FED.R.CIV.P. 11 was intended to spare both courts and parties.

Next, the PMA argues that the Writ of Execution should be vacated because "the assets of third parties may not be restrained in anticipation of a finding that a third party is an alter ego or holds assets of alleged alter egos of the judgment debtor…." (PMA Memo at II(A)) (citing *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.*, 295 F.Supp.2d 366, 392-393 (S.D.N.Y. 2003)).

This glaring fallacy with this argument is that it assumes that the PMA is a "third party" and that the Knoxes are seeking to hold the PMA liable for the debts of the PA under an alter ego theory.

But the gravamen of the Knoxes' action is not that the PMA is an alter ago of the PA, but that PMA is a constituent department and/or division of the PA and therefore legally indistinguishable from the PA itself. (*See* Complaint at ¶¶ 26-34).

The Knoxes also allege that the Executive Branch has determined that the PA and PMA are legally identical, and that therefore, if the position of the Executive Branch is found to be dispositive, the Court must find that the assets at issue are subject to turnover by the Knoxes. Complaint ¶¶ 54-60.

Thus, *Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.* which dealt with alter ego claims, is completely inapposite here.

Furthermore, the PMA's demand to "vacate" the Writ of Execution seeks to prejudge the outcome of the instant action and flies in the face of the statutory scheme established by New York law. Under CPLR § 5232, service of a writ of execution restrains the debt or property sought by the judgment creditor, and if the judgment creditor initiates a turnover proceeding under CPLR §§ 5225-5227 within ninety days after service of the execution, that restraint continues in effect automatically until the conclusion of the turnover action:

> Talcott perfected its levy against the I.R.A. account when within 90 days following the original levy it commenced a special proceeding pursuant to CPLR s 5225(b). The very commencement of the CPLR s 5225(b) proceeding within the ninety day period perfected the Talcott levy. As explained by a leading CPLR commentator:
>
> > The levy must be perfected one way or another during that 90-day period, however, and if the garnishee has not made a voluntary transfer to the sheriff within that time the judgment creditor is going to have to take some other step before the 90 days expire. Two other steps are available to him, either of which will perfect the levy at least to the extent of satisfying the 90-day requirement. One is for the judgment creditor to commence a special proceeding against the uncooperative garnishee. The proceeding contemplated is governed by CPLR 5225 or 5227, and its mere commencement within the 90 days satisfies the

21

> requirement; the proceeding need not be heard or
> determined within that time.

Siegel, New York Practice (West), § 496 at 673.

> The levy takes hold the moment the garnishee is served with the
> Execution in the case of personal property not capable of delivery.
> It continues in full force and effect ***without*** the 90 day period if
> ***within*** the 90 day period the property is turned over to the sheriff
> or the judgment creditor institutes a special proceeding. No court
> order or judgment entry is necessary to perfect the levy, sustain
> perfection of the levy, or give the levy status in the ranking of
> priorities under CPLR s 5234.

*Matter of Blatter*, 16 B.R. 137, 139 (Bkrtcy.N.Y. 1981) (emphasis added).

Obviously, if third-party garnishees were not restrained from paying debts or delivering property to the judgment debtor during the pendency of a turnover proceeding, in 99% of cases the debt or property would be gone long before the turnover proceeding concluded. The statutory scheme created by the § 5232 of the CPLR is designed to answer that simple empirical problem. Indeed, it appears that every jurisdiction in the country has a similar device to prevent dissipation of debts or property during the pendency of enforcement proceedings.

The Knoxes filed the instant turnover proceeding within 90 days after levy of the Writ of Execution. Thus, under the statutory scheme provided for in § 5232, that Execution will remain in force until the conclusion of the turnover proceeding.

The PMA also complains that it is being harmed by the restraint of the $17 million dollars at issue. (PMA Memo at Point II(E)). But the PMA does not explain why it is being "harmed" any more than any other party whose assets are restrained during the pendency of a turnover proceeding. All that is at issue is the sum currently at BNY, and the Knoxes have repeatedly made clear both to BNY and the PMA that the PMA is free to conduct dollar

clearance activities without interferences or hindrance. The PMA's claims in this regard are therefore baseless.

In sum, the PMA's motion is shrill and filled with special pleading, but it fails to present any grounds to deviate from the statutory scheme set forth in the CPLR.

**VII.    CONCLUSION**

The instant motion should be denied (except as stated in Part I) and this matter should proceed to discovery and trial.

Dated:    New York, New York
          May 29, 2007

Respectfully submitted,

JAROSLAWICZ & JAROS, ESQS.
*Attorneys for the plaitniffs*


by:    _____
       Robert J. Tolchin
150 William Street, 19th Floor
New York, New York 10038
(212) 227-2780
