UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LESLYE KNOX, et al.,

    Plaintiffs – Judgment Creditors,

v.　　　　　　　　　　　　　　　　　　　　　　　Case No. 07-CV-03349 (VM)

THE BANK OF NEW YORK,

    Defendant – Garnishee,

v.

PALESTINE MONETARY AUTHORITY,

    Applicant for Intervention.

## DECLARATION OF ROBERT J. TOLCHIN

**ROBERT J. TOLCHIN**, an attorney licensed to practice law in the State of New York, declares as follows subject to the penalties of perjury:

1. I am an attorney licensed to practice before the courts of the State of New York. I am of counsel to the firm Jaroslawicz & Jaros, attorneys for the Plaintiffs – Judgment Creditors in the above-captioned matter ("Knoxes"). I am making this declaration in support of the Knoxes opposition to the Palestine Monetary Authority's Motion for Leave to Intervene and for an Order Vacating the Writ of Execution and Dismissing the Complaint.

### A.   Background

2. The background to this action is set forth in ¶¶ 1-3 of the complaint, a copy of which is annexed hereto as Exhibit 1.

**B.    The Palestine Monetary Authority**

3.    At least two federal courts have found that the Palestine Monetary Authority ("PMA") is legally indistinguishable from the Palestinian Authority ("PA").

4.    In *Ungar v. Palestinian Authority,* 325 F. Supp. 2d 15, 51 (D.R.I. 2004) the court found that the PMA is "the financial department of the PA".

5.    In *International Technologies Integration v. Palestine Liberation Organization et al.*, C.A. 98-00756(CKK) (D.D.C.), the court issued an order on July 2, 1999, restraining assets titled to the PMA in aid of enforcement of a judgment against the PA. (Exhibit 2).

6.    The decisions in *Ungar* and *International Technologies Integration* treating the PMA as legally identical with the PA are well founded, as shown below.

7.    The PMA was established and operates pursuant to the Oslo Accords (Published by the Israeli Foreign Ministry at: http://www.mfa.gov.il/MFA/Peace+Process/Guide+to+the +Peace+Process/Gaza-Jericho+Agreement+Annex+IV+-+Economic+Protoco.htm) and the Palestinian Monetary Authority Law, a copy of which is annexed hereto as Exhibit 3.

8.    The Oslo Accords were a series of agreements entered into between the government of the State of Israel and the Palestine Liberation Organization ("PLO"). The Oslo Accords created the Palestine Interim Self-Government Authority, also known as the "Palestine National Authority" or most commonly simply the "Palestinian Authority" or PA. The Oslo Accords were followed by a series of protocols and annexes to the Oslo Accords, including the Protocol on Economic Relations Between the Government of the State of Israel and the PLO Representing the Palestinian People, which was signed in Paris on April 29, 1994 ("Economic Protocol").

9. Article IV of this Economic Protocol, entitled Monetary and Financial Issues, provides in relevant part as follows:

> 1. The Palestinian Authority will establish a Monetary Authority (PMA) in the Areas. The PMA will have the powers and responsibilities of the regulation and implementation of the monetary policies within the functions described in this article.
>
> 2. The PMA will act as the Palestinian Authority's official economic and financial advisor.
>
> 3. The PMA will act as the Palestinian Authority's and public sector entities' sole financial agent locally and internationally.
>
> 4. The foreign currency reserves (including gold) of the Palestinian Authority and all Palestinian public sector entities will be deposited solely with the PMA and managed by it.

10. Thus, we see that the function which was contemplated for the PMA in the Oslo Accords was to serve as the "official economic and financial advisor for the PA" and to act as the PA's "local and international financial agent." The fact that the PMA, in the very document that led to its creation, is designated as the PA's agent and moreover as the sole holder and manager of the PA's "foreign currency reserves" (the PA has no currency of its own so this provision perforce includes <u>all</u> of the PA's currency reserves) strongly suggests that any funds which are held in a bank account or which are part of a wire transfer in the name of the PMA are actually as a matter of law and fact assets of the PA, and that the PMA lacks any separate legal identity.

11. We now turn to the Palestine Monetary Authority Law. (Exhibit 3).

12. The Monetary Authority Law begins with Chapter 1 which contains various definitions which are used throughout the rest of the statute. These will be referred to as "Defined Terms" in the discussion that follows.

13. Article 2 of the Monetary Authority Law provides for the creation of "an authority" called the "Palestine Monetary Authority." Notably, it does not say that an "entity" is being created or a "separate entity" is being created; it merely says that "an authority called the Palestinian Monetary Authority" was to be created having an "autonomous corporate character."

14. Article 4 of the statute—and it must be recalled that this is a statute of the PA—provides that the office of the PMA "shall be at any other place to be determined by the National Authority." The term "National Authority" in this statute is a Defined Term referring to the PA. It is noteworthy that even such a mundane matter as the location of the PMA's office is determined by the PA and not left to this allegedly independent entity to determine for itself. This suggests a domination by the PA of even the most detailed aspect of the PMA's existence.

15. Article 5 of the statute sets forth the objective duties and powers of the PMA. It explicitly states that the monetary authority is intended to secure economic soundness "in line with the general policy of the National Authority." Thus, the PMA is charged with carrying out the PA's policies. Article 5 subparagraph 6 provides that the PMA is charged with "keep[ing] and manag[ing] the National Authority reserve of gold and foreign currency," which, as noted, effectively means <u>all</u> of the PA's currency, since the PA has no currency of its own. Subparagraph 7 requires the PMA to "render financial and economic advice to the National Authority, carry out economic and monetary analysis to the National Authority . . ." Subparagraph 8 provides that the PMA shall "serve as financial agent to the National Authority and Palestinian public institutions inside and outside Palestine." Thus, the PMA is plainly fully subordinate to the PA for its policies and activities.

16. Article 6 provides that one of the PMA's functions is to "issue, manage, and maintain securities on behalf of the National Authority." Again, the term "National Authority" is

a Defined Term referring to the PA. Thus, when the PMA issues securities "on behalf of" the PA, it is doing so not in its own behalf as a truly independent body would do, but rather on behalf of the judgment-debtor in our case, the PA.

17. Article 8 provides that the initial capital used to create the PMA was "to be paid by the National Authority" and that the capital may be increased by "a decision to be adopted by the chairman of the National Authority."

18. Of extreme importance is Article IX of the Palestine Monetary Law which provides in its entirety as follows:

> If the budget for each fiscal year indicates that the assets of the Monetary Authority are less than its total capital and commitment, the deficit shall be covered from the reserve balance assigned for that and, in case of insufficiency of that, the <u>National Authority</u> shall pay the difference in cash for issue for its account negotiable indebtedness securities at the interest rates prevailing in Palestine and transfer them to the Monetary Authority.

19. Thus, we see that if the PMA has a shortfall and cannot meet its financial obligation, the judgment-debtor, the PA, is obligated to make up the PMA's shortfall.

20. There is a very practical application of this article to the case at hand. The PMA complaints in its motion papers that it will have difficulty continuing its operations if the assets which have been frozen are not released. However, pursuant to its own statute, <u>all the PMA has to do to avoid any such difficulties is to advise the PA that the PMA has a shortfall and the PA, pursuant to the statute, will be obligated to make it up</u>. There would be no injustice whatsoever in this considering that the judgment we are seeking to collect, after all, is a judgment against the PA.

21. Also of remarkable significance here is Article 12 of the statute which provides in its entirety as follows:

5

>After deduction of all commitments and expenses and completion of transfers to the general reserve accounts, the net profits shall devolve on the treasury of the National Authority.

22.     When we juxtapose Article 8, Article 9, and Article 12, we see a statutory framework providing that (a) the initial capital of the PMA came from the PA; (b) if there is a shortfall in the PMA it is paid by the PA; and (c) if there is a profit in the PMA it gets paid to the PA. The PMA is thus simply the name for the PA's wallet or bagman. Indeed, Article 13 goes on to provide that the distribution of profits back to the PA provided in Article 12 will not be carried out if the PMA's financial standing would be negatively affected, but <u>only</u> with the approval of the chairman of the PA. Thus, the discretion to determine whether such a distribution would negatively affect the PMA does not rest with the governor or board of the PMA, but rather with the PA itself. There is thus no independence whatsoever.

23.     Chapter 3 of the statute sets forth the manner in which the PMA is to be managed. Article 15 contains the provision setting forth how the management of the PMA will be selected. Remarkably, it provides in its entirety as follows:

>A.     A governor and deputy governor shall be appointed by a decision to be taken by <u>the chairman of the National Authority</u> at the proposal of the cabinet [cabinet is a Defined Term referring to the National Authority or PA cabinet].
>
>B.     The representative of the ministry of financial *[sic]* shall be appointed by a decision to be taken by the chairman of the National Authority at the proposal of the minister of finance.
>
>C.     The remaining board members shall be appointed as follows:
>
>>1.     Two members by a decision to be taken by the <u>chairman of the National Authority</u>.

    2. Three members proposed by the cabinet [of the National Authority] and by a decision to be taken by the <u>chairman of the National Authority</u>.

    3. One member proposed by the governor and by a decision to be taken by the <u>chairman of the National Authority</u>.

(Emphasis added).

  24. Thus, we see that the management of the PMA is entirely dominated by the National Authority and its chairman. Indeed, in order to serve as an officer of the PMA, one must take an oath before the chairman of the National Authority. *See* Article 16.

  25. Article 17 provides that the PMA may only follow policies which serve "the established economic policy of the National Authority." *Id.*

  26. Article 17(b) provides that "the board [of the PMA] shall be responsible before the chairman of the Palestinian National Authority." *Id.*

  27. Article 19 provides that "the salary and other financial rights of the governor and deputy governor as well as the remuneration of board members shall be determined by a decision to be taken by the <u>chairman of the National Authority</u>." *Id.* (Emphasis added).

  28. The management of the PMA is thus selected, dominated, and paid at the discretion of the PA and lacks any real independence whatsoever.

  29. Continuing the trend, Article 30 governing resignation of PMA management personnel provides that:

> The governor or deputy governor or member [of the PMA board] may tender his resignation from his position <u>to the chairman of the National Authority</u> in which case another person shall be appointed in his place within a period not exceeding three months from the date of accepting the resignation.

*Id.* (Emphasis added).

30. If this were truly an independent entity, why would resignation of board members be tendered to the chairman of the PA, rather than internally within the PMA, for example to the governor of the PMA?

31. Article 31 governs termination of officers or board members. Article 31(b) grants the chairman of the National Authority the authority to terminate board members and officers of the PMA. What independence does the PMA have at all?

32. The chairman of the National Authority also has, pursuant to Article 32, the authority to appoint auditors to audit the PMA and the PMA is required to cooperate with those audits.

33. Of enormous significance to our case is Chapter 4 of the statute which governs the relationship between the PMA and the PA. Article 35 (part of Chapter 4) provides in its entirety as follows:

> In accordance with the provisions hereof:
>
> A. The Monetary Authority serves <u>as a financial agent to the National Authority</u> in the following fields:
>
>   1. Marketing, management and transfer of the indebtedness securities issued by the National Authority and financial institution, and working as a register for those securities.
>
>   2. Execution of payment transactions relative to the accounts of the National Authority and public institutions opened with the Monetary Authority.
>
>   3. Any works assigned to it by the National Authority, commensurate with the objectives and duties of the Monetary Authority.
>
> B. The Monetary Authority after agreement with the ministry of finance may perform all the duties related to the registration, control, and management of foreign debt of the National Authority and

>   public institutions, in accordance with the conditions to be set by the National Authority in conformity with the laws and regulations of the Monetary Authority.

(Emphasis added).

34. Article 36 provides that:

>   at the request of the minister of finance, the Monetary Authority may provide the treasury with interest free advance *[sic]* to cover any seasonal deficit arising out from *[sic]* increase of the National Authority expenses to its revenues . . .

35. Article 39 requires the PMA to submit to the PA and its cabinet once every three months "a detailed report on its works and activities." *Id.*

36. Thus, we see that overall Chapter 4 demonstrates that the affairs of the PA and the PMA are bound up with each other and that the PMA is nothing but the financial agent and/or financial department of the PA.

37. Chapter 5 of the statute governs the relationship between the PMA and the banks. Article 40(a) delegates to the PMA the authority to license banks within the Palestinian territories and prohibits anyone from conducting banking activities without a license issued by the PMA. Thus, the PA delegates an obviously governmental function to the PMA, which is a strong indicator that the PMA is part of the governmental structure of the Palestinian territories and is not independent. This is confirmed by Article 40, subparagraph (b) which makes it clear that although the PMA is responsible for working out the banking regulations, the regulations themselves "will be issued by a decision from the chairman of the National Authority at the proposal of the board [a Defined Term referring to the board of the PMA].

38. Plainly, even the delegation of the authority to license banks to the PMA comes with control strings attached which lead straight to the chairman of the PA.

39.     Article 63 provides that the PMA "is responsible for the international reserves" of the PA and "all the Palestinian public institutions." The term "international reserves" is defined as gold or currency or any other assets, promissory notes, and government bonds, and other notes and negotiable securities.

40.     However, even in this there is no independence as is demonstrated by Article 64 which provides that if there is a fluctuation in currency or gold prices "which results in a loss affecting the value of the assets and liabilities of the Monetary Authority and causes a deficit" the "National Authority shall issue interest free negotiable security to cover the deficit." If there is later a surplus, subparagraph 3 requires that the money be returned to the PA.

41.     Article 71 provides that the PMA cannot be canceled or liquidated except by a law. It thus cannot sell itself or merge or make an independent decision to close its operations. It is dependent even for its demise upon the will and whim of the PA.

42.     Article 73 provides that the board of the PMA "shall work out the regulations and decisions required for the application of the provisions hereof" but that the regulations themselves "shall be issued by a decision from the chairman of the National Authority."

43.     The plain gist pervading the entirety of the Palestinian Monetary Law is the complete and total domination and control of the PMA by the PA. This is not a body that is in any way separate or independent in any meaningful application of such a term.

### B.     The Funds at Issue

44.     In 2005 the PMA brought two frivolous civil actions for damages against the estate and family of Yaron Ungar, an American citizen murdered in a terrorist attack in June 1996.

45. One of these actions was filed in the United States District Court for the District of Rhode Island. *Palestine Monetary Authority v. Strachman et al,* (C.A. 05-261L) (D.R.I.).

46. At a hearing in the Rhode Island action, counsel for the PMA, Haig Kalbian, who also represents the PMA in the instant action, informed the federal court that the funds held by the Bank of New York that are the subject of the instant action are "essentially ... the PMA's money". *See* Transcript, June 16, 2005, p. 6 (Exhibit 4).

47. Thus, the PMA's own counsel has expressly represented to a federal court that the funds at issue belong to the PMA and not to third-party banks as alleged by the PMA in its instant motion. These funds are therefore subject to execution by and turnover to the Knoxes.

48. The PMA subsequently dismissed the Rhode Island action unilaterally.

49. The other action by the PMA against the Ungars was brought in the Supreme Court of New York County. *Palestine Monetary Authority v. Strachman et al.*, (Index No. 107777/05). The damages prong of that action was discontinued with prejudice in May 2006 (Exhibit 5).

Dated: New York, New York
      May 29, 2007

                                                ROBERT J. TOLCHIN