COPY

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-8-07
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
LESLYE KNOX, Individually, and as Natural Guardian        :
of Plaintiffs Jordan Terrell Ellis, Reuven Carter,           :
Shanon Carter, Shayrah Carter, Yoshavyah Carter and         :    07 Civ. 3349
Amitai Carter, JORDAN TERRELL ELLIS, minor,                  :
REUVEN CARTER, minor, SHANON CARTER, minor,                  :    **ORDER TO SHOW CAUSE**
                                                             :    **REGARDING THE**
SHAYRAH CARTER, minor, YOSHAVYAH CARTER,                     :    **PALESTINE MONETARY**
minor, AMITAI CARTER, minor, by their Next Friend and        :    **AUTHORITY'S MOTION FOR**
Guardian Leslye Knox, and TSAPHRIRAH ELLIS,                  :    **LEAVE TO INTERVENE AND**
                                                             :    **FOR AN ORDER VACATING**
                      Plaintiffs-Judgment Creditors,         :    **THE WRIT OF EXECUTION**
                                                             :    **AND DISMISSING**
               - against -                                   :    **THE COMPLAINT**
                                                             :
THE BANK OF NEW YORK,                                        :
                                                             :
                      Defendant-Garnishee                    :
                                                             :
PALESTINE MONETARY AUTHORITY,                                :
                                                             :
                      Applicant for Intervention.            :
-------------------------------------------------------------------------X

Upon (i) the Affirmation of Scott R. Emery in Support of the Palestine Monetary

Authority's Order to Show Cause for Leave to Intervene and for an Order Vacating the Writ of

Execution and Dismissing the Complaint; ii) the Exhibits attached thereto; and iii) the

Memorandum of Law in Support of Palestine Monetary Authority's Order to Show Cause for

Leave to Intervene and for an Order Vacating the Writ of Execution and Dismissing the

Complaint, and upon all of the pleadings previously filed in this action, it is

ORDERED that Plaintiffs-Judgment Creditors, Leslye Knox et al. show cause before this

Court on May 18, 2007, at 11:45 a.m, or as soon after that counsel may be heard, at the

United States Courthouse located at 500 Pearl Street, New York, New York, Courtroom No. 20B

why Palestine Monetary Authority ("PMA") should not be granted leave to intervene in this

action, pursuant to Federal Rule of Civil Procedure 24, in order to obtain confirmation from this Court that the Writ Of Execution dated February 14, 2007 has no bearing on any PMA clearance funds suspended by the Bank of New York and for an order dismissing the Complaint and immediately vacating the Writ of Execution served by the United States Marshal on the Bank of New York which purports to attach the Seized Funds.

IT IS FURTHER ORDERED that in order to provide sufficient service and notice of the execution of this order, service of a copy of this order, made upon Plaintiffs – Judgment Creditors Leslye Knox, et al., by 5 pm on May 9, 2007, via facsimile or by hand as follows, shall be deemed good and sufficient service; and

IT IS FURTHER ORDERED that opposition papers, if any, be filed with the Court and served upon the Palestine Monetary Authority's counsel, Scott R. Emery, Esq., Lynch Daskal Emery LLP, 264 West 40th Street, 18th Floor, New York, New York 10018, so as to be received on or before May 15, 2007.

No prior request for relief has been made in this action.

DATE: 8 May 2007

SO ORDERED:

_____
U.S.D.J.
**Victor Marrero**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
LESLYE KNOX, Individually, and as Natural Guardian :
of Plaintiffs Jordan Terrell Ellis, Reuven Carter, :
Shanon Carter, Shayrah Carter, Yoshavyah Carter and : Civil Action No. 07-3349
Amitai Carter, JORDAN TERRELL ELLIS, minor, :
REUVEN CARTER, minor, SHANON CARTER, minor, :
SHAYRAH CARTER, minor, YOSHAVYAH CARTER, : **AFFIRMATION OF**
minor, AMITAI CARTER, minor, by their Next Friend and : **SCOTT R. EMERY IN SUPPORT**
Guardian Leslye Knox, and TSAPHRIRAH ELLIS, : **OF PALESTINE MONETARY**
: **AUTHORITY'S MOTION FOR**
Plaintiffs-Judgment Creditors, : **LEAVE TO INTERVENE AND**
: **FOR AN ORDER VACATING**
- against - : **THE WRIT OF EXECUTION**
: **AND DISMISSING THE**
THE BANK OF NEW YORK, : **COMPLAINT**
:
Defendant-Garnishee, :
:
PALESTINE MONETARY AUTHORITY, :
:
Applicant for Intervention. :
-------------------------------------------------------------------X

SCOTT R. EMERY, an attorney admitted to the Bar of this Court, affirms the following:

1.    I am a member of Lynch Daskal Emery LLP, attorneys for Plaintiff Palestine

Monetary Authority ("PMA"). I respectfully submit this affirmation in support of PMA's

Motion for Leave to Intervene, pursuant to Rules 6(d) and 24(a)(2) of the Federal Rules of Civil

Procedure, allowing PMA to intervene to obtain confirmation from this Court that the Writ of

Execution dated February 14, 2007 has no bearing on any PMA clearance funds suspended by

the Bank of New York ("Seized Funds"), which the New York Supreme Court ordered released

on April 2, 2007. PMA further moves, pursuant to F.R.C.P. 12(b)(1) and (6), to dismiss the

Complaint for the reasons discussed below and for an order immediately vacating the Writ of

Execution served on the Bank of New York ("BNY") that, according to plaintiffs' April 25, 2007

complaint commencing turnover proceedings, purports to attach the Seized Funds.

2.    PMA was established in the mid-1990's as a direct result of and pursuant to the issuance of Law No. 2 of 1997 in the Palestinian Territories in accordance with the terms of the Oslo Accords. (The Oslo Accords refers to a series of agreements reached between Israel and the Palestine Liberation Organization between 1993 and 1998.) PMA serves as the regulatory authority for commercial banks and related deposit-taking institutions in the Palestinian Territories. *See* Ex. A below at ¶ 13-22. It is not controlled by the PA or PLO and possesses an autonomous corporate character financially and operationally independent from those entities. It does not hold or manage any funds belonging to either organization or of any other named defendant in the *Ungar* Action. Furthermore, PMA has enjoyed and continues to enjoy good banking relations with banks in Israel, Europe, and throughout the world. PMA is also in good standing with the United States Treasury and the Federal Reserve Bank.

3.    PMA's core function is to perform clearance transactions, here, in U.S. dollars on behalf of the banks it regulates. (PMA also performs clearance transactions in Euros, Jordanian dinars, and Israeli shekels.) Prior to the seizure of the funds at issue, PMA conducted these clearance transactions through the Palestine International Bank ("PIB"), which operates as a commercial bank in the Palestinian Territories. PIB, in turn, processed the transactions through its account with BNY. PMA does not maintain an account with BNY (*see* Ex. F below at 20) and, in fact, holds no assets in the U.S.

4.    Through March 31, 2007, PMA has suffered in excess of $2.2 million in lost interest and/or interest obligations on the Seized Funds. It continues to incur such damages at a rate in excess of $3,200 per day while the Seized Funds continue to be restrained (figure varies according to interest rate changes). While funds are frozen by BNY, PMA cannot fulfill its obligations to the banks it serves and is limited in its ability to generate income. Moreover,

2

PMA has been obliged, as a matter of principle, to pay interest to the banks it serves on funds that have been frozen by BNY. If BNY's improper restraint of the funds continues, PMA's relationship with the commercial banks it serves will continue to be damaged and PMA will continue to suffer substantial monetary damages as well as the loss of its goodwill and reputation as a trusted member of the international banking community.

5.      Attached as Exhibit A is a copy of the First Amended Complaint filed July 19, 2005 in *Palestine Monetary Auth. v. Strachman*, Index No. 107777/05, Supreme Court of the State of New York, County of New York ("*Ungar* Action").

6.      Attached as Exhibit B is a copy of a judgment entered by the U.S. District Court for the District of Rhode Island in the matter of *Estates of Yaron Ungar et al. v. The Palestinian Authority, et al.*, C.A. No. 00105(L) (Hon. Ronald R. Laguex) ("RI Action").

7.      Attached as Exhibit C is a copy of an injunction dated May 5, 2005 issued in the RI Action.

8.      Attached as Exhibit D is a copy of a "Notice of Injunction" dated May 9, 2005.

9.      In 2005, on the basis of the RI Injunction, the Notice of Injunction, and the State Restraining Notice, BNY suspended approximately $30,000,000 in wire transfers.[1] *See* Ex. A at ¶ 44.

10.     Attached as Exhibit E is a copy of a Decision and Order dated April 2, 2007 issued in the *Ungar* Action with Notice of Entry.

---

[1] The precise amount of the dollar transactions initially affected by the Strachman Parties' actions is $39,634,693. Two transactions were cancelled due to insufficient funds, however, and one further transaction was cancelled before BNY debited the PIB's account. The dollar value of the funds actually placed in the suspense account is $17,604,703.33. This amount does not include two Euro transactions of 39,994.26 Euro and 15,000.01 Euro.

11.    Attached as Exhibit F is a copy of a Decision and Order dated October 15, 2005 issued in the *Ungar* Action.

12.    Attached as Exhibit G are copies of excerpts of the testimony of Jessica Goodwin from a hearing in the *Ungar* Action that took place on August 3, 2005.

13.    Attached as Exhibit H is a copy of PMA's motion for summary judgment, without exhibits, in the *Ungar* Action.

14.    Attached as Exhibit I is a copy of a Stipulation of Discontinuance filed November 9, 2005 in the *Ungar* Action.

15.    Attached as Exhibit J is a copy of an email from Robert J. Tolchin to Haig V. Kalbian dated April 8, 2007.

16.    Attached as Exhibit K is a copy of a Writ of Execution issued February 14, 2007 in the *Knox* Action.  PMA had been unaware about the Writ of Execution before April 8, 2007.

17.    Attached as Exhibit L is a copy of an email from Haig V. Kalbian to Robert J. Tolchin dated April 10, 2007.

18.    Attached as Exhibit M is a copy of a letter from Scott R. Emery to Kenneth M. Bialo dated April 12, 2007.  On April 11, 2007, Mr. Bialo advised PMA counsel that unless the Writ of Execution at Exhibit K is withdrawn or BNY is otherwise ordered, BNY will continue to restrain the Seized Funds.

19.    Attached as Exhibit N is a copy of an email from Robert J. Tolchin to Haig V. Kalbian dated April 18, 2007.

20.    Attached as Exhibit O is a copy of an Order to Show Cause issued on April 18, 2007 in the *Ungar* Action.

4

21.    Attached as Exhibit P is a copy of the transcript of the hearing on the Order to Show Cause referenced in Exhibit O.

22.    Attached as Exhibit Q is a copy of a letter from Scott R. Emery to Kenneth M. Bialo dated April 20, 2007.

23.    Attached as Exhibit R is a copy of the Complaint seeking to commence turnover proceedings dated April 25, 2007.

24.    Attached as Exhibit S is a copy of OFAC Recent Action Notice dated April 12, 2006.

25.    Attached as Exhibit T is a copy of OFAC General License No. 4 (April 12, 2006).

26.    For the foregoing reasons and the reasons set forth in the accompanying Affirmation of Scott R. Emery in Support of the Palestine Monetary Authority's Motion for Leave to Intervene and for an Order Vacating the Writ of Execution and Dismissing the Complaint, the Palestine Monetary Authority respectfully requests that this Court enter an order vacating the Writ of Execution, dismissing the complaint, and directing immediate release of the Seized Funds, and for such further relief as the Court deems appropriate.

Dated: New York, New York
     May 7, 2007

                                                    SCOTT R. EMERY

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

LESLYE KNOX, Individually, and as Natural Guardian : 
of Plaintiffs Jordan Terrell Ellis, Reuven Carter, :
Shanon Carter, Shayrah Carter, Yoshavyah Carter and :     Docket No. 07 Civ 3349
Amitai Carter, JORDAN TERRELL ELLIS, minor, :
REUVEN CARTER, minor, SHANON CARTER, minor, :
SHAYRAH CARTER, minor, YOSHAVYAH CARTER, :
minor, AMITAI CARTER, minor, by their Next Friend and :
Guardian Leslye Knox, and TSAPHRIRAH ELLIS, :
                                         :

               Plaintiffs-Judgment Creditors, :

          - against - :

THE BANK OF NEW YORK, :

               Defendant-Garnishee :

PALESTINE MONETARY AUTHORITY, :

               Applicant for Intervention. :

------------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## THE PALESTINE MONETARY AUTHORITY'S
## ORDER TO SHOW CAUSE FOR LEAVE TO INTERVENE
## AND FOR AN ORDER VACATING THE WRIT OF EXECUTION
## AND DISMISSING THE COMPLAINT

Scott R. Emery
LYNCH DASKAL EMERY LLP
264 West 40th Street
New York, New York  10018
(212) 302-2400

-and-

Haig V. Kalbian
KALBIAN HAGERTY LLP
888 17th Street, NW, Suite 1000
Washington, DC  20006
(202) 223-5600
Attorneys for Plaintiff

## PRELIMINARY STATEMENT

Plaintiff Palestine Monetary Authority ("PMA") respectfully submits this memorandum of law in support of its Order to Show Cause for Leave to Intervene, pursuant to Rules 6(d) and 24(a)(2) of the Federal Rules of Civil Procedure, allowing the PMA to intervene as a purported defendant in this matter for the purpose of obtaining confirmation from this Court that the Writ Of Execution dated February 14, 2007 has no bearing on any PMA clearance funds suspended by the Bank of New York ("the Seized Funds"). The PMA further moves, pursuant to F.R.C.P. 12(b)(6) to dismiss the Complaint for failure to state a cause of action; and CPLR 5239 and 5240, for an order immediately vacating the Writ of Execution served by the United States Marshal on the Bank of New York ("BNY") which, according to plaintiffs' April 25, 2007 complaint commencing turnover proceedings, purports to attach the Seized Funds.

The PMA has been attempting to have the Seized Funds released since May 2005 after they were improperly suspended by BNY in response to a restraining notice issued pursuant to a judgment in a case adjudicated in the District Court of Rhode Island. After the PMA finally succeeded on its motion in New York Supreme Court to have the funds released, BNY persisted in its refusal to release the funds on the ground that plaintiffs _might_ prevail on a turnover proceeding involving the seized funds. On April 26, 2007, plaintiffs filed a complaint seeking turnover of the Seized Funds.

The PMA's motion to intervene should be granted because:

a)     The PMA is not a party in the underlying action;

b)     The PMA has an interest relating to the property which is the subject of the action and its interest will be impaired by the disposition of the action should its motion for leave to intervene be denied; and

c)     The PMA's interest is not protected adequately by the parties to the action.

1

The PMA's motion for an order releasing the Seized Funds and dismissing the Complaint should be granted on an emergency basis because:

a)      The Seized Funds are being held pursuant to the enforcement of a default judgment entered against the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO"), not the PMA, who was not named in the action, served with notice of the action, given an opportunity to be heard, or afforded any due process whatsoever;

b)      The PMA is not a department, division, or alter ego of the PA but is an independent entity that already has successfully asserted its independence from the PA after two years of litigation in Supreme Court of the State of New York, County of New York;

c)      The plaintiffs' claims present a non-justiciable political question;

d)      The Seized Funds have been restrained in violation of U.C.C. Article 4A;

e)      The *Knox* plaintiffs are bound by the April 2, 2007 Decision and Order issued by Justice Shirley W. Kornreich of the Supreme Court of the State of New York, County of New York on *res judicata* grounds because their interest is identical to that of the plaintiffs in the case over which Justice Kornreich decided and both sets of plaintiffs are controlled by the same attorneys; and

f)      Continued restraint of the Seized Funds is prohibiting the PMA from performing even its most basic function, damaging its relationship with commercial banks, causing it to suffer substantial monetary damages, and severely harming its goodwill and reputation in the Middle East and around the world; and

g)      Plaintiffs have failed to state a cause of action for turnover of the seized funds.

## BACKGROUND

This Order to Show Cause arises from the collection efforts of two sets of plaintiffs in separate legal proceedings, the *Ungar* Action and the *Knox* action underlying this one. The plaintiffs in both lawsuits, acting through their mutual agents David Strachman and Robert J. Tolchin, obtained judgments against third parties, which they have attempted, without legal basis, to collect against the PMA by filing a complaint commencing turnover proceedings.

**The *Ungar* Action**

2

The "*Ungar* Action" was litigated before the New York Supreme Court, New York

County, as Index No. 107777/05. *See* First Amended Complaint filed by the PMA on July 19,

2005, (the "*Ungar* Complaint"), a copy of which is attached to the Affirmation of

Scott R. Emery in Support of the Palestine Monetary Authority's Motion for Preliminary

Injunction dated May ___, 2007 ("Emery Aff."), as Exhibit A.  Defendants in that action were,

*inter alia*, David Strachman, as Administrator of the Estates of Yaron Ungar, Professor Meyer

Ungar, Judith Ungar, Rabbi Uri Dasberg and Judith Dasberg (Individually and in Their Capacity

as Legal Guardians of Plaintiffs Dvir Ungar and Yishai Ungar), Amichai Ungar, Dafna Ungar,

and Michal Cohen (collectively referred to in the *Ungar* Action as the "Strachman Defendants"

or "Strachman Parties").

The PMA's dispute with the Strachman Parties arose from their efforts to collect a

judgment for over $116,000,000.00 entered by the United States District Court for the District of

Rhode Island in the matter of *Estates of Yaron Ungar et al. v. The Palestinian Authority, et al.,*

C.A. No. 00105(L) (Hon. Ronald R. Laguex) (the "RI Judgment" or the "RI Action").  The RI

Judgment was issued against the Palestinian Authority (the "PA"), the Palestinian Liberation

Organization (the "PLO"), and several individual defendants.  *See* RI Judgment, a copy of which is

attached to the Emery Aff. as Exhibit __.  The PMA was not a party to the RI Action, was not

named in that action as an entity holding assets of the PA or PLO, and is not named in the RI

Judgment.  *See* Exh. A at ¶ 7.

In an effort to collect on the RI Judgment, the Strachman Defendants sought and were

granted an Injunction dated May 5, 2005 (the "RI Injunction") which enjoined the PA and PLO –

as well as their agents and anyone in privity with those entities – from withdrawing, transferring,

secreting, or removing those entities' assets except in payment of normal operating expenses. A copy of the RI Injunction is attached to the Emery Aff. as Exhibit ___.

The Strachman Parties domesticated the RI Judgment in New York Supreme Court, New York County, under Index Number 105521/05. *See* Exh. A at ¶¶5-12. They then availed themselves of the New York creditor process to restrain certain funds passing through BNY.[1]

Specifically, the Strachman Parties served a "Notice of Injunction" dated May 9, 2005 (the "Notice of Injunction"), a copy of which is attached to the Emery Aff. as Exhibit ___, on BNY. The Notice of Injunction, drafted by David Strachman and not issued or endorsed by any court, attaches the RI Injunction, but wrongly claims that it applies to assets of the PA and PLO "held and/or titled" in the name of the PMA.

Established in the early 1990's as a result of the Oslo Accords, the PMA is the regulatory authority for commercial banks and related deposit-taking institutions in the Palestinian Territories. *See* Exh. A at ¶ 13-22. It is not controlled by the PA or the PLO and possesses an autonomous corporate character financially independent from those entities. Moreover, it does not hold or manage any funds belonging to either organization or of any other named defendant in the RI Action. *See id.*

One of PMA's primary functions is to perform clearance transactions in U.S. dollars on behalf of the banks and other institutions it regulates. Prior to the seizure of the funds at issue, the PMA conducted these clearance transactions through the Palestine International Bank ("PIB"), which in turn processed the transactions through its account with BNY.

On the basis of the RI Injunction, the Notice of Injunction and the State Restraining Notice, in 2005, BNY suspended approximately $30,000,000 in wire transfers (the "Seized

---

[1] "Creditor process" means levy, attachment, garnishment, notice of lien, sequestration, or similar process issued by or on behalf of a creditor or other claimant with respect to an account. N.Y. U.C.C. § 4-A502(1).

Funds").[2] *See id.* at ¶ 44. BNY did so because the PMA was one party in the chain of transfers

relating to the Seized Funds. *See id.* at ¶ ___. Testimony of Jessica Goodwin ("Goodwin

Testimony"), dated August 3, 2005 at p. 141-192, excerpts of which are attached to the Emery

Aff. as Exhibit ___. BNY further advised that it would freeze additional funds if the PMA

conducted any further clearance transactions through BNY. *See id.* at p. ___.

The PMA instituted the *Ungar* Action on June 3, 2005. With its complaint, the PMA

filed a request for a temporary restraining order and preliminary injunction (the "TRO Motion").

Thereafter, the PMA filed its First Amended Complaint. *See* Exh. ___.

The Strachman Parties filed (i) a counterclaim seeking a declaratory judgment the PMA

is an alter ego of the PA or, alternatively, that the PMA holds assets of the PA and (ii) a

crossclaim against BNY seeking turnover of all assets in BNY's possession belonging to the

PMA and numerous other entities.

Justice Shirley Werner Kornreich of the New York Supreme Court held an evidentiary

hearing in August 2005 on the TRO Motion where the PMA offered evidence that the Seized

Funds should be released because (i) the funds do not belong to the PMA, (ii) the PMA is a

separate entity from the PA, and (iii) the PMA does not hold any assets of the PA. On October

14, 2005, the court issued a Decision and Order (the "October Order") a true and complete copy

of which is attached to the Emery Aff. as Exhibit __, in which it held that the Seized Funds were

never properly seized under N.Y. U.C.C. § 4-A-503, which sets out specific stages in the wire

transfer process when funds may be permissibly restrained by the court in aid of a judgment

creditor. *See id.* at 17 and 20-21. The Seized Funds belong to third party banks; the PMA

---

[2] The precise amount of the dollar transactions initially affected by the Strachman Parties' actions is $39,634,693. Two transactions were cancelled due to insufficient funds, however, and one further transaction was cancelled before BNY debited the PIB's account. The dollar value of the funds actually placed in the suspense account is $17,604,703.33. This amount does not include two Euro transactions in the amounts of 39,994.26 Euro and 15,000.01 Euro.

merely served as an intermediary, and attachment at this stage of the process was not proper

under U.C.C. § 4-A. *Id.* The PMA then moved for summary judgment. A copy of the PMA's

motion for summary judgment is attached to the Emery Aff. as Exhibit ___.

Though the New York Supreme Court in its October Order granted the preliminary

injunction and ordered the Seized Funds released, it conditioned the release on the PMA's

posting an undertaking of $30 million pending further discovery on the Strachman Parties'

claims that the PMA was an *alter ego* or held funds of the PA. *See* Ex. ___ at ___. Because the

expense of such an undertaking was prohibitive, an, despite appeals to numerous international

banks, the PMA was unable to obtain a letter of credit because of the uncertain political

situation in the region, BNY has continued to hold the seized funds even after the October

Order, and the PMA has remained unable to conduct clearance transactions in U.S. dollars on

behalf of its regulated banks.

BNY was included as a named defendant in the *Ungar* Action. The PMA later stipulated

to dismiss with prejudice its claims seeking monetary damages against BNY in the *Ungar*

Action. The Stipulation of Discontinuance, so ordered on November 3, 2005, a copy of which is

attached to the Emery Aff. as Exhibit___, further stipulated that BNY would remain a party to the

*Ungar* Action as a stakeholder and be subject to the Court's ruling on the PMA's claim for

declaratory and injunctive relief.

On April 2, 2007, Justice Kornreich issued a Decision and Order granting summary

judgment in favor of the PMA. A copy of the Order ("April Order"), with Notice of Entry, is

attached to the Emery Aff. as Exhibit ___. In that Order, Justice Kornreich addressed, among

other things, the PMA's motion for summary judgment. The Court declared that the PMA "is a

separate juridical entity from the Palestinian Authority" and ordered that "the money in its name, restrained by [BNY], should be released." See Exh. ___ at p. 19 (emphasis added).[3]

The Court granted the PMA's motion for summary judgment on all of PMA's claims as well as on all crossclaims as they relate to the PMA. *Id.* at 18-19.

**The PMA's Interest in the Underlying Action**

On April 8, 2007, after learning that the court granted the PMA summary judgment in the *Ungar* Action, Robert J. Tolchin, counsel for the Strachman Parties informed PMA's counsel that the Seized Funds at BNY remained restrained by an execution/restraining notice recently served on BNY in the "*Knox* Action" (*Knox v. Palestinian Authority*, 03 Civ. 4466 (VM)(THK) (S.D.N.Y.). A copy of the email from Robert J. Tolchin to Haig V. Kalbian dated April 8, 2007 is attached to the Emery Aff. as Exhibit ___.

As this Court is aware, on July 11, 2006, it ordered that the Clerk of the Court enter judgments against the PA and PLO in the amount of $192,740,660.13. The Court entered a Writ of Execution as to the PA and PLO on February 14, 2007. A copy of the Writ of Execution ("*Knox* Writ of Execution") is attached to the Emery Aff. as Exhibit ___. The United States Marshal served the *Knox* Writ of Execution on BNY on February 15, 2007.

The PMA was not a defendant in the *Knox* Action, was never served with notice of or appeared in that action, and is not named in the Judgment issued in favor of the *Knox* plaintiffs. Neither the *Knox* plaintiffs nor BNY gave notice to the PMA when the Writ of Execution was served on BNY. The PMA was indeed unaware that a Writ of Execution had been served until it received the April 8, 2007 email from Mr. Tolchin.

---

[3] A copy of the unfiled Decision and Order was served on counsel for BNY on April 6, 2007. A copy of the Order with notice of entry was served on counsel for defendants-counterclaim plaintiffs and BNY on April 10, 2007.

The *Knox* Writ of Execution seeks to claim the "goods and chattels of the Palestine Liberation Organization and the Palestinian Authority (a/k/a "The Palestinian Interim Self-Government Authority" and/or "The Palestinian Council" and/or "The Palestinian National Authority.") *See* Exh. ___. Nowhere in the *Knox* Writ of Execution is the PMA mentioned.

In his April 8, 2007 email, Mr. Tolchin informed counsel that he would "conduct some consultations regarding whether the *Knox* plaintiffs intend to stand on their execution/restraining notice, and to proceed against these funds." He further stated, "I expect to be able to inform you of the position of the Knox plaintiffs by no later than Monday, April 16, 2007." *See* Exh. ___.

On April 10, 2007, counsel for the PMA requested that Mr. Tolchin withdraw the *Knox* restraining notice immediately. They noted, "If BNY does not allow the PMA to resume clearance transactions forthwith, we will pursue all available legal remedies to ensure that your attempts to interfere with the PMA and circumvent Justice Kornreich's order are finally stopped." *See* April 10, 2007 email from Haig V. Kalbian to Robert J. Tolchin, a copy of which is attached to the Emery Aff. as Exhibit __.

**The Seized Funds Remain Improperly Restrained by The Bank of New York**

On April 11, 2007, PMA counsel telephoned Kenneth M. Bialo, counsel for BNY, to discuss BNY's position with respect to the restrained funds, particularly given the New York Supreme Court's recognition that pursuant to N.Y. U.C.C. § 4(a), it is improper to restrain funds in transit.

Notwithstanding the fact that <u>nowhere</u> in the *Knox* Writ of Execution is the PMA mentioned, BNY counsel has advised that unless the Writ of Execution is withdrawn or BNY is ordered to do otherwise, BNY will continue to act as if it were bound by it and restrain the Seized Funds. On April 12, 2007, PMA counsel faxed to Mr. Bialo a letter stating that pursuant

to Justice Kornreich's Order, BNY is prohibited from restraining the Seized Funds at issue and

that the Seized Funds must be released. The letter also put BNY on notice that should it

"maintain the position that it is now bound by the *Knox* restraining notice (which purports to

accomplish the same thing that the restraining notice in the instant case was intended to), the

PMA will pursue all available legal remedies to ensure that the funds are released and to

recompense the PMA for all damages suffered as a result of the improper restraint." The April

12, 2007 letter is attached to the Emery Aff. as Exhibit __.

On April 18, 2007, Mr. Tolchin informed PMA counsel that "I write as a courtesy to

inform you that the Knox plaintiffs will be seeking turnover of the PA/PMA funds held

by BNY. Their turnover action should be filed in the next few days." *See* April 18, 2007 email

from Robert J. Tolchin to Haig V. Kalbian, a copy of which is attached to the Emery Aff. as

Exhibit __.

On the same day, the PMA brought, by Order to Show Cause, a motion before Justice

Kornreich requesting that that the court issue an Order to let the attorneys for the *Knox* parties to

show cause why an order should not be made and entered, among other things, to require

plaintiffs' counsel to withdraw the *Knox* Writ of Execution served on BNY; to prohibit plaintiffs'

counsel from attempting to circumvent the court's Order dated April 2, 2007 granting the PMA

summary judgment; and requiring BNY to immediately release the Seized Funds pursuant to

N.Y. U.C.C. § 4 and per the Court's April 2, 2007 Order. A copy of the Order to Show Cause is

attached to the Emery Aff. as Exhibit ___.

A hearing on the Order to Show Cause was scheduled on April 19, 2007. A transcript of

that hearing is attached to the Emery Aff. as Exhibit __. At the hearing, counsel for the

Strachman Parties contended that because they believe that the PMA is associated with the

defendants targeted in the *Knox* Writ of Execution, BNY should continue to restrain the very
same funds that the New York State Supreme Court already ordered to be released in the *Ungar*
Action.[4]

      BNY counsel represented that they had not had opportunity to consult with their client
about its position with regard to the *Knox* Writ of Execution, but as far as they were concerned,
they were obligated to continue to restrain the funds. *See* Exh. ___ at 24.

      Justice Kornreich denied the PMA's motion on the grounds that her court has no
jurisdiction over the *Knox* matter and cannot interpret the *Knox* Writ of Execution. She directed
that any claims arising from the *Knox* matter should be brought in federal court. *See* Exh. ___ at
34. She stated about the *Knox* Writ of Execution, "It's my advice to the Palestine Monetary
Authority…that if you really seek to have the money released, just get clarification from the
Federal Court on its order on its execution because that is apparently the only thing that is
stopping the Bank of New York from releasing your funds. Whether or not it, indeed, they
should be stopping that release, I'm not going to even opine because I don't know what the
Federal judge is going to do here." *See* Ex. ___ at 33.

      On April 20, 2007, PMA counsel again faxed to counsel for BNY a letter demanding that
BNY comply with Justice Kornreich's April 2, 2007 Order. A copy of the April 20, 2007 letter
is attached to the Emery Aff. as Exhibit ___. The letter advised the BNY to inform the PMA "in
writing, no later than 5:00 p.m. on Tuesday, April 24, 2007 what BNY intends to do with respect
to the PMA's funds and, if BNY does not intend to release them immediately, the reasons behind
BNY's decision." *See* Exh. ___.

      Having received no response from BNY indicating BNY's position with regard to the
Seized Funds, on April 26, 2007, counsel for the PMA telephoned BNY counsel. BNY counsel

---

[4] The Court will note that several of these defendants were named in the *Ungar* action.

stated [**FILL IN DETAILS OF CONVERSATION WITH BIALO**]. BNY, thus, continued to

maintain the Seized Funds in a suspense account in anticipation that plaintiffs' counsel will

pursue a turnover proceeding targeting the PMA.

On April 26, 2007, plaintiffs filed a complaint in this Court against BNY commencing

turnover proceedings. The PMA was not served with this complaint though the Seized Funds are

specifically targeted in it. The PMA thus now turns to this Court for guidance.

## ARGUMENT

## POINT I

## THE PMA IS ENTITLED TO INTERVENE AS OF RIGHT FOR CLARIFICATION FROM THIS COURT REGARDING THE SEIZED FUNDS

### I.    The Intervention Standard

Pursuant to Fed.R.Civ.P. 24(a)(2), "Upon timely application anyone shall be permitted to

intervene in an action ... when the applicant claims an interest relating to the property or

transaction which is the subject of the action and the applicant is so situated that the disposition

of the action may as a practical matter impair or impede the applicant's ability to protect that

interest, unless the applicant's interest is adequately represented by existing parties."

Fed.R.Civ.P. 24(a)(2). To intervene as of right, a movant must: "(1) timely file an application,

(2) show an interest in the action, (3) demonstrate that the interest may be impaired by the

disposition of the action, and (4) show that the interest is not protected adequately by the parties

to the action." *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 129 (2d Cir. 2001) (*internal

citation omitted*). For an interest to be cognizable under Rule 24(a)(2), it must be "direct,

substantial, and legally protectable." *Brennan*, 260 F.3d 123, 129. As shown below, the PMA

meets the standards for intervention as of right as articulated by the Second Circuit and this

Court.

11

## II.    This Application Is Timely

This Court has recognized a four prong test to evaluate timeliness.  In re Neuman

55 B.R. 707 (S.D.N.Y. 1985) (*internal citations omitted*).  Pursuant to this test, "the following

factors are to be evaluated: (1) the length of time the proposed intervenor knew or reasonably

could have known of his interest in the case before actually petitioning to intervene, (2) the

extent of prejudice that the existing parties to the litigation will suffer due to the proposed

intervenor's failure to petition at the time he first knew or should have reasonably known of his

interest in the case, (3) the extent of prejudice that the proposed intervenor will suffer if his

application for intervention is denied, and (4) any unusual circumstances militating either for or

against the application as timely." *Id.* at 709.

As discussed above, the PMA was not aware of the *Knox* Writ of Execution and the

effect that it would have on the PMA's interests until April 8, 2007, some two months after this

Court ordered the case closed.  The plaintiffs cannot claim any potential prejudice that granting

the PMA intervenor status at this post-judgment juncture might cause because by not giving

reasonable notice to the PMA that its funds would be attached by the *Knox* plaintiffs, they placed

the PMA in a position where it is forced to apply for intervention at this time.  The PMA should

not be denied the opportunity to intervene because of plaintiffs' counsel's lack of good faith and

failure to give timely notice.  As discussed below, the PMA will certainly continue to suffer if its

application is denied.

## III.    The PMA Has an Interest Relating to the Property Which is the Subject of the Action and Its Interest Will Be Impaired by the Disposition of the Action Should Its Motion for Leave to Intervene Be Denied

The PMA's interest in the property which is the subject of the action is clear on the face

of the Complaint.  As the Complaint states, "BNY currently holds funds nominally titled to the

Palestine Monetary Authority ("PMA") in the amount of approximately $20 million.  In this proceeding, Plaintiffs/Judgment Creditors seek turnover of those funds."  *See* Complaint, ¶¶24-25.

In applying for intervener status, the PMA seeks clarification from this Court that the Writ of Execution has no bearing on any PMA clearance funds suspended by the Bank of New York so that it may resume its core business of managing liquidity in the Palestinian economy forthwith.

**IV.    The PMA's Interest is Not Protected Adequately by the Parties to the Action**

As discussed above, because BNY has refused to release the Seized Funds despite the PMA's repeated, grounded insistence that BNY is in violation of N.Y. U.C.C. 4A and Justice Kornreich's April 2007 Order, the PMA's interests are clearly not adequately protected by BNY in this action.


**POINT II**

**THE PMA IS ENTITLED TO AN ORDER VACATING THE WRIT OF EXECUTION IMMEDIATELY RELEASING THE SEIZED FUNDS AND DISMISSING THE COMPLAINT**

The PMA respectfully requests that this court grant it a special proceeding to determine the rights of the Seized Funds; or in the alternative, that the Court make its determinations with regard to the Seized Funds based on submissions from counsel.  New York Civil Practice Law Rule 5239 provides for a special proceeding to be commenced against the judgment creditor or other person with whom a dispute exists to determine rights in the property or debt.  *See N.Y. C.P.L.R. 5239.*  Pursuant to CPLR 5240, "a court may, on its own initiative or the motion of any interested person…make an order denying, limiting, conditioning, regulating, extending or

modifying the use of any enforcement procedure." *See N.Y. C.P.L.R. 5240; LNC Invs., Inc. v. Rep. of Nicaragua,* 115 F.Supp.2d 358, 361 (S.D.N.Y. 2000).

I.      **The Seized Funds Are Being Held Pursuant to the Enforcement of a Default Judgment Entered Against the PA and the PLO, Not the PMA, Which Was Not Named in the Action, Served with Notice of the Action, Given an Opportunity to be Heard, or Afforded Any Due Process Whatsoever**

The Bank of New York's assertion that it will continue to hold the funds originally seized by the *Ungar* restraining notice based on a claim by the *Knox* plaintiffs' counsel – made via email – that the very same funds remain restrained by the *Knox* Writ of Execution is unjustifiable. *See* Exh. ___. Pursuant to 28 U.S.C. 3203(c), "[a] writ of execution shall specify...the name of the judgment debtor, and the judgment debtor's last known address." Here, the *Knox* Writ of Execution served on BNY contains no mention of the PMA and provides no legal support for either the continued retention of the Seized Funds nor any new attachment. *See* Exh. ___. That BNY has continued to restrain the Seized Funds pursuant to the *Knox* Writ of Execution is, on its face, patently improper and unjust.

While a "judgment creditor may restrain the assets of a judgment debtor wherever those assets may be," the assets of third parties may not be restrained in anticipation of a finding that a third party is an alter ego or holds assets of alleged alter egos of the judgment debtor for such a situation would be violative of the CPLR 5222 and "would also pose significant due process problems." *See JSC Foreign Economic Ass'n Technostroyexport v. Int'l Dev. and Trade Servs. Inc.,* 295 F.Supp.2d 366, 393 (S.D.N.Y. 2003). As described above, the PMA, was not named in the action, served with notice of the action, given an opportunity to be heard, or afforded any due process whatsoever. The underlying litigation was commenced in 2003, and an inquest regarding damages was held on November 8, 2005, months after the PMA was brought into the *Ungar* action. That fact provides evidence that Messrs. Tolchin and Strachman had an

14

affirmative duty to inform known counsel for the PMA that its client would be targeted in this litigation. By ignoring their duty, the plaintiffs have attacked the PMA and denied it the opportunity to fairly litigate the underlying issues in this case.

II.     **The PMA is Not a Department, Division, or Alter Ego of the PA But Is An Independent Entity That Already Has Successfully Asserted Its Independence From the PA After Two Years of Litigation in Supreme Court of the State of New York, County of New York**

Government instrumentalities established as juridical entities distinct and independent from the sovereign – as the PMA was – should normally be treated as such. *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 629 (1983) *(citation omitted)*. However, "[w]here a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," one may be held liable for the actions of the other. *First Nat'l City Bank*, 462 U.S. at 629 *(citation omitted)*. It is the plaintiffs' burden of proving the agency relationship or the resulting fraud if the PMA is recognized as an independent corporate entity. *LNC Invs., Inc. v. Rep. of Nicaragua* 115 F.Supp.2d 358, 363 (S.D.N.Y. 2000).

In order for a government instrumentality, such as the PMA to lose its separate juridical status and become the alter ego or agent of its parent government, the PA, must exercise "extensive control over the instrumentality's daily operations and abus[e] the corporate form." *Id.* citing *First Nat. City Bank*, 462 U.S. 611, 629 (1983) *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277, 1284 (11th Cir.1999); *Hester Int'l Corp. v. Federal Rep. of Nigeria*, 879 F.2d 170, 178-81 (5th Cir.1989). As discussed further below, plaintiffs have failed to meet their burden. Indeed, there has been no showing by BNY or the *Knox* plaintiffs that the PMA is an *alter ego* or holds funds for the named judgment debtors in the *Knox* action.

15

As discussed above, the Supreme Court of New York has already declared that the PMA "is a separate juridical entity from the Palestinian Authority" and ordered that "the money in its name, restrained by [BNY], should be released." See Exh. ___ at p. 19 (emphasis added). In making her determination, Justice Kornreich wrote:

> [O]n April 12, 2006, OFAC [the Office of Foreign Assets Control of the U.S. Department of the Treasury] authorized transactions with the PMA, as well as several other agencies in the Palestinian territories it deemed to be "independent" from the PA-The Central Elections Commission, The Independent Citizens Rights' Commission and the General Audit Authority/External Audit Agency. The independence or separateness of the PMA from the PA is the issue this court must determine in this case. The court's undertaking an independent resolution of an issue identical to that already decided by OFAC, the court believes, would express a lack of respect due the Executive branch and its orders. (OFAC is not limited by concepts of title under state law in promulgating its regulations and defining interests in property and its definition is subject to deferential judicial review). More important, it would insert the judicial system into foreign policy regarding worldwide terrorism and Middle-East relations. And, if the court were to make a determination different from the policy statement of OFAC and the political decision of the Executive branch that is, were the court to find PMA an alter ego or part of the PA there exists potential for embarrassment. The court, therefore, finds the issue of the separate juridical status of the PMA non-justiciable. *Id.* at ___. *Emphasis added. Internal citations omitted.*

*See also* Ex. ___ (Aff. in Support of Motion for Summary Judgment) at ___ (explaining the PMA's autonomous nature).

Because the PMA is not an agent of the PA and has been deemed a separate juridical entity from the PA, the Seized Funds must be released.

## III.    The Plaintiffs' Claims Present a Non-Justiciable Political Question

As discussed above, OFAC, an executive department of the federal government, has ruled that the PMA is independent from the PA.[5] OFAC is an Executive Branch agency responsible for enforcing economic and trade sanctions based on U.S. foreign policy and national security goals. The sanction regulations administered by OFAC encompass, in OFAC's words, a "foreign affairs function". *See* 71 Fed. Reg. 27199 (May 10, 2006). Hamas has been designated

---

[5] *See* http://www.treas.gov/offices/enforcement/ofac/

as a target of these sanction regulations by the President,[6] and, as a result, U.S. persons may not

deal in property or interests in property of Hamas. Subsequently, OFAC determined that Hamas

has an interest in the PA.[7] As such, OFAC restricted U.S. persons' dealings with the PA.[8]

However, on April 12, 2006, OFAC set forth an official policy statement proclaiming the PMA

to be an agency independent of the PA, and as a result OFAC authorized transactions with the

PMA by U.S. persons. *See* OFAC General License No. 4 (April 12, 2006).

The political question doctrine prohibits courts from exceeding their constitutional

authority. See *Baker v. Carr*, 369 U.S. 186, 217 (1962); *Jones v. Beame*, 45 N.Y.2d 402, 408-09

(1978) (courts should "abstain from venturing into areas if it is ill-equipped to undertake the

responsibility and other branches of government are far more suited to the task") *citing Baker* at

208-237 (1962); *Palestine Monetary Authority v. Strachman*, 2007 WL 1063867. The Doctrine

"excludes from judicial review those controversies which revolve around policy choices and

value determinations constitutionally committed for resolution to the halls of Congress or the

Confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Society*, 478 U.S.

221, 230 (1986); *Bancoult v. McNamara*, 445 F.3d 427 (D.C. Cir. 2006) (affirming complaint

dismissal based on lack of subject matter jurisdiction under the political question doctrine).

A six point test, as set forth in *Baker*, is applied when deciding the political question

doctrine. Each prong stands on its own and the court need only conclude that one factor is

present to preclude justiciability. *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005).

---

[6] Hamas' property and interests in property are blocked under three distinct OFAC-administered economic sanctions programs: 1) the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594; (20 the Terrorism Sanctions Regulations, 31 C.F.R. Part 595; and 3) the Foreign Terrorist Organizations Sanctions Regulations, 31 C.F.R. Part 597.

[7] See OFAC Recent Action Notice, dated April 12, 2006, available at,
http://www.treas.gov/offices/enforcement/ofac/actions/20060412.shtml.

[8] The OFAC anti-terrorism regulations apply to all U.S. persons, including all U.S. citizens and permanent resident aliens regardless of where they are located, all persons and entities within the U.S., all U.S. incorporated entities and their foreign branches.
http://www.ustreas.gov/offices/enforcement/ofac/faq/answer.shtml.

The elements are whether: 1) there is a commitment of the issue to a coordinate political department; 2) there are judicially discoverable and manageable standards for resolving the issue; 3) a non-judicial discretionary policy determination must be made in order to resolve the issue; 4) the court's undertaking independent resolution of the issue would express a lack of respect due to a coordinate branch of government; 5) there is an unusual need for unquestioning adherence to a political decision already made; and 6) there exists the potential for embarrassment were the court to rule differently from another political department on the issue. *Baker*, *supra* at 217.

Based on the Executives Branch's determination that the PMA is independent of the PA, several of the factors set forth in *Baker* are present rendering the subject matter of this action non-justiciable.

**a.    There Exists a Textually Demonstrable Constitutional Commitment of the Issue to a Coordinate Political Department**

Whether the PMA is an alter ego or a part of the PA is an issue that clearly involves "policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Id.*  Resolution of this question has far - reaching foreign policy and national security implications.  The Executive Branch has determined that national security and foreign policy issues dictate that U.S. dealings with the PA be carefully regulated.

It is well-settled that foreign policy and national security issues are constitutionally committed to the Executive and Legislative Branches of the U.S. government and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision. *See Schneider*, 412 F.3d at 194-95 (setting forth the extensive constitutional support for the commitment of foreign policy and national security decisions to the Executive and

Legislative Branches, but not the Judiciary); *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302

(1918) ("The conduct of the foreign relations of our Government is committed by the

Constitution to the Executive and Legislative – 'the political' – Departments of the Government,

and the propriety of what may be done in the exercise of this political power is not subject to

judicial inquiry or decision").

b.    **The Court's Undertaking Independent Resolution of the Issue Would Express a
      Lack of Respect Due to a Coordinate Branch of Government**

OFAC obviously has many resources available to it – such as intelligence sources and

policy advisors – that can reach far beyond the jurisdiction of this Court and the realms of

permissible discovery under the C.P.L.R.  OFAC is therefore best placed to make the

determination as to the PMA's legal standing relative to the PA.  *See generally Jones*, 45 N.Y.2d

at 408-09.  As such, it would be impossible for the Court to undertake an independent resolution

of the question at hand without expressing a "lack of respect due coordinate branches of

government." *Schneider*, 412 F.3d at 197-98.  For the same foregoing reasons and in terms of

point three of the *Baker* factors, the Court will be unable to make a determination without

passing judgment on the policy decision made by OFAC in determining that the PMA is separate

from the PA.

c.    **There is an Unusual Need for Unquestioning Adherence to a Political Decision
      Already Made**

The way in which the U.S. conducts its affairs on issues intertwined or related to the

unique aspects of the Israeli-Palestinian situation satisfies the unusual need for this Court to

exercise unquestioning adherence to the political decision already made by the Executive Branch

regarding the PMA.  *See Doe v. State of Israel*, 400 F. Supp. 2d 86, 111-12 (D.D.C. 2005) ("It is

hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-

Palestinian conflict, which has raged on the world stage with devastation on both sides for decades. The region of the Middle-East specifically, and the entire global community generally, is sharply divided concerning these tensions; American foreign policy has come under attack as a result. Courts have observed that 'foreign policy is constitutionally committed to the political branches, and disputes over foreign policy are non-justiciable political questions.') *citing Haig v. Agee,* 453 U.S. 280, 292 (1981). U.S. foreign relations in this area are understandably delicate and there is strong need for the U.S. to speak with a single voice on any issues touching this region.

**d.    There Exists the Potential for Embarrassment Were the Court to Rule Differently From the Executive Branch on the Issue**

As Justice Kornreich acknowledged, there exists the real danger of embarrassment on the issue of PMA's legal status should the court rule differently from the Executive Branch on the issue. As well as potentially causing embarrassment, a different decision by this Court on the alter ego question would violate the Supremacy Clause of the U.S. Constitution (Art. VI, cl. 2). *See Crosby v. National Foreign Trade Council,* 530 U.S. 363 (2000). In *Crosby,* the issue was whether a Massachusetts law restricting state contracts with companies doing business with or in Burma was invalid under the Supremacy Clause owing to its threat of frustrating federal statutory objectives. *530 U.S. at 366-367.* In *Crosby,* Congress had provided the President with express statutory authority (pursuant to the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 ("the federal Act")) to "exercise economic leverage against Burma, with an eye towards national security." *530 U.S. at 375-76.*

The Supreme Court held that the Massachusetts Burma law, if enforced, would "blunt the consequences of discretionary Presidential action" by imposing a different, state system of economic pressure against the Burmese political regime. *530 U.S. at 376.* Specifically, the state

law penalized some private action that the federal Act did not and its sanctions were immediate, perpetual and had no termination provision. *Id.* at *376-77.* The Court held that Congress "manifestly intended to limit economic pressure against the Burmese Government to a specific range" and the state law frustrated that intent. *Id.*

As such, any subsequent state action on the question of the PMA's relationship with the PA would undermine and likely conflict with Congress' investiture of power in the President in violation of the Supremacy Clause. Finally, even if the Court were to reach the same decision as the Executive Branch, there is no guarantee that the decision will not extend beyond the parameters intended by OFAC.

For the foregoing reasons, the Court should dismiss the instant matter as it represents a non-justiciable political question.[9]

## IV.     The Seized Funds Have Been Restrained in Violation of U.C.C. Article 4A

By continuing to withhold the Seized Funds, BNY is in violation of New York Unified Commercial Code Article 4A which states in relevant part, "For proper cause and in compliance with applicable law, a court may restrain (i) a person from issuing a payment order to initiate a funds transfer, (ii) an originator's bank from executing the payment order of the originator, or (iii) the beneficiary's bank from releasing funds to the beneficiary or the beneficiary from withdrawing the funds. A court may not otherwise restrain a person from issuing a payment order, paying or receiving payment of a payment order, or otherwise acting with respect to a funds transfer." U.C.C. § 4-A-503. *Emphasis added.* The Official Comment for N.Y. U.C.C. § 4-A-503 provides that Section 4-A-503 is "designed to prevent the interruption of a funds transfer after it has been set in motion." The Official Comment further provides that

---

[9] As discussed above, Justice Shirley W. Kornreich of the Supreme Court of The State of New York has already ruled that this issue represents a non-justiciable political question after applying the six factors presented in *Baker.* *See Palestine Monetary Authority v. Strachman,* 2007 WL 1063867 (N.Y. Sup.), 2007 N.Y. Slip. Op. 27144 (2007).

intermediary banks are specifically protected from injunctions. *See also Weston Compagnie De Finance Et D'Investissment, S.A. v. La Republic Del Ecuador*, 1993 WL 267282, No. 93 Civ. 2698 (LMM) (S.D.N.Y. July 14, 1993) (a court may only restrain funds "prior to initiation by the originator, prior to execution by the originator's bank, prior to release of funds by the beneficiary's bank, and prior to withdrawal of funds"). By acting on the Restraining Notice and Notice of Injunction, BNY interrupted the funds transfer process after it had been initiated but prior to its completion.

As articulated above, in October 2005, Justice Shirley W. Kornreich of the New York Supreme Court agreed with the PMA's position, and after a hearing, redacted the PMA from the *Ungar* State Restraining Notice, finding that the State Restraining Notice violated Article 4A of the New York Uniform Commercial Code. *See* Exh. __ at ___. In her April 2, 2007 Order, Justice Kornreich recognized that by continuing to restrain the Seized Funds, BNY was in violation of N.Y. U.C.C. 4A. *See id.* BNY's continued refusal to release the Seized Funds in the face of its knowledge that the attachment was and always has been improper is without justification and results in continuing irreparable harm to the PMA.

**V.      The *Knox* Plaintiffs are Bound by the April 2, 2007 Decision and Order Issued by Justice Shirley W. Kornreich of the Supreme Court of the State of New York, County of New York on *Res Judicata* Grounds**

As stated above, the plaintiffs in *Knox* and *Ungar* are represented by David Strachman and Robert J. Tolchin and the *Knox* plaintiffs' interests are identical to those of the *Ungar* plaintiffs. Plaintiffs in a subsequent case may be bound by the prior case if their interest is identical to that of the prior plaintiffs and they are controlled by the same party, including an attorney. *See Ferris v. Cuevas*, 118 F.3d 122 (2d Cir 1997), where the prior and subsequent plaintiffs "shared a law firm which formulated an overarching strategy for the two actions." The

22

rule does not apply to two plaintiffs who happen to secure the same attorney for similar claims, but is intended to "prevent one controlling person . . .from bringing multiple suits in the names of different plaintiffs, and controlling the litigation from the shadows" as Messrs. Tolchin and Strachman are doing here.

[Argument to be further developed]

VI.     **Continued Restraint of the Seized Funds is Prohibiting the PMA from Performing Even Its Most Basic Function, Damaging its Relationship with Commercial Banks, Causing It to Suffer Substantial Monetary Damages, and Severely Harming its Goodwill and Reputation in the Middle East and Around the World**

The effects of the disingenuous acts of plaintiffs' counsel and the Bank of New York's unlawful restraint on the PMA's funds are deleterious and far-reaching. As discussed *supra*, for over two years, approximately $18 million of the wire transfers relating to the PMA have been subject to a restraining notice levied as a result of the judgment in the Rhode Island District Court matter *Ungar v. The Palestinian Authority, et al.*, C.A. No. 00105(L). The ramifications of this restraining notice have extended from quantifiable losses to the PMA's intangible assets. While the issue of whether the PMA was an *alter ego* or held funds of the named defendants was adjudicated by the New York State Supreme Court, the restraining order frustrated the PMA's reputation and its position as the central bank of the Palestinian Territories.

As detailed above, after nearly two years of litigation, the New York State Supreme Court ordered those funds to be released. Through March 31, 2007, the PMA has suffered in excess of $2.2 Million in lost interest and/or interest obligations on the Seized Funds. It continues to incur such damages at a rate in excess of $3,200 per day while the Seized Funds continue to be restrained (figure varies according to interest rate changes). While funds are frozen by BNY, the PMA cannot fulfill its obligations to the banks it serves and is prevented

23

from generating income. Moreover, the PMA has been forced to pay interest to the banks it

serves on funds that have been frozen by BNY. If BNY's improper restraint of the funds

continues, the PMA's relationship with the commercial banks it serves will continue to be

damaged and the PMA will continue to suffer substantial monetary damages as well as the loss

of its goodwill and reputation as a trusted member of the international banking community.

Thus, for the PMA, time is demonstrably of the essence as it seeks to resolve the status of the

Seized Funds.

**VII.    Plaintiffs Have Failed to State a Cause of Action For Turnover of the Seized Funds**

**a.    Plaintiffs Have Not Served the Judgment Debtor As Required by CPLR 5225 and 5227**

Plaintiffs' claim for turnover must be dismissed because plaintiffs have not shown or

alleged that the Complaint in this deferral action was served on the judgment debtors, the PA and

the PLO.[10]  Section 5227 of the N.Y. Civil Practice Law and Rules requires that "[n]otice of the

proceeding shall also be served upon the judgment debtor...." N.Y. C.P.L.R. § 5227; *Phoenician*

*Trading Partners LP v. Iseson*, No. CV-04-2178, 2004 WL 3152394, at *4 (E.D.N.Y. Dec. 11,

2004) ("because the proceeding divests the judgment debtor of any rights to the property in

possession of the third party, due process requires proper notice of the turnover proceeding").

Such notice must be served either "in the same manner as a summons or by registered or

certified mail, return receipt requested." N.Y. C.P.L.R. §5227

Here, there is no indication in the docket or in the served papers that plaintiffs have

complied with the requirement for service on judgment debtors, the PA and the PLO. Failure to

serve the judgment debtors is grounds for dismissal of the turnover claim. *See Phoenician*

*Trading Partners LP*, 2004 WL 3152394, at *4 (holding that "[t]o be entitled to judgment

---

[10] The PMA has never been served with the Complaint. While not the judgment debtor due process would call for service upon them as it is their property plaintiff seeks to obtain.

pursuant to §5225 or §5227, [the judgment creditor] must also have served …the judgment debtor…with notice of the proceeding[,] [and] [f]ailure to serve the judgment debtor renders the proceeding jurisdictionally defective") (citing *Oil City Petroleum Co. v. Fabac Realty Corp.*, 70 A.D.2d 859, 859, 418 N.Y.S.2d 51 (N.Y. App. Div. 1979)); *Bergdorf Goodman, Inc. v. Marine Midland Bank*, 97 Misc. 2d 311, 313, 411 N.Y.S.2d 90, 91 (N.Y. Civ. Ct. 1978) (holding that "there must be strict compliance with the provisions for service upon the judgment debtor" and that "improper notice to the judgment debtor alone would be sufficient ground to dismiss the petition").

b.   **Plaintiffs Have Not Adequately Pled That the PMA is an Alter Ego or Mere Department of the PA**

As stated above, [text to be provided by AD]

25

## CONCLUSION

For the foregoing reasons and the reasons set forth in the accompanying

Affirmation of Scott R. Emery in Support of the Palestine Monetary Authority's Order to

Show Cause for Preliminary Injunction and for an Order Vacating the Writ of Execution

and Dismissing the Complaint, the Palestine Monetary Authority respectfully requests

that this Court grant its motion for preliminary injunction and for an order dismissing the

complaint and releasing the Seized Funds immediately.

Dated: New York, New York
      May \_\_\_, 2007

                      Respectfully submitted,

                      LYNCH DASKAL EMERY LLP

                      By: _____
                      Scott R. Emery (SE \_\_\_\_)
                      264 West 40th Street
                      New York, New York  10018
                      Attorneys for *Plaintiff Palestine Monetary Authority*

                      Of Counsel:

                      Haig V. Kalbian
                      KALBIAN HAGERTY LLP
                      888 17th Street, NW, Suite 1000
                      Washington, DC 20006
                      (202) 223-5600

TO:    Robert J. Tolchin, Esq.
        Jaroslawicz & Jaros
        150 William Street, 19th Floor
        New York, NY  10038
        (212) 227-2780

        Attorneys for *Plaintiffs-Judgment Creditors*

Kenneth M. Bialo
Emmet, Marvin & Martin, LLP
120 Broadway, 32nd Floor
New York, NY  10271
(212) 238-3000

Attorneys for *Defendant-Garnishee The Bank of New York*